CLOSED_2006, HBS

# U.S. DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK [LIVE] (Buffalo)
## CIVIL DOCKET FOR CASE #: 1:05-cv-00798-JTE
### Internal Use Only

0 6 ⁓ 5 9 1 ⁓

Henrich v. Field et al
Assigned to: Hon. John T. Elfvin
Cause: 28:1332 Diversity - Stockholders Suits

Date Filed: 11/04/2005
Jury Demand: Plaintiff
Nature of Suit: 160 Stockholders Suits
Jurisdiction: Diversity

**Plaintiff**

**Christian J. Henrich**

represented by **David S. Widenor**
Damon & Morey LLP
1000 Cathedral Place
298 Main Street
Buffalo, NY 14202-4096
(716) 858-3813
Fax: 716-856-5537
Email: dwidenor@damonmorey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*



FILED

SEP 2 2 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

V.

**Defendant**

**John W. Field**
*individually*

represented by **Edward S. Mazurek**
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5019
Fax: 877.432.9652
Email: emazurek@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Maxwell**
Hodgson Russ, LLP
One M&T Plaza
Suite 2000
Buffalo, NY 14203
(716) 848-1495
Fax: 716-849-0349
Email: mmaxwell@hodgsonruss.com
*LEAD ATTORNEY*

ATTEST: A TRUE COPY
U.S. DISTRICT COURT, WDNY
RODNEY C. EARLY, CLERK

By _____
Deputy Clerk

*ATTORNEY TO BE NOTICED*

**Hugh M. Russ, III**
Hodgson, Russ, Andrews, Woods &
Goodyear
One M&T Plaza
Suite 2000
Buffalo, NY 14203
(716) 856-4000
Fax: 716-849-0349
Email: hruss@hodgsonruss.com
*ATTORNEY TO BE NOTICED*

**Michael E. Dash, Jr.**
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
215-963-5495
Fax: 215-963-5001
Email: mdash@morganlewis.com
*TERMINATED: 06/07/2006*

**Defendant**

**Joseph B. Elad**
*Individually*

represented by **Edward S. Mazurek**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Maxwell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hugh M. Russ, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Dash, Jr.**
(See above for address)
*TERMINATED: 06/07/2006*

**Defendant**

**Faith B. Elad**
*Individually*

represented by **Edward S. Mazurek**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Maxwell**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hugh M. Russ, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Dash, Jr.**
(See above for address)
*TERMINATED: 06/07/2006*

**Defendant**

**Quantum Leap Holdings, Inc.**     represented by **Edward S. Mazurek**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Maxwell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hugh M. Russ, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Dash, Jr.**
(See above for address)
*TERMINATED: 06/07/2006*

**Defendant**

**Quantum Leap Innovations, Inc.**     represented by **Edward S. Mazurek**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Maxwell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hugh M. Russ, III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Dash, Jr.**
(See above for address)

*TERMINATED: 06/07/2006*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/04/2005 | ◐1 | COMPLAINT against John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc. ( Filing fee $ 250 receipt number 18619.), filed by Christian J. Henrich. (Attachments: # 1 Exhibit A# 2 Exhibit B)(SG, ) (Entered: 11/09/2005) |
| 11/04/2005 | | ***Standby Magistrate Judge Hugh B. Scott, ***Set HBS Flags (SG, ) (Entered: 11/09/2005) |
| 11/04/2005 | ◐ | Summons Issued as to John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.. (SG, ) (Entered: 11/09/2005) |
| 02/16/2006 | ◐2 | MOTION for Leave to Appear Por Hac Vice by Michael E. Dash, Jr. for John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc..(JDK, ) (Entered: 02/17/2006) |
| 02/16/2006 | ◐3 | DECLARATION by Michael E. Dash Jr. in support of 2 MOTION for Leave to Appear Por Hac Vice filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc., (JDK, ) (Entered: 02/17/2006) |
| 02/16/2006 | ◐4 | DECLARATION by Michael E. Maxwell in support of 2 MOTION for Leave to Appear Por Hac Vice filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.,(JDK, ) (Entered: 02/17/2006) |
| 02/16/2006 | ◐5 | CERTIFICATE OF SERVICE by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc. re 4 Declaration, 2 MOTION for Leave to Appear Por Hac Vice, 3 Declaration (JDK, ) (Entered: 02/17/2006) |
| 02/16/2006 | | ***Attorney Michael E. Maxwell for John W. Field and Joseph B. Elad added. (JDK, ) (Entered: 02/17/2006) |
| 02/21/2006 | ◐6 | MOTION to Dismiss for Lack of Jurisdiction by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc..(Russ, Hugh) (Entered: 02/21/2006) |
| 02/21/2006 | ◐7 | DECLARATION signed by Franklin T. Abbott re 6 MOTION to Dismiss for Lack of Jurisdiction filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc., John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc. filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc., John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.. (Russ, Hugh) (Entered: 02/21/2006) |

| 02/21/2006 | ●8 | MEMORANDUM in Support re 6 MOTION to Dismiss for Lack of Jurisdiction filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.. (Russ, Hugh) (Entered: 02/21/2006) |
|---|---|---|
| 02/21/2006 | ●9 | CERTIFICATE OF SERVICE by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc. re 6 MOTION to Dismiss for Lack of Jurisdiction, 8 Memorandum in Support of Motion, 7 Declaration,, (Russ, Hugh) (Entered: 02/21/2006) |
| 02/22/2006 | ● | Set Deadlines as to 6 MOTION to Dismiss for Lack of Jurisdiction. Responses due by 3/31/2006. Replies due by 4/5/2006. Motion Hearing set for 4/7/2006 at 3:00 PM before Hon. John T. Elfvin. (RAZ) (Entered: 02/22/2006) |
| 02/24/2006 | ●10 | ORDER 2 that, MICHAEL E. DASH, JR., Esq., is granted leave to appear pro hac vice as counsel for defendants in this action. Signed by Judge John T. Elfvin on 2/23/06. (RAZ) (Entered: 02/24/2006) |
| 02/28/2006 | ● | Pro Hac Vice fee: $75, receipt number 20072 for Michael E. Dash, Jr. (SG) (Entered: 03/03/2006) |
| 03/31/2006 | ●11 | MEMORANDUM in Opposition re 6 MOTION to Dismiss for Lack of Jurisdiction *and for improper venue* filed by Christian J. Henrich. (Attachments: # 1 Exhibit To Memorandum of Law# 2 Irene Phillips Declaration# 3 Christian J. Henrich Declaration# 4 Exhibit A to CJH Declaration# 5 Exhibit B to CJH Declaration# 6 Exhibit C to CJH Declaration# 7 Exhibit D to CJH Declaration# 8 Certificate of Service)(Widenor, David) (Entered: 03/31/2006) |
| 04/05/2006 | ●12 | REPLY to Response to Motion re 6 MOTION to Dismiss for Lack of Jurisdiction *w/ certificate of service* filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.. (Attachments: # 1 Affidavit Supplemental Declaration of Franklin Abbott)(Dash, Michael) (Entered: 04/05/2006) |
| 04/07/2006 | ● | Minute Entry for proceedings held before Judge John T. Elfvin : Motion Hearing held on 4/7/2006 re 6 MOTION to Dismiss for Lack of Jurisdiction filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc. Motion argued. Defendants' can respond in writing to plaintiff's uncited case law no later than 4/13/06; any reply no later than 4/20/06; then motions submitted. Appearances: David S. Widenor, Michael E. Maxwell. (Court Reporter yg.) (JBS, ) (Entered: 04/13/2006) |
| 04/13/2006 | ●13 | MEMORANDUM in Support re 6 MOTION to Dismiss for Lack of Jurisdiction *Supplemental Memorandum* filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.. (Dash, Michael) (Entered: 04/13/2006) |
| 04/20/2006 | ●14 | RESPONSE in Opposition re 6 MOTION to Dismiss for Lack of Jurisdiction filed by Christian J. Henrich. (Attachments: # 1 Appendix Case Law Attached)(Widenor, David) (Entered: 04/20/2006) |

| 06/07/2006 | ●15 | ORDER granting leave to Michael E. Dash, Jr., Esq. to withdraw as counsel. Attorney Michael E. Dash, Jr. terminated. Signed by Hon. John T. Elfvin on 6/6/06. (RAZ) (Entered: 06/07/2006) |
| --- | --- | --- |
| 08/29/2006 | ●16 | RESPONSE in Support re 6 MOTION to Dismiss for Lack of Jurisdiction filed by John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc., Quantum Leap Innovations, Inc.. (Attachments: # 1 Exhibit)(Mazurek, Edward) (Entered: 08/29/2006) |
| 09/01/2006 | ●17 | NOTICE of Appearance by Edward S. Mazurek on behalf of all defendants (Mazurek, Edward) (Entered: 09/01/2006) |
| 09/01/2006 | | ***Attorney Edward S. Mazurek for John W. Field and Joseph B. Elad and Quantum Leap Holdings, Inc. and Quantum Leap Innovations, Inc. added (SG) (Entered: 09/05/2006) |
| 09/13/2006 | ●18 | MEMORANDUM AND ORDER that venue is improper in this District and the Clerk of the Court is directed to take all steps necessary to effectuate the transfer to the District of Delaware and to close this case in this District. Signed by Judge John T. Elfvin on 9/13/06. (RAZ) (Entered: 09/13/2006) |
| 09/13/2006 | | ***Civil Case Terminated. (SG) (Entered: 09/19/2006) |
| 09/13/2006 | | ***Set Closed Flags (SG) (Entered: 09/19/2006) |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTIAN J. HENRICH, ) | |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | |
| vs. ) | **JURY IS DEMANDED** |
| ) | |
| JOHN W. FIELD, individually, ) | |
| JOSEPH B. ELAD, individually, ) | Case No.:_____ |
| FAITH B. ELAD, individually, ) | |
| QUANTUM LEAP HOLDINGS, INC., ) | |
| QUANTUM LEAP INNOVATIONS, INC., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff, Christian J. Henrich ("Plaintiff"), by his attorneys, Damon & Morey LLP, as and for his Complaint against defendants above named, alleges, upon information and belief, as follows:

**NATURE OF THE ACTION**

1.    The nature of this action is for the recovery of monetary damages for wrongful termination of an employment agreement, breach of fiduciary duties to a shareholder, breach of contract, imposition of a constructive trust and accounting, conversion, and misrepresentation (innocent, negligent, and/or intentional), all arising from the wrongful conduct of the above named defendants.

2.    The relief sought is direct and indirect damages of over one million dollars ($1,000,000.00), with interest thereon, plus exemplary damages where applicable.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

4.      This Court has a basis for exercise of *in personam* jurisdiction over each defendant under New York Civil Procedure Law and Rules §§301 and 302.

5.      Venue is proper in this District under 28 U.S.C. §1391(a) as the events giving rise to the above-mentioned claims occurred in this District and the defendants are persons, corporations and/or legal entities subject to personal jurisdiction in this District due to their conducting business and/or directing business activities in this District.  Thus, the defendants are considered residents of this District, and venue proper, in accordance with 28 U.S.C. §1391(c).

## THE PARTIES

6.      Plaintiff, an attorney, admitted to practice in the States of Delaware and New York, is the former employee of Quantum Leap Innovations, Inc. ("Innovations"), and currently resides in the Town of Orchard Park, County of Erie, State of New York.

7.      Defendant Innovations was and is, at all times herein mentioned, a corporation organized under the laws of the state of Delaware with its principal place of business at 3 Innovation Way, Suite 100, Newark, Delaware.

8.      Defendant Innovations was and is, at all times herein mentioned, engaged in the business of software programming and development.

9.      Defendant Quantum Leap Holdings, Inc. ("Holdings"), was and is, at all times herein mentioned, a corporation organized under the laws of the State of Delaware with its principal place of business at 3 Innovation Way, Suite 100, Newark, Delaware.

10.     Defendant Holdings was and is, at all times herein mentioned, engaged in the business of holding stock in Innovations, Quantum Leap Life Sciences, Inc., Quantum Leap

Research Inc. ("Research"), Quantum Leap Interactive, Inc., Quantum Leap Solutions, Inc., Quantum Leap Technologies, Inc., and   (collectively referred to as "Quantum Entities").

11.     Defendant John W. Field ("Field") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

12.     Defendant Field was and is, at all material times herein mentioned, the Chairman of the Board of Directors of Holdings.

13.     Defendant Field was and is, at all material times herein mentioned, a substantial shareholder of Holdings.

14.     Defendant Joseph B. Elad ("JB Elad") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

15.     Defendant JB Elad was and is, at all times herein mentioned, the Chief Executive Officer and/or President of Innovations.

16.     Defendant JB Elad was and is, at all times herein mentioned, a member of the Board of Directors of the Quantum Entities.

17.      Defendant Faith B. Elad ("FB Elad") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

18.     Defendant FB Elad was and is, at all material times herein mentioned, the majority shareholder of Holdings.

19.     Defendant FB Elad was and is a member of the Board of Directors of the Quantum Entities.

20.     Defendant FB Elad was and is, at all material times stated herein, President of Holdings and Secretary of Innovations.

21.    For the sake of convenience, Defendants Innovations, Holdings, Fields, JB Elad, Fb Elad will be collectively referred to herein as the "Defendants".

## BACKGROUND FACTS
## COMMON TO ALL CAUSES OF ACTION

22.    The Quantum Entities, collectively, was and are, at all times herein mentioned, engaged in the business of developing unique, intelligent software solutions for government, military, and manufacturing customers.

23.    In October 2000, Defendants JB Elad and Field approached the Plaintiff to inquire whether the Plaintiff would be interested in joining the Quantum Entities as the head of business development.

24.    In 1999, the Plaintiff obtained a Masters in Business Administration from the University of Pennsylvania's Wharton School of Business.

25.    In 1999, the Plaintiff obtained a law degree from the University of Pennsylvania.

26.    From November 1, 2000 to about August 27, 2001, Defendant JB Elad and the Plaintiff agreed that the Plaintiff would provide Quantum Entities with consultant services (referred to as the "Initial Services" period).

27.    On behalf of the Quantum Entities, Defendant JB Elad and the Plaintiff agreed that the Plaintiff would receive deferred compensation during the Initial Services period.

28.    During the Initial Services period, the Plaintiff, as a consultant, provided not less than five hundred twenty-five (525) hours of service to the Quantum Entities.

29.    Defendant JB Elad repeatedly assured the Plaintiff that the Defendant JB Elad would "take care of [the Plaintiff], and treat [the Plaintiff] fairly for the services [the Plaintiff] was providing at the time" to the Quantum Entities despite the fact that the Quantum Entities were not financially viable.

30.    During March and April 2001, the Quantum Entities had nearly no cash receipts.

31.    In summer of 2000, Defendant Innovations bid for and was awarded a Phase II contract by the Air Force to develop a software program that (i) created the optimal schedule for downloading and uploading information from approximately 700 intelligence gathering satellites and (ii) scheduled launch and maintenance activities during the two week period prior to space shuttle launches (the "Air Force Project").

32.    Each of the satellite and launch scheduling projects had been deemed "unsolvable" by the United States Air Force Space Command ("Space Command") and submitted to industry competition for solutions.

33.    The Air Force Project started in May 2001.

34.    The Air Force Project generated sufficient cash flow to cover approximately 80% of the Quantum Entities' expenses during the approximately 15 month performance period.

35.    In late January of 2002, the Plaintiff undertook direct management of the Air Force Project.

36.    After commencement of the Air Force Project and in order to cover the Quantum Entities' negative cash flow, Defendant Field agreed to provide a $250,000.00 certificate of deposit (the "Field Certificate of Deposit") as collateral to enable the Quantum Entities to secure a line of credit in the same amount from Christiana Bank (the "Christiana Line of Credit").

37.    The Quantum Entities obtained the Christiana Line of Credit in August of 2001.

## THE EMPLOYMENT AGREEMENT

38.    From about May 1, 2001 to about August 15, 2001, Defendant JB Elad and the Plaintiff negotiated the terms of the Plaintiff's employment with Defendant Innovations.

39.    On August 27, 2001, Plaintiff and Defendant Innovations executed an Employment Agreement for an unspecified term as an at-will employee (the "Innovations Employment Agreement").

40.    A true and correct copy of the Innovations Employment Agreement, **Marked Exhibit "A"**, is attached hereto and incorporated by reference.

41.    Pursuant to the express terms of the Innovations Employment Agreement, Defendant Innovations employed the Plaintiff as the Chief Network Building Officer of Innovations.

42.    In addition to a base salary, in paragraph 3(a)(ii) of the Innovations Employment Agreement, Defendant Innovations agreed to issue to the Plaintiff three thousand, two hundred and fifty (3,250) shares of "Granted Stock" of Innovations with the following restrictions:

(a)    the Corporation shall have right to repurchase, for one cent ($.01) per share, 100% of the Granted Stock up to November 1, 2001 (the "Initial Vesting Date").

(b)    After the Initial Vesting Date, the Corporation shall have the right to repurchase from the Employee, for one cent ($.01) per share, the number of shares equal to the number that results from the following formula (the "Unvested Shares"):

$X$ = Total number of shares of the Granted Stock
$Y$ = Number of calendar months that have been completed subsequent to October 31, 2001

$[X * (.625)] - [Y * (.017361111) * X] = $ The Unvested Shares.

43.    At the time Plaintiff was wrongfully terminated by the Defendants, the Plaintiff owned 1,896 shares of Innovations stock (the "Vested Shares").

44.    The Plaintiff conditioned his execution of the Innovations Employment Agreement upon JB Elad's oral representation that (1) the Quantum Entities had no liabilities other than those set forth in their Balance Sheets and (2) Field's guarantee of a line of credit with Christiana Bank for not less than $250,000.00.

45.     At the time Plaintiff executed the Innovations Employment Agreement, the Quantum Entities had a "pipeline" of approximately $550,000 of future work and expenditures exceeded revenues by approximately $25,000 per month.

46.     On November 5, 2001 the Board of Directors of Holdings held a "special meeting" wherein the Board of Directors of Holdings ratified the issuance of three thousand, two hundred fifty (3,250) shares of restricted Common Stock of Holdings to the Plaintiff (the "Holdings Shares").

47.     The Vested Shares and Holdings Shares will collectively be referred to as the "Plaintiff's Shares."

### THE PROMOTION

48.     In February 2002, the Plaintiff was promoted to Chief Operating Officer of Innovations.

49.     In February 2002, at or about the same time as the Plaintiff was named the Chief Operating Officer of Innovations, Defendant JB Elad appointed the Plaintiff project manager of the Air Force Project, which, at the time, was the Quantum Entities' largest software project and principal source of revenue.

50.     As project manager of the Air Force Project, the Plaintiff was responsible for day-to-day management of the software development activities of approximately 10 software developers as well as coordinating testing and interaction with Space Command.

51.     At the time the Plaintiff was appointed project manager of the Air Force Project, Defendant JB Elad instructed the Plaintiff to "milk" the Air Force Project for "cash."

52.     At the time Plaintiff was appointed project manager of the Air Force Project, Defendant JB Elad also stated to the Plaintiff that Defendant JB Elad "expected nothing successful" from the Air Force Project.

53.     After the Plaintiff undertook project manager responsibilities for the Air Force Project, it became successful and was awarded the prestigious Tibbets award, which the Quantum Entities marketed to obtain additional business from the United States government.

54.     For three (3) successive months (April, May, and June of 2002), the Plaintiff agreed to accept one-half his normal monthly salary to help preserve the Quantum Entities' cash flow.

55.     On August 19, 2002, the Plaintiff received a superlative employment review that stated, among other things, that the Quantum Entities were "lucky to have you" and praised the Plaintiff for "fix[ing]" the Air Force Project.

56.     A true and correct copy of the employment review, Marked as **Exhibit "B"**, is attached hereto and incorporated by reference.

57.     At or about the time of the superlative employment review, the Quantum Entities rewarded the Plaintiff with a $250,000 life insurance policy.

## THE BUDNER PROMISSORY NOTE

58.     On or about Fall of 1998, Innovations entered into a promissory note whereby Mr. Stanley Budner, father-in-law to Defendant JB Elad, agreed to loan Innovations approximately $350,000.00 (the "Budner Liability") (collectively referred to as the "Budner-Innovations Loan Documents").

59.     At the time, Defendant JB Elad and FB Elad were the sole shareholders of Defendant Innovations.

60.     The Defendants never disclosed to the Plaintiff the Budner Liability before execution of the Innovations Employment Agreement.

61.     On July 26, 2002, the Board of Directors of Holdings resolved that in the event the Quantum Entities experienced a liquidity event of not less than $50,000,000.00, the Quantum Entities would pay Defendant JB Elad $500,000.00 for the purpose of satisfying the Budner Liability relating to the Budner-Innovations Loan Documents (the "Budner Resolution").

62.     On or about August 15, 2002, Defendant Field agreed to allow Christiana Bank ("Christiana") to receive the proceeds from the Field Certificate of Deposit that had been guaranteeing the Christiana Line of Credit in exchange for six thousand thirty (6,030) shares of Holdings.

63.     The Field Certificate of Deposit significantly reduced the Quantum Entities' financial obligations.

64.     In August 2002, as compensation for the Field Certificate of Deposit, the Board of Directors of Holdings issued six thousand thirty (6,030) shares of Holdings at a per share price of approximately forty-one dollars and fifty cents ($41.50) per share as payment for the Field Certificate of Deposit.

65.     During late August 2002, the Plaintiff discovered another set of loan documents establishing that a Quantum corporation wholly owned by Defendant JB Elad was solely liable for repaying the Budner Liability (the "Fake Budner Loan Documents.")

66.     When the Plaintiff confronted Defendant JB Elad about two sets of loan documents, in late August 2002, Defendant JB Elad told the Plaintiff that the Budner Liability was his personal obligation only and not Defendant Innovations' liability.

67.    In late August 2002, Defendant JB Elad instructed the Plaintiff to destroy the Budner Loan Documents obligating Holdings and/or Innovations to pay the Budner Liability.

68.    The Plaintiff refused to destroy either the Budner Loan Documents or the Fake Budner Loan Documents.

69.    Upon such refusal, Defendant JB Elad became extremely angry and stopped all verbal communication with the Plaintiff for several weeks.

## THE ANALYSIS

70.    At approximately the same time as Defendant JB Elad demanded that the Plaintiff destroy the Budner Loan Documents, Defendant Field instructed the Plaintiff to provide an analysis of how to reduce the Quantum Entities' expenditures and to identify all financial practices that would need to be altered to comply with demands of potential investors and/or auditors (the "Analysis").

71.    The Analysis set forth a number of recommended changes, including, among other matters, the following recommendations:

(a)    that the Quantum Entities cease paying Defendants JB Elad and FB Elad's handyman's salary as the handyman performed few or no services for the Quantum Entities;

(b)    reducing the monthly royalty payments to Research as excessive and unlikely to survive auditor scrutiny;

(c)    increase JB Elad's salary;

(d)    reduction of Defendant FB Elad's salary; and

(e)    introduction of a cost accounting system.

72.     In early September 2002, the Quantum Entities received official notice that it had been awarded a six million dollar project from the Office of Naval Research (the "Homeland Security Project").

73.     In August 2002, the Quantum Entities began an extensive hiring process, ultimately making permanent hires of approximately five (5) persons to commence work on the Homeland Security Project.

74.     During October 2002, the Quantum Entities received the Tibbetts Award from the Small Business Administration for the company's performance on the Air Force Project.

75.     The Tibbetts Award is given annually to approximately sixty (60) companies from a pool of two thousand, five hundred (2,500) companies for superlative performance on Phase II of the Small Business Innovation Research program.

76.     On or about November 5, 2002, the Plaintiff gave a well-received and successful brief to a collection of senior members of Space Command, including Lieutenant General Brian A. Arnold, regarding the Air Force Project.

## WRONGFUL TERMINATION

77.     On or about November 8, 2002, Defendant Field informed the Plaintiff that he was terminated, effective immediately.

78.     Defendant Field also assured the Plaintiff that "he would be treated fairly" and his shares, if repurchased, would be repurchased "for a fair price."

79.     Shortly after being terminated, the Plaintiff permanently moved his residence to New York.

80.     Upon information and belief, the Board of Directors of Innovations never met, as required by Section 8 of the Innovations Employment Agreement, to discuss termination of the Plaintiff.

81.     On November 18, 2002, after the Plaintiff moved to New York, Innovations sent the Plaintiff a corporate check in the amount of $13.54 to cover the repurchase of the Unvested Shares based upon the formula contained in paragraph 3(a)(ii) of the Innovations Employment Agreement.

82.     In early February 2003, the Plaintiff received a letter dated January 31, 2003 in the amount of $530.88 purporting to repurchase the Vested Shares for twenty-eight cents ($.28) per share.

83.     On or about February 18, 2003, the Plaintiff advised Defendants that the Plaintiff was rejecting the Defendants' offer to repurchase the vested shares as patently unfair and that the price was not establish pursuant to the express terms of the Innovations Employment Agreement.

84.     On March 13, 2003, Defendant JB Elad purportedly reaffirmed that the "fair market value as established by the Board of Directors was $.28/share."

85.     Upon information and belief, the Board never met to discuss the fair market value of Plaintiff's Vested Shares.

86.     On June 2, 2003, the Plaintiff sent a correspondence via facsimile to Defendant Field, Mike Bowman, and Defendant JB Elad stating that the "offer to purchase [the Plaintiff's] shares of stock is completely unacceptable."

87.     Neither, Defendant Field, Defendant JB Elad, nor any other representative of the Quantum Entities responded to the June 2, 2003 facsimile correspondence.

## FIRST CAUSE OF ACTION
### Unlawful Termination

88.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 87, inclusive, and incorporates them herein by reference.

89.    The State of Delaware has a substantial interest in officers and agents of a corporation preserving corporate records.

90.    Plaintiff was the Chief Operating Officer of Innovations and therefore responsible for all operations of the corporation, creation of corporate records, and legal matters.

91.    Defendant JB Elad instructed the Plaintiff to destroy corporate records to eliminate evidence of a substantial corporate liability.

92.    Destruction of such documents would have been a breach of the Plaintiff's fiduciary duty to Defendant Innovations and/or the Quantum Entities and unlawful.

93.    Upon information and belief, the Plaintiff was terminated for his refusal to destroy such documents.

94.    As a result of the Defendants' wrongful actions, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

## SECOND CAUSE OF ACTION
### Unlawful Termination:  Misrepresentation

95.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 94, inclusive, and incorporates them herein by reference

96.    Plaintiff executed the Innovations Employment Agreement on the express condition that the Quantum Entities disclosed all corporate liabilities.

97.     Defendant JB Elad intentionally misrepresented the extent of the debt obligations of the Quantum Entities in that he knowingly and purposefully concealed from the Plaintiff the existence of the Budner Liability in that prior to the Plaintiff becoming an employee of Innovations Defendant JB Elad stated to the Plaintiff that (a) the Quantum Entities had no further liabilities beyond those disclosed on the Quantum Entities' balance sheet and concealed the fact that the Quantum Entities, not Defendant JB Elad, was obligated to repay the Budner Liability.

98.     Plaintiff left Morris, Nichols, Arsht & Tunnel to join the Quantum Entities based, in part, upon Defendant JB Elad's misrepresentation.

99.     As a result of the Defendants' wrongful actions, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

### THIRD CAUSE OF ACTION
### Breach of Contract

100.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 99, inclusive, and incorporates them herein by reference

101.    In executing the Innovations Employment Agreement, Innovations agreed to pay a fair market value for the Vested Shares.

102.    The Defendants have refused to honor the terms of the Innovations Employment Agreement in that they have failed to pay the Plaintiff a fair market value for the Vested Shares.

103.    Based upon the default in performance and resulting breach of the Innovations Employment Agreement by the Defendants, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

## FOURTH CAUSE OF ACTION
### Conversion

104.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 103, inclusive, and incorporates them herein by reference.

105.    The Plaintiff is the rightful owner of the Vested Shares.

106.    The Defendants have converted for their own personal use and benefit the Vested Shares.

107.    The Defendants' conversion of the Vested Shares has resulted in the deprivation of the use, enjoyment and benefit of the Vested Shares to the Plaintiff.

108.    The Plaintiff has demanded that the Defendants repurchase the Vested Shares at a fair market value.

109.    The Defendants have intentionally and maliciously refused to repurchase the Vested Shares at a fair market value.

110.    As a direct and proximate result of the Defendants' wrongful conversion of the Vested Shares, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

111.    Additionally, by reason of the willful and malicious nature of the conversion, the Plaintiff is entitled to recover punitive damages in the amount of $300,000.00.

## FIFTH CAUSE OF ACTION
### Declaratory Action

112.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 111, inclusive, and incorporates them herein by reference.

113.    The Plaintiff seeks judgment as to Plaintiff's rights and ownership to the Vested Shares.

114.     Plaintiff seeks judgment that Defendants have not lawfully exercised its right to repurchase the Vested Shares.

115.     The Plaintiff seeks judgment as to Plaintiff's rights and ownership to the Holdings Shares.

116.     The Plaintiff has received no communication (such as a notice to stockholders) from any of the Defendants or the Quantum Entities in over two years even though, upon information and belief, Holdings has reorganized its capital structure during that period of time.

117.     A case and controversy exists between the parties as the Defendants have refused to repurchase the Vested Shares at a fair market value as required by the express terms of the Innovations Employment Agreement.

118.     Plaintiff has no adequate remedy at law.

119.     Plaintiff seeks a speedy hearing in respect to Plaintiff's prayer for relief regarding Plaintiff's rights and ownership in the Plaintiff's Shares.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duties

120.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119, inclusive, and incorporates them herein by reference.

121.     The wrongful conduct of Defendants JB Elad, FB Faith and Field ("Individual Defendants") constitutes a breach or breaches of fiduciary duties owed by them to the Plaintiff, as a stockholder of Innovations and/or constitutes gross mismanagement on the part of the Individual Defendants.

122.     The wrongful conduct of Individual Defendants constitutes a breach or breaches of fiduciary duties owed by them to the Plaintiff, as a minority stockholder of Holdings and/or constitutes gross mismanagement on the part of the Individual Defendants.

123.    As a direct and proximate result of the wrongful conduct of the Individual Defendants has been deprived of money and property, the full extent of which is not known.

124.    By reason of the foregoing, the Plaintiff has been damaged in the amount to be proven at trial, but in no event less than $1,000,000.00.

125.    The wrongful conduct of the Individual Defendants was gross, wanton, willful, malicious and deliberately designed to injure the Plaintiff, thereby entitling the Plaintiff to punitive damages of not less than $2,000,000.00.

## SEVENTH CAUSE OF ACTION
### Constructive Trust to Prevent Unjust Enrichment

126.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 125 inclusive, and incorporates them herein by reference

127.    By virtue of the Defendants' scheme and artifice to wrong the Plaintiff, the Defendant now unfairly and unjustly holds the Vested Shares.

128.    In purporting to acquire the Vested Shares under the circumstances set forth herein, the Defendants' wrongful activities are such that the Defendants may not in good conscience be allowed to retain the Vested Shares.

129.    Any further benefit to the Defendants based upon the use and enjoyment of the wrongful conversion of the Vested Shares will only result in further unjust enrichment to the Defendants.

130.    Based upon these facts and the nature of the Defendants' actions, the Court should impose a constructive trust upon the Vested Shares in favor of the Plaintiff, and declare the Defendants trustees over the Vested Shares until such time as this Court appoints an independent trustee.

131.    As trustee of the constructive trust, the Defendants should be made to account for the fair market value of the Vested Shares in Defendants' possession and control up to and through the time that this Court appoints an independent trustee and the Vested Shares are delivered to the trustee.

**WHEREFORE**, Plaintiffs demand judgment against the defendants as follows:

a.    On the **FIRST** and **SECOND CAUSES OF ACTION**, that Defendants wrongfully terminated the Plaintiff causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00;

b.    On the **THIRD CAUSE OF ACTION**, that Defendants breach the Innovations Employment Agreement causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00;

c.    On the **FOURTH CAUSE OF ACTION**, that Defendants have wrongfully converted the Plaintiff's Shares causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00; together with punitive damages in the amount of $300,000.00;

d.    On the **FIFTH CAUSE OF ACTION**, that judgment be entered declaring that the Plaintiff retains rights and ownership in the Vested Shares and Holdings Shares;

e.    On the **SIXTH CAUSE OF ACTION**, that the Individual Defendants, jointly and severally, have breached certain fiduciary duties to the Plaintiff causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $1,000,000.00; together with punitive damages in the amount of $2,000,000.00.

f.     On the **SEVENTH CAUSE OF ACTION**, that a constructive trust be imposed on the Defendants over the Vested Shares; and

g.     Against all Defendants, on all causes of action, for costs, disbursements, pre-judgment interest and post-judgment interest and such other and further relief as may be just, proper and equitable.

DATED:     Buffalo, New York
           November 4, 2005

                              **DAMON & MOREY LLP**


                              By: ___/s/ David S. Widenor_____
                                      David S. Widenor, Esq.
                              1000 Cathedral Place
                              298 Main Street
                              Buffalo, New York 14202
                              (716) 856-5500


954888 v2

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of August 27, 2001, by and between Quantum Leap Innovations, Inc., a Delaware corporation having a place of business at Three Innovation Way, Suite 100, Newark, Delaware 19711 (the "Corporation"), and Christian J. Henrich (the "Employee"), an individual residing in Wilmington, DE.

## W I T N E S S E T H:

WHEREAS, the Corporation and the Employee desire to set forth the terms and conditions on which, from and after August 27, 2001 (the "effective Date"), (i) the Corporation shall employ the Employee, (ii) the Employee shall render services to the Corporation and (iii) the Corporation shall compensate the Employee for such services;

WHEREAS, the Employee has provided substantial consulting services commencing upon November 1, 2000 (the "Initial Services") to the Corporation for which the Employee has, as of the Effective Date, not yet received compensation;

WHEREAS, the Initial Services were equal to approximately five hundred and twenty five (525) total hours;

WHEREAS, the Employee has agreed that the consideration received in this Agreement adequately compensates him for the Initial Services as well as future services to be provided by the Employee to the Corporation;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants herein contained, the parties agree as follows:

1.    EMPLOYMENT; DUTIES

(a)    The Corporation engages and employs the Employee, and the Employee hereby accepts engagement and employment, as the Chief Network Building Officer of the Corporation. The Employee shall perform such services and duties as are normally incident to such positions and are commensurate with the Employee's background, education and professional standing, all as the Board of Directors of the Corporation (the "Board") shall reasonably determine. Such services and duties will include, but are not limited to: i) business development, ii) supporting the effort to obtain financing for the Corporation, iii) serving as a liaison between the Corporation's officers and the Board of Directors of the Corporation, and iv) serving as the primary point-of-contact between the Corporation's legal counsel and the Corporation.

(b)    The Employee shall perform his duties hereunder from the Corporation's executive offices in the Delaware Technology park in Newark, Delaware; provided, however, that the Employee acknowledges and agrees that the performance of his duties hereunder may require domestic and international travel by the Employee.

(c)    The Employee shall devote such time and efforts to the Corporation as required for the proper discharge of his duties and responsibilities under this Agreement.

2.    TERM

The Employee's employment hereunder shall be for an unspecified term and shall be "at-will." Either the Employee or the Corporation may terminate the employment relationship at any time.

3.    COMPENSATION

(a)    As compensation for the performance of his duties on behalf of the Corporation, the Employee shall be compensated as follows:

(i)    The Corporation shall pay the Employee a base salary ("Base Salary") at the rate of ninety thousand dollars ($90,000) per annum which amount may be increased (but not decreased) by the Corporation; provided, however, that such Base Salary may be reduced below ninety thousand dollars ($90,000) in the event that there has been a general reduction in the base salaries of a majority of the senior officers of the Corporation; and provided, further, that any reduction to the Base Salary shall be proportional to such other salary reductions.

(ii)    Within sixty (100) days of the completion of the Effective Date, the Corporation shall issue the Employee three thousand two hundred fifty (3,250) shares of common stock of the Corporation, par value one cent ($.01) per share (the "Granted Stock"). The Granted Stock shall be subject to the following restrictions: the Corporation shall have right to repurchase, for one cent ($.01) per share, 100% of the Granted Stock up to November 1, 2001 (the "Initial Vesting Date"). After the Initial Vesting Date, the Corporation shall have the right to repurchase from the Employee, for one cent ($.01) per share, the number of shares equal to the number that results from the following formula (the "Unvested Shares"):

X = Total number of shares of the Granted Stock
Y = Number of calendar months that have been completed subsequent to October 31, 2001.

$[X * (.625)] - [Y * (.017361111) * X] = $ The Unvested Shares

By way of example, on November 30, 2001, the Employee shall have one thousand, two hundred seventy-five shares of vested Common Stock and the Unvested Shares shall equal one thousand, nine hundred seventy-five (1,975) shares. All of the shares of the Granted Stock that are no longer subject to the Corporation's right to repurchase for one cent ($.01) per share (i.e., no longer an Unvested Share) shall be referred to hereunder as the "Vested Shares".

(iii)    No share of the Granted Stock may be transferred without the written consent of the Corporation. In addition, the certificate representing the shares of the Granted Stock shall contain a legend substantially similar to the legend set forth below:

- 2 -

THESE SHARES HAVE NOT BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY
APPLICABLE SECURITIES LAW OF ANY JURISDICTION
AND MAY NOT BE TRANSFERRED UNTIL (i) A
REGISTRATION STATEMENT UNDER SUCH SECURITIES
ACT OR SUCH APPLICABLE SECURITIES LAWS SHALL
HAVE BECOME EFFECTIVE WITH REGARD THERETO, OR
(ii) IN THE OPINION OF COUNSEL ACCEPTABLE TO THE
COMPANY, REGISTRATION UNDER SUCH SECURITIES
ACT OR SUCH APPLICABLE SECURITIES LAWS IS NOT
REQUIRED IN CONNECTION WITH SUCH PROPOSED
TRANSFER.

THESE SHARES ARE SUBJECT TO TRANSFER
RESTRICTIONS SET FORTH IN THE STOCK TRANSFER
AGREEMENT BETWEEN QUANTUM LEAP HOLDINGS,
INC. AND CHRISTIAN J. HENRICH DATED AUGUST 27,
2001.

(iv)    The Base Salary and the Employee's additional participation in the
Corporation's stock option plan, shall be reviewed by the Corporation at the end of each year of
the Employee's employment but with no obligation to effect an increase in the Base Salary or to
grant additional options to purchase common stock of the Corporation.

The Corporation shall withhold all applicable federal, state and local taxes, social
security and workers' compensation contributions and such other amounts as may be required by
law or agreed upon by the parties with respect to the compensation payable to the Employee
pursuant to this Section 3(a).

(b)    The Corporation shall reimburse the Employee for all reasonable expenses
incurred by the Employee in furtherance of the business and affairs of the Corporation, including
reasonable travel and entertainment, against receipt by the Corporation of appropriate vouchers
or other proof of the Employee's expenditures and otherwise in accordance with such Expense
Reimbursement Policy as may from time to time be adopted by the Board of Directors of the
Corporation.

(c)    The Employee shall accrue paid vacation and shall be entitled to participate in all
health, dental, disability, life insurance and other employee benefits plans, including any 401(k)
or other retirement plans, as set forth in the Corporation's Employee Handbook, subject to
eligibility, enrollment or other requirements of such plans. The Employee shall also be entitled
to all other benefits generally made available to senior executive officers of the Corporation from
time to time.

- 3 -

4.    REPRESENTATIONS AND WARRANTIES BY
      THE EMPLOYEE AND CORPORATION

The Employee hereby represents and warrants to the Corporation as follows:

(a)    Neither the execution and delivery of this Agreement nor the performance by the Employee of his duties and other obligations hereunder (i) violate or will violate any statute, law, determination or award or (ii) conflict with or constitute a default under (whether immediately, upon the giving of notice or lapse of time or both) any prior employment agreement, contract or other instrument to which the Employee is a party or by which he is bound;

(b)    The Employee has the full right, power and legal capacity to enter into and deliver the Agreement and to perform his duties and other obligations hereunder.  This Agreement constitutes the legal, valid and binding obligation of the Employee enforceable against him in accordance with its terms.  No approvals or consents of any persons or entities are required for the Employee to execute and deliver the Agreement or perform his duties and other obligations hereunder;

(c)    The Employee shall devote his full time, attention and energies to the business of the Corporation and shall not so long as he remains an employee of the Corporation engage in any other business activity, whether or not such business activity is pursued for gain, profit or other pecuniary advantage;

(d)    The Employee is authorized to work in the United States and will provide proof of such authorization upon request by the Corporation; and

(e)    The Employee has read the Corporation's Employee Handbook and has an opportunity to ask questions regarding the policies contained therein.

The Corporation hereby represents and warrants to the Employee as follows:

(a)    The Corporation is duly organized, validly existing and in good standing under the laws of the State of Delaware, with all requisite corporate power and authority to own its properties and conduct its business in the manner presently contemplated.

(b)    The Corporation has full power and authority to enter into the Agreement and to incur and perform its obligations hereunder.

(c)    The execution, delivery and performance by the Corporation of the Agreement does not conflict with or result in a breach or violation of or constitute a default under (whether immediately, upon the giving of notice or lapse of time or both) the certificate of incorporation or by-laws of the Corporation, or any agreement or instrument to which the Corporation is a party or by which the Corporation of any of its properties may be bound or affected.

- 4 -

5.    NON-COMPETITION

The Employee understands and recognizes that his services to the Corporation are special and unique and agrees that during the term of the Agreement and for one (1) year thereafter the Employee shall not in any manner, directly, on behalf of himself or any person, firm, partnership, joint venture, corporation, limited liability company or other business entity, enter into or engage in any business competitive with and employing the same or substantially similar technology of a type developed by the Corporation, either as an individual for his own account, or as a partner, joint venturer, executive, agent, consultant, salesperson, officer, director or shareholder of a firm, partnership, joint venture, corporation, limited liability company or other business entity operating or intending to operate within the market that the Corporation is, at the date of termination, conducting its business.    Notwithstanding the foregoing, if the Employee is terminated without Cause, as defined in Section 8 of the Agreement, this Section 5 shall not be binding on the Employee and shall have no force and effect.

6.    INVENTIONS; CONFIDENTIAL INFORMATION

(a)    All inventions, improvements, ideas, names, patents, trademarks, copyrights, and innovations (including all data and records pertaining thereto), whether or not reduced to writing, which the Employee may originate, make or conceive during the term of his employment or during the three (3) month period following the date of termination, either alone or with others, and which (i) are developed using equipment, supplies, facilities or trade secrets of the Corporation, (ii) result from work performed by the Employee for the Corporation or (iii) relate to the Corporation's business or current or anticipated research and development, shall be the exclusive property of the Corporation.

(b)    The Employee agrees that during the course of his employment and for a period of one (1) year after termination, he will not (i) disclose or make accessible to any other person, firm, partnership, joint venture, corporation, limited liability company or other business entity any technical, business and other information of the Corporation or its clients, whether or not in writing, which derives value, economic or otherwise, from not being generally known to the public or to any other person, firm, partnership, joint venture, corporation, limited liability company or other business entity who can obtain value from its disclosure or use, including, without limitation, technical or non-technical data, compositions, devices, methods, techniques, drawings, inventions, processes, financial data, financial plans, product plans, lists or information concerning actual or potential customers or suppliers, information regarding business plans and operations, methods and plans of operation, marketing strategies, sales and distribution plans or strategies, cost information, pricing strategies, and acquisition and investment plans ("Confidential Information"), (ii) use Confidential Information for himself or others, (iii) take any Confidential Information or reproductions thereof from the Corporation's facilities at any time during his employment by the Corporation, except in connection with the performance of the Employee's duties to the Corporation, or (iv) without the prior written authorization of the Corporation, publish any articles, journals or other scientific or marketing materials that contain any Confidential Information. The Employee agrees immediately to return all Confidential Information and reproductions thereof in his possession to the Corporation upon request and in any event upon termination of employment.  The foregoing notwithstanding, the

parties acknowledge and agree that the Confidential Information of the Corporation and/or its clients shall not include the following: (a) information already in the public domain or hereafter disclosed to the public through no fault of the Employee (including but not limited to knowledge of (i) the business of other companies in the field, (ii) general business methods, and (iii) the status of patents and other technology in the field (other than those of the Corporation)); (b) general knowledge about the medical field obtained through the Employee's academic or previous general business experience; (c) information that becomes available to the Employee from a source other than the Corporation, provided that such source is not bound by a confidentiality agreement with the Corporation and otherwise has the lawful right to disclose the same; or (d) information that any governmental or judicial authority requires that the Employee disclose, provided that in such case the Employee shall use his reasonable efforts to notify the Corporation promptly of any such requirement so that the Corporation shall have an opportunity to contest it.

(c)     Any and all information conceived, developed and/or made by the Employee while in the employ of Corporation and which is or may be of use to Corporation in its business or as a business shall be disclosed promptly to the Corporation and shall be the sole and exclusive property of the Corporation or its nominee and shall become part of Corporation's "proprietary information" as defined below; and whenever requested so to do by the Corporation (whether or not Employee is in the employ of Corporation at such time) the Employee shall execute any and all applications, assignments, and other instruments or writings which the Employer shall deem necessary or desirable, in order (1) to apply for and obtain copyrights, patents or other proprietary protection in the United States and foreign countries covering said proprietary information or (2) otherwise to protect its confidential and/or proprietary status and in order to assign, transfer and convey to the Corporation or its nominee the sole and exclusive right, title and interest therein. These obligations of Employee contained in this Agreement shall continue beyond the termination, for whatever reason, of the period of employment with respect to any proprietary information conceived, developed and/or made by the Corporation or to which the Corporation obtains access during his or her employment and shall bind such Employee and his or her assigns, executors, administrators or other legal representative.

For purposes of the Agreement, "Proprietary Information" shall mean any files, methods, processes, products, equipment, systems, know-how, customer lists and information and other information (including, without limitation, research and development information), which are patented, copyrighted, trademarked or held as trade secrets or as confidential information (whether because it relates to the business of clients or to the business of the Corporation or because it is useful to the Corporation in maintaining its competitive status) by the Corporation and are related to the Corporation's (i) development and sale of software systems and products and (ii) research activities.

## 7.    INJUNCTIVE RELIEF

The Employee hereby acknowledges that the Corporation has entered into this Agreement in reliance, among other things, upon the fulfillment by the Employee of the

covenants made by the Employee in Sections 5 and 6. The parties hereto acknowledge and agree that remedies at law for any breach of the provisions of Section 5 or 6 will be inadequate and if there is a breach or threatened breach by the Employee of any provisions of Section 5 or 6, the Corporation shall, in addition to all other remedies, be entitled to injunctive relief and specific performance.

8.    TERMINATION

(a)    The Employee's employment hereunder shall begin on the Effective Date and shall continue thereafter until terminated upon the first to occur of the following events:

      (i)    the death or Disability (as defined below) of the Employee;

      (ii)    termination by the Board of Directors of the Corporation, either with or without Cause; or

      (iii)    voluntary resignation by the Employee after providing the Corporation with at least thirty (30) days prior written notice.

(b)    Upon termination pursuant to clause (a)(i) above, the Employee (or the Employee's estate in the event of termination as a result of the death of the Employee) shall be entitled (i) to receive two (2) months salary and any other compensation or benefits required under applicable law or offered generally by the Corporation to its employees. "Disability" of the Employee shall be deemed to have occurred if the Employee, by virtue of any injury, sickness, or physical condition, is unable to perform substantially and continuously the duties assigned to the Employee hereunder for more than sixty (60) consecutive or ninety (90) non-consecutive days out of any consecutive twelve (12) month period, exclusive of any accrued vacation.

(c)    Upon termination pursuant to clause (a)(ii) for any reason other than for Cause: (i) the Employee shall be entitled to all health and other benefits described in Section 3(c) above for two (2) months unless the Employee becomes entitled to comparable health and other benefits provided by a new employer or contractor at such new employer or contractor's expense; and (ii) thereafter, the Employee shall have only those health and other benefits required by law. The Employee shall have no duty to mitigate the Corporation's obligations hereunder by seeking any employment or consulting arrangements after the Termination Date (and the receipt by the Employee of any compensation from employment or consulting arrangements following termination hereunder shall not reduce the severance compensation payable hereunder). If following the Termination Date the Employee becomes entitled to health and other benefits provided by a new employer or contractor at such new employer or contractor's expense, the Employee agrees to inform the Corporation promptly of such entitlement and to cooperate with the Corporation in terminating the Employee's coverage under the Corporation's benefit plans.

(d)    Upon termination for any reason, the Corporation shall have the right to repurchase each of the Vested Shares held by the Employee (or the Employee's estate in the

- 7 -

event of termination as a result of the death of the Employee) for the fair market value of such shares as shall be reasonably determined by the Board.

(e)     For purposes of this Agreement, "Cause" shall mean (i) any unlawful conduct of the Employee constituting a felony under the law, (ii) any dishonest conduct of the Employee involving moral turpitude and causing material harm to the Corporation, (iii) material substandard performance of the Employee's duties hereunder continuing beyond a period of thirty (30) days after written notice thereof by the Board of Directors or (iv) a material breach of any of the Employee's obligations (not occasioned by the Employee's death or Disability) hereunder after written notice by the Board of Directors and failure to cure within 30 days of such notice.

(f)     Upon the occurrence of a Constructive Termination Event (as defined below), the Employee shall have the right to terminate his employment with the Corporation upon at least thirty (30) days prior written notice. In the event such notice is given by the Employee within sixty (60) days following the occurrence of any Constructive Termination Event, such termination of employment shall be deemed, for all purposes of this Agreement (including, without limitation, Section 8(c) above), as a termination of the Employee's employment by the Corporation without Cause. As used herein, the term "Constructive Termination Event" means a material breach of or default under this Agreement by the Corporation which is not cured by the Corporation within thirty (30) days after its receipt of written notice thereof from the Employee.

9.     NOTICES

Any notice or other communication under this Agreement shall be in writing and shall be deemed to have been given upon receipt by the other party.

10.    SEVERABILITY OF PROVISIONS

If any provision of this Agreement shall be declared by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced in whole or in part, the remaining conditions and provisions or portions thereof shall nevertheless remain in full force and effect and enforceable to the extent they are valid, legal and enforceable, and no provision shall be deemed dependent upon any other covenant or provision unless so expressed herein.

11.    ENTIRE AGREEMENT; MODIFICATION

This Agreement contains the entire agreement of the parties relating to the subject matter hereof, and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein. No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.

12.    BINDING EFFECT

The rights, benefits, duties and obligations under this Agreement shall inure to, and be binding upon, the Corporation, its successors and assigns, and upon the Employee and his legal

representatives. This Agreement constitutes a personal service agreement, and the performance of the Employee's obligations hereunder may not be transferred or assigned by the Employee.

13.    NON-WAIVER

The failure of either party to insist upon the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver or relinquishment of future compliance therewith, and said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or condition of this Agreement on the part of either party shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

14.    GOVERNING LAW; CONSENT TO JURISDICTION. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE. EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND OF ANY FEDERAL COURTS LOCATED IN THE STATE OF DELAWARE FOR ALL PURPOSES IN CONNECTION WITH ANY ACTION OR PROCEEDING THAT ARISES FROM OR RELATES TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND HEREBY WAIVES ANY RIGHT IT MAY HAVE TO PERSONAL SERVICE OF SUMMONS, COMPLAINT OR OTHER PROCESS IN CONNECTION THEREWITH, AND AGREES THAT SERVICES MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH PARTY AT SUCH PARTY'S ADDRESS PROVIDED IN, OR DETERMINED IN ACCORDANCE WITH, SECTION 9 HEREOF.

15.    INDEMNIFICATION

As additional consideration for the Employee's agreement to perform the duties outlined herein, the Employee shall be held harmless for any activity in any suit brought against the Employee for actions undertaken on behalf of the Corporation and shall be indemnified by the Corporation (and shall receive advancements of expenses) to the maximum extent provided by law.

16.    MATERIAL CHANGE

In the event of a Material Change, the Employee may elect to have the Unvested Shares and all previously granted options vest immediately. A Material Change shall be defined as (i) any purchase of not less than seventy-five percent (60%) of the shares of all classes of stock of the Corporation if all such shares are treated as a single class of stock; (ii) any merger in which the Corporation is not the surviving entity; (iii) any sale of not less than seventy-five percent (60%) of the assets of the Corporation; or (iv) any public offering pursuant to a registration statement under the Securities Act of 1933.

17.    RULES OF CONSTRUCTION; HEADINGS

Words used herein, regardless of the number and gender used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires and, as used herein, unless the context otherwise requires, the words "hereof," "herein" and "hereunder," and words of similar import, shall refer to the Agreement as a whole and not to any particular provision hereof. The term "including" shall be deemed to mean "including, without limitation." The headings contained in the Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement.

18.    SURVIVAL

The obligations of the parties in Section 6, shall survive termination of this Agreement indefinitely. The obligations of the parties in Section 5 shall survive for one (1) years upon termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

QUANTUM LEAP INNOVATIONS, INC

By:    Joseph B. Elad
Title:    Chief Executive Officer

By:    Christian J. Henrich

- 10 -

# EXHIBIT B

**Name:** _Arejh_                                                                                    <u>**Date:**</u> 7/23/02

<u>**Supervisor:**</u> jbe

<u>**Position / Job Description:**</u> COO

<u>**Goals & Objectives of Review Period\*:**</u>
[\*Section C & D (or equivalent) of previous review]

---

<u>**Instructions:**</u>  Please complete the following form as a means to evaluating those Quantumites under your supervision. All questions refer to the last 6 months.  Provide examples as necessary.  This is a .dot file, please save your completed .doc files into your own directories.  Thank you.

### (A) Does X uphold Quantum Leap's Core Values?

#### 1. Be a pioneer

a. Does X communicate important information concerning the tasks they face and the business?  Do they do more than "just follow orders?"  Are they intelligent advisors - concerned that the orders make sense?
Yes to all.

b. Is X innovative?  Does X generate creative, original solutions to challenges?
Yes. Quite innovative.

c. Does X enjoy challenges?
Yes.  He loves them.

d. Is X too afraid of failure?
Never.

e. Is X willing to try new ideas?
Mostly.  There is still a little bit of risk-averse and logic left probably from legal background.  Not bad to have a bit of that.

f. Is X remaining current in his/her area of expertise?

I can't answer the legal side, but he is learning quickly on the software and AI side -- though there is much more to learn for all of us.

#### 2. Reach beyond

a. Does X constantly push his/herself to succeed personally?  Do they find useful work even when it is not assigned to them?
Yes.

b. Is X willing to take on tasks for the good of the team that are not within their comfort zone?  Provide examples?
Always. Aug Cog Program Mgmt. is an excellent example.

#### 3. Try another way

a. Does X work effectively to accomplish his/her tasks?  Does X use his/her time, experience and expertise effectively?  Has X actively and effectively tried to identify and avoid roadblocks?
Yes to all.

b. Does X make an adequate attempt to solve problems personally before bringing them to you?
Always.

c. Does X give up easily when forced with a challenge?  Does X exhibit too much persistence?
No, no.  Never.

#### 4. Be Fair

a. Does X respect the organizations' efforts and co-worker's time by making meetings on time?
Yes.  Perhaps the best here, though Frank is a tough competitor on that.

b. Does X give good estimates about the difficulty of accomplishing various tasks?
Yes.

c. Does X communicate clearly with the others inside and beyond QL?
Yes.

d. Does X shoulder his/her share of tasks?
More than his share.

e. Is X a good team player?
Yes.

f. Does X help out co-workers?
Always.  Though some may view strong personality and attention to detail as too much – I disagree.

g. When X makes a statement, can it be relied upon?

Yes.

## 5. Respect the individual

a. When X is part of your team, do you feel comfortable that X will deliver quality work on time and being fully prepared for teamwork?
Yes.

b. Is X receptive to your input?
Mostly, when he is not I believe it is a personality trait that I have too of trying to answer before hearing the entire argument.  Input-Process-Output would solve that.

c. Does X respect his/her coworkers? Supervisor?
Always, but sometimes it is misunderstood because of strong personality and what might be perceived by some as being too pushy, too detail oriented,  other small staff – I think that patience and a bit more maturity would solve all of that.

d. Is X a good listener?
Mostly.  Again, as for myself a bit more I-P-O would help here.

e. Does X ever act in a disruptive or team damaging way?
~~Rarely~~. Disruptive happened in the past; ~~rarely~~ *does not* happens anymore.  That was at least 75% my fault in most cases.

**(B) State X's principle accomplishments since his/her last review:**

1. Process for managing projects
2. Financial controls and reviews
3. Personnel controls and reviews
4. Business development, yes – believe it or not – business development (e.g. SPF in USAF; DuPont/Dow Kalrez)

*[handwritten: 5. Aug Pog Program Mgnt.  6. SPF fix-up @  7. Legal work / Capital structure  8. Juris hrworking]*

**(C) State 3 things you would like X to improve over the next review period:**

1. Be more patient  *realist*
2. Use more I-P-O ~~when communicating~~
3. Be ~~optimist~~ but also optimist; it is rough in high-tech startup: we must be realists and optimists at the same time and all the time

**(D) State/describe the key tasks/projects you'd like X to focus on over the next review period:**

1. Software project mgmt. and methodologies with Barry and Irene
2. Financial controls and mgmt. with Frank
3. Business development – any contribution to this is a BIG plus in the next 12-18 months  *{SPF mÉ blanc ; XY ≥}*
4. Patent filing process and effort – we must find a solution which allows us to continue to do this; perhaps hiring a paralegal part-time; other solutions, but this is a big concern re. process and mgmt. that I don't know how to s

**(E) Other comments/feedback:**

Lucky to have you. We are building an good team, but we will need an awesome team to win in a BIG way.

Case 2:05-cv-00599-SLR    Document 15-4    Filed 09/22/2006    Page 4 of 4



Employee _____    Date  8-19-02

Supervisor  Joseph B. Ell    Date  8|19|02

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

CHRISTIAN J. HENRICH,

                          Plaintiff,

        v.                                 Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                          Defendants.

———————————————————————

# NOTICE OF MOTION
# FOR ADMISSION *PRO HAC VICE*

| | |
|---|---|
| Nature of Action: | Wrongful termination/breach of contract. |
| Moving Party: | Defendants. |
| Directed To: | Plaintiff. |
| Date and Time: | To be scheduled by the Court, if required. |
| Place: | United States Courthouse, 68 Court Street, Buffalo, New York. |
| Supporting Papers: | Declaration of Michael E. Dash, Jr., dated February 14, 2006, and Declaration of Michael E. Maxwell, dated February 15, 2006. |
| Answering Papers: | If any, are required to be served at least three business days prior to the return date of this motion, in accordance with Local Rule 7.1(c). |
| Relief Requested: | An Order of this Court admitting Michael E. Dash, Jr. *pro hac vice* for purposes of representing the Defendants in this action. |
| Grounds for Relief: | Rule 83.1(i) of the Local Rules of the Western District of New York. |
| Oral Argument: | Not Requested. |

Dated:          Buffalo, New York
                February 15, 2006

                                        **HODGSON RUSS** LLP
                                        *Attorneys for Defendants*


                                        By:    _____
                                                Michael E. Maxwell
                                        One M&T Plaza, Suite 2000
                                        Buffalo, New York 14203
                                        (716) 856-4000


TO:     **DAMON & MOREY LLP**
        *Attorneys for Christian Henrich*
        David S. Widenor, of counsel
        1000 Cathedral Place
        298 Main Street
        Buffalo, New York 14202
        (716) 856-5500


000161/00867 GBDOCS 516145v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTIAN J. HENRICH,

                    Plaintiff,

v.                                                          Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                    Defendants.

---

# DECLARATION OF MICHAEL E. DASH, JR.
## IN SUPPORT OF MOTION
### FOR ADMISSION *PRO HAC VICE*

I declare, under penalty of perjury and pursuant to 28 U.S.C. Section 1746, that the following is true and correct:

1.    I make this declaration in support of the motion of Defendants to have me admitted *pro hac vice* in this case.

2.    I have been involved in the analysis and investigation of this case, and I am fully familiar with the pleadings in this action.

3.    My residence address is 220 French Road, Newtown Square, Pennsylvania 19073.

4.      Currently, I am an associate with the firm of Morgan, Lewis & Bockius LLP, located at 1701 Market Street, Philadelphia, Pennsylvania 19103.

5.      I graduated from Villanova University School of Law in 1997, and I was admitted to practice in the States of Pennsylvania and New Jersey in 1997. Thereafter, I was admitted to practice in the United States District Courts for the District of New Jersey in 1997, the Eastern District of Pennsylvania in 1999, and the Middle District of Pennsylvania in 2001. Also, I was admitted to practice in the United States Court of Appeals for the Third and Ninth Circuits in 2002. Since initial admission to the Bar, my area of practice has been Labor and Employment law.

6.      I am a member in good standing of every Bar to which I have been admitted. Further, I am an active member in the Philadelphia Bar Association.

7.      I have never been held in contempt of court, or censured in a disciplinary proceeding, suspended or disbarred by any court or admonished by any disciplinary committee of the organized bar, nor am I the subject of any pending complaint before any court.

8.      I am familiar with:  the provisions of the Judicial Code, 28 U.S.C. §§ 1130-1452, which pertain to jurisdiction of and venue in a United States District Court; the Federal Rules of Civil Procedure; the Federal Rules of Criminal Procedure; the Federal Rules of Evidence; the Local Rules of Practice of the United States District Court for the Western District of New York; the Revised Plan for the Prompt Disposition of Criminal Cases for the Western District of New York; the New York State Lawyer's Code of Professional Responsibility as adopted from time to time by the Appellate Divisions of the State of New York, and as interpreted and applied by the United States Supreme Court; the United States

- 2 -

Court of Appeals for the Second Circuit, and this court; and the Civility Principles of the United States District Court for the Western District of New York. A completed oath to the Court's Civility Principles is being submitted with this declaration.

9.    I agree to adhere faithfully to the New York State Lawyer's Code of Professional Responsibility as adopted from time to time by the Appellate Divisions of the State of New York.

10.    I agree to adhere to the Code of Professional Responsibility of the American Bar Association as adopted by the New York State Bar Association and am prepared to comply with all requirements necessary for my admission *pro hac vice*.

Dated: February 14, 2006

Michael E. Dash, Jr.

- 3 -

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF NEW YORK

## APPENDIX TO CIVILITY PRINCIPALS

## OATH OF OFFICE

I do solemnly swear (or affirm):

I will support the Constitution of the United States and the Constitution of the State of New York;

I will maintain the respect due to Courts of Justice and judicial officers;

I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust nor any defense except such as I believe to be honestly debatable under the law of the land;

I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with the truth and honor and will never seek to mislead the judge or jury by an artifice or false statement of fact of law;

I will maintain the confidence and preserve inviolate the secrets of my client and will accept no compensation in connection with his business except from him or with his knowledge or approval;

I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness unless required by the justice of the cause with which I am charged;

I will in all other respects conduct myself personally and professionally in conformity with the high standards of conduct imposed on members of the bar as conditions for the privilege to practice law in this State and before this Court.

Michael E. Dash, Jr.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTIAN J. HENRICH,

                              Plaintiff,

       v.                                              Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                              Defendants.

---

# DECLARATION OF MICHAEL E. MAXWELL
# IN SUPPORT OF MOTION
# FOR ADMISSION *PRO HAC VICE*

       I declare, under penalty of perjury and pursuant to 28 U.S.C. section 1746, that

the following is true and correct:

       1.     I am a member of the firm Hodgson Russ LLP, attorneys for Defendants.  I

was admitted to practice before this Court in 1988.

       2.     I make this declaration in support of the admission *pro hac vice* of

Michael E. Dash, Jr. on behalf of Defendants in this action.

       3.     Mr. Dash is an associate with the firm of Morgan, Lewis & Bockius LLP,

in Philadelphia, Pennsylvania, and, upon information and belief, is a member in good standing

with the bar of Pennsylvania.

4.    I have known and worked with Mr. Dash for the last several months and find him to be of high moral character and suitable for admission to the United States District Court for the Western District of New York.

5.    Also submitted in support of this motion is the accompanying Declaration of Michael E. Dash, Jr, dated February 14, 2006.

6.    I respectfully request that Michael E. Dash, Jr. be admitted *pro hac vice* in this action.

Dated: February 15, 2006

_____
Michael E. Maxwell

000161/00867 BFLODOCS 1459165v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTIAN J. HENRICH,

                            Plaintiff,

        v.                                                  Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                            Defendants.

---

## CERTIFICATE OF SERVICE

        I certify that I caused a copy of the Notice of Motion for Admission *Pro Hac Vice*, dated February 15, 2006, the Declaration of Michael E. Maxwell in Support of Motion for Admission *Pro Hac Vice*, dated February 15, 2006, and the Declaration of Michael E. Dash, Jr. in Support of Motion for Admission *Pro Hac Vice*, dated February 14, 2006, to be served by first class mail, on Damon & Morey LLP, David S. Widenor, of counsel, 1000 Cathedral Place, 298 Main Street, Buffalo, New York 14202, attorneys for Christian Henrich, on February 15, 2006.

                                    _____
                                    Amy Malachowski

000161/00867 BFLODOCS 1467481v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHRISTIAN J. HENRICH,

                              Plaintiff,

        v.                                              Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                              Defendants.

_____


# <u>NOTICE OF MOTION</u>


Nature of Action:          Contract/wrongful termination.

Moving Party:              Defendants.

Directed To:               Plaintiff.

Date and Time:             At a date and time to be determined by the Court.

Place:                     United States Courthouse, 68 Court Street, 7th Floor, Buffalo, New
                           York.

Supporting Papers:         Declaration of Frank Abbott, dated February 21, 2006, and
                           Memorandum of Law in Support of Motion to Dismiss, dated
                           February 21, 2006.

Answering Papers:          Pursuant to Local Rule 7.1(c), plaintiff is required to file and serve
                           answering papers, if any, at least eight (8) business days prior to
                           the return date of this motion.  Defendants intend to file and serve
                           reply papers.

Relief Requested:          An Order dismissing plaintiff's Complaint in its entirety, by reason
                           that this Court lacks personal jurisdiction over Defendants, and in
                           addition, is an improper venue for this action.

Grounds for Relief:        FED. R. CIV. P. 12(b)(2) and (b)(3).

Oral Argument:           Requested.


Dated:          February 21, 2006

                                        By: s/Hugh M. Russ, III
                                              Hugh M. Russ, III
                                              Michael E. Maxwell
                                        *Local Counsel for Defendants*
                                        Hodgson Russ LLP
                                        One M&T Plaza, Suite 2000
                                        Buffalo, New York 14203-2391
                                        (716) 856-4000
                                        mmaxwell@hodgsonruss.com


                                        Edward S. Mazurek (General Admission Pending)
                                        Michael E. Dash Jr. (Pro Hac Admission Pending)
                                        *Attorneys for Defendants*
                                        Morgan, Lewis & Bokius LLP
                                        1701 Market Street
                                        Philadelphia, Pennsylvania 19103
                                        (215) 963-5000
                                        mdash@morganlewis.com

TO:      **DAMON & MOREY LLP**
         *Attorneys for Christian Henrich*
         David S. Widenor, of counsel
         1000 Cathedral Place
         298 Main Street
         Buffalo, New York 14202
         (716) 856-5500


000160/00867 BFLODOCS 1472242v1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

CHRISTIAN J. HENRICH,

                Plaintiff,

     v.

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                Defendants.

Civil No.: 05-CV-0798

## DECLARATION OF FRANKLIN T. ABBOTT IN
## SUPPORT OF DEFENDANTS' MOTION TO DISMISS

I, FRANKLIN T. ABBOTT, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declare:

1.     The facts set forth herein are based on my own personal knowledge, information, and belief.

2.     I am currently employed by Quantum Leap Innovations, Inc. ("Innovations"). I am the Vice President of Administration and Finance at Innovations.

3.     I am authorized to make this declaration on behalf of the defendants.

4.     John W. Field, Joseph B. Elad, and Faith B. Elad all reside in the County of New Castle, Delaware. All of them work in the Corporate Defendant's principal place of

business in Newark, Delaware.  None of the individual defendants own real property in New York.

5.      Innovations has no New York place of business, mailing address, or telephone number.

6.      Innovations owns no real property in New York.

7.      Innovations has no employees based in New York .

8.      Innovations does not maintain a New York bank account and its shares are not listed on a New York stock exchange.

9.      Innovations does not actively solicit business in New York.

10.      Quantum Leap Holdings ("Holdings") is a holding corporation that is incorporated in the state of Delaware, and maintains its business address at 2700 Philadelphia Pike, P.O. Box 970 Claymont Drive Newark, Delaware 19703.

11.      Holdings has no places of business, operations, or contractual relationships with New York.

12.      Holdings owns no real property in New York.

13.      Holdings has no employees based in New York

14.      Holdings does not maintain a New York bank account and its shares are not listed on a New York stock exchange.

15.      Holdings does not actively solicit business in New York.

16.     Holdings owns stock in various affiliated Quantum Leap entities, including Quantum Leap Innovations, Quantum Leap Life Sciences, Quantum Leap Research, Quantum Leap Interactive, Quantum Leap Solutions, and Quantum Leap Technologies.

17.     None of Holdings' subsidiaries is incorporated in New York or maintains a place of business in New York.

18.     The employment agreement in question between Mr. Henrich and Innovations was negotiated in person over several meetings.  These meetings were initiated by Mr. Henrich who authored his own agreement.  None of these meetings took place in New York.  None of the agreement's terms were agreed upon in New York.  The contract itself was executed in Newark, Delaware.

19.     None of the complained-of conduct took place in New York.  All events related to this suit occurred in Delaware.

WHEREFORE, I respectfully request that this Court dismiss plaintiff's Complaint in its entirety, along with such other and further relief as this Court deems just.

Date:  February 21, 2006

__s/ Franklin T. Abbott_____

000160/00867 BFLODOCS 1472174v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTIAN J. HENRICH,

                              Plaintiff,

        v.                                                    Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                              Defendants.

---

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349

Edward S. Mazurek (general admission pending)
Michael E. Dash, Jr. (pro hac vice pending)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Dated:  February 21, 2006                    Attorneys for Defendants

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF RELEVANT FACTS ............................................................ 1

    A.    The Nature of Mr. Henrich's Claims Generally ...................................... 1

    B.    None of the Defendants Has Connections with New York Sufficient to
        Confer Personal Jurisdiction .................................................................... 4

        1.    The Corporate Entities Do Not Have Substantial Connections with
            New York .................................................................................... 4

        2.    The Individual Defendants Do Not Have Connections with New
            York ............................................................................................ 5

III.  ARGUMENT ...................................................................................................... 6

    A.    The Court Does Not Have Personal Jurisdiction Over Any of the
        Defendants ................................................................................................ 6

        1.    The Standard of Review .............................................................. 6

        2.    None of the Defendants are Subject to Personal Jurisdiction Under
            New York State Law ................................................................... 7

            a.    CPLR § 301 Does Not Provide a Basis for Personal
                Jurisdiction .................................................................... 7

            b.    CPLR §  302 Does Not Provide a Basis for Personal
                Jurisdiction .................................................................... 8

        3.    The Constitutional Requirements for the Exercise of Personal
            Jurisdiction Are Not Met. ......................................................... 11

            a.    The Minimum Contacts Test is Not Met .................... 13

            b.    The Court's Assertion of Personal Jurisdiction Over the
                Defendants Would Be Unreasonable. .......................... 13

    B.    Venue is Improper .................................................................................. 15

IV.   CONCLUSION .................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,
98 F.3d 25 (2d Cir. 1996) ...................................................................................9

Berk v. Nemetz,
646 F. Supp. 1080 (S.D.N.Y. 1986)..........................................................7, 8, 9,

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985)........................................................................................11

DiStefano v. Carozzi North America, Inc.,
286 F.3d 81 (2d Cir. 2001)...............................................................................6

International Shoe Co. v. Washington,
326 U.S. 310 (1945)........................................................................................11

In re Magnetic Audiotape Antitrust Litigation,
334 F.3d 204 (2d Cir. 2003)..............................................................................6

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
84 F.3d 560 (2d Cir. 1996)...........................................................6, 11,12,13,15

Maurice Silvera, Inc. v. Nat. Ctr. for Employment of the Disabled,
No. 02 Civ. 6223 (LMM), 2003 WL 262508 (S.D.N.Y. Feb. 6, 2003).......................7, 8

Roland v. Margi-Systems, Inc., 00-CV-0341E(M),
2001 U.S. Dist. LEXIS 2444 (W.D.N.Y. Feb. 28, 2001) ............................................10

### <u>STATUTES</u>

28 U.S.C. § 1391(a) ..................................................................................15, 16

CPLR. § 301 ............................................................................................7, 8

CPLR § 302 ..................................................................................7, 8, 9, 10, 11

### <u>RULES</u>

Fed. R. Civ. P. 12(b)(2)....................................................................................6, 7

Fed. R. Civ. P. 12(b)(3)......................................................................................18

I.    **INTRODUCTION**

This case has absolutely no connection with the State of New York, much less the

Western District of New York.  Nor do any of the Defendants have any meaningful connection

with either New York or this District.  Nor are any of the potential witnesses – save Plaintiff

Christian Henrich and his current counsel who employs him – located in either New York or the

Western District.  Nor are any of the relevant documents housed in either New York or the

Western District.  All of the Defendants, the overwhelming majority of the party- and third-party

witnesses likely to testify in this matter, and the relevant documents are located in the State and

District of Delaware, where all of the relevant events at-issue took place.

The only ostensible reason that the case was brought in this Court is because Mr.

Henrich currently works in Buffalo for the law firm that is representing him in this case.  That

particular happenstance, however, does not vest this Court with personal jurisdiction over the

Defendants, nor does it render this Court an appropriate venue for this suit.  Accordingly,

Defendants John Field, Joseph Elad, Faith Elad, Quantum Leap Holdings, Inc. ("Holdings"), and

Quantum Leap Innovations, Inc. ("Innovations") (collectively, "Defendants") hereby move

pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure to dismiss Mr. Henrich's

lawsuit for lack of personal jurisdiction and pursuant to Rule 12(b)(3) to dismiss for improper

venue.

II.    **STATEMENT OF RELEVANT FACTS**

A.    **The Nature of Mr. Henrich's Claims Generally**

This is an employment dispute.  Mr. Henrich worked for Innovations in Delaware

pursuant to an Employment Agreement that, according to its terms, was subject to Delaware law

and subject to enforcement in Delaware.  [See Compl. (Docket No. 1), at Ex. A].  Mr. Henrich

**TABLE OF CONTENTS**
(continued)

**Page**

was fired from Innovations in November 2002, and this lawsuit now arises directly from that employment termination.  [See Compl. at ¶¶ 6, 77 and Ex. A].

In Count One, Mr. Henrich asserts that Defendants discharged him in Delaware because, in Delaware, he refused to destroy a copy of a set of loan documents.  [See id. at ¶¶ 65-69, 93].  In Count Two, he asserts that Defendants – all of whom are located in Delaware according to the Complaint – wrongfully induced him to agree to the Employment Agreement (the "Agreement") he entered into with Innovations in Delaware in August 2001 by misrepresenting the financial health of the Delaware company.  [Id. at ¶ 97].  Finally, in Count Three, Mr. Henrich asserts that following his discharge, Innovations failed to pay him the fair market value of certain vested and unvested shares of Innovations he had received under the Delaware Employment Agreement.  [Id. at ¶¶ 101-102].  Counts Four through Seven are based on the same universe of alleged facts that underpin the first three counts.  Counts Four through Seven merely assert an alternative legal theory, e.g., breach of fiduciary duty, or request a specific form of relief, e.g., constructive trust.

The specific facts underlying Mr. Henrich's claims are largely irrelevant to this Motion.  Suffice it to say that Defendants vehemently deny his rather belated allegations of wrongdoing.  If this litigation progresses in an appropriate jurisdiction, the evidence will demonstrate that Mr. Henrich was appropriately discharged and received all of the compensation to which he was under his Employment Agreement.  The Complaint's allegations, however, are relevant to this Motion for two reasons:  (1) they emphatically demonstrate that Mr. Henrich has not set forth any facts on which this Court might find that it has personal jurisdiction over any of the Defendants; and (2) venue in this Court is not appropriate.  To the contrary, the Complaint

makes it very clear that this case's *only* connection to this District is Mr. Henrich's desire to sue in the location where he landed after he left Innovations' employ.

The Agreement on which Mr. Henrich's claims rest has no connection with New York whatsoever. The Agreement was negotiated in person during several meetings between Mr. Henrich and various individuals affiliated with Innovations. [See Declaration of Frank Abbott ("Abbott Decl."), at ¶ 18]. None of those meetings occurred in New York; they all occurred in Delaware. [Id. at ¶¶ 18,19]. The parties executed the Agreement in Delaware. [Id. at ¶ 18]. Significantly, paragraph 14 of the Agreement provides that "THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE." [Compl. Ex. A at p. 9 ¶ 14 (emphasis in original)]. Further, the Agreement provides that "EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND OF ANY FEDERAL COURTS LOCATED IN THE STATE OF DELAWARE FOR ALL PURPOSES IN CONNECTION WITH ANY ACTION OR PROCEEDING THAT ARISES FROM OR RELATES TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY …." [Id. (emphasis in original)].

**B.    None of the Defendants Has Connections with New York Sufficient to Confer Personal Jurisdiction**

**1.    The Corporate Entities Do Not Have Substantial Connections with New York**

Neither of the Corporate Defendants (Innovations and Holdings) has any substantial connection with the State of New York or the Western District. Holdings is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Newark, Delaware. [Compl. at ¶ 9]. As its name implies, Holdings is a holding

TABLE OF CONTENTS
(continued)

**Page**

corporation that holds stock in various affiliated Quantum Leap entities, including Innovations. [Abbott Decl. at ¶ 16]. None of Holdings' subsidiaries is incorporated in New York, maintains a place of business in New York, or employs any New York-based employees. [Id. at ¶ 17]. Holdings owns no real property in New York. [Id. at ¶ 12]. Holdings itself has no employees based in New York. [Id. at ¶ 13]. Holdings does not maintain any places of business, mailing addresses, or telephone numbers within New York. [Id. at ¶ 11]. Holdings does not maintain a New York bank account and its shares are not listed on a New York-affiliated stock exchange. [Id. at ¶ 14]. Holdings does not actively solicit business in New York. [Id. at ¶ 15].

Innovations, a subsidiary of Holdings, is a corporation organized under the laws of the State of Delaware and has its principal place of business in Newark, Delaware. [Compl. at ¶ 6]. Innovations does not maintain any places of business, mailing addresses, or telephone numbers within New York. [Abbott Decl. at ¶ 5]. Innovations owns no real property in New York. [Id. at ¶ 6]. Innovations has no employees based in New York. [Id. at ¶ 7]. Innovations does not maintain a New York bank account and its shares are not listed on a New York-affiliated stock exchange. [Id. at ¶ 8]. Innovations does not actively solicit business in New York. [Id. at ¶ 9].

**2.      The Individual Defendants Do Not Have Connections with New York**

The Individual Defendants (Mr. and Mrs. Elad, and Mr. Field) also have no substantial connection with New York. As noted in the Complaint, all of the Individual Defendants reside in New Castle County, Delaware. [Compl. at ¶¶ 11, 14, 17; see also Abbott Decl. at ¶¶ 4]. All of them work primarily in the Corporate Defendants' principal place of business in Newark, Delaware. [Abbott Decl. at ¶ 4].

**III.    ARGUMENT**

    **A.    The Court Does Not Have Personal Jurisdiction Over Any of the Defendants**

        **1.    The Standard of Review**

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." DiStefano v. Carozzi North Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001) (internal quotation and citation omitted); see also In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (same).  Prior to discovery, however, a plaintiff may defeat a motion to dismiss if the plaintiff sufficient facts that might establish personal jurisdiction.[1/]  Id.  The plaintiff's *prima facie* showing "must include an averment of fact that, if credited … would suffice to establish jurisdiction over the defendant."  Id.

In cases where – as here – the Court's subject matter jurisdiction in based in diversity, personal jurisdiction "is in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitution guarantee." Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).  Thus, in resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry.  Id.  First, the Court "must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process."  Id. (citation omitted).

---

[1/]    Obviously, any averments set forth in the Complaint are subject to the constraints of Rule 11 which effectively forecloses the Plaintiff in this case from meeting his burden.

Here, the Complaint's allegations are woefully inadequate to establish the Court's personal jurisdiction over any of the Defendants.  The Complaint merely alleges that after Mr. Henrich left Innovations' employ and moved back to New York, he exchanged three basic letters with Innovations.  There is no basis under which the Court might find that New York's jurisdictional requirements are met.  Moreover, even if *arguendo,* the Court were to find that that personal jurisdiction is appropriate under New York state law, the exercise of such jurisdiction would violate the Constitutional due process requirements.  Accordingly, the Complaint is ripe for dismissal under Rule 12(b)(2).

> **2.    None of the Defendants are Subject to Personal Jurisdiction Under New York State Law**

> **a.    CPLR § 301 Does Not Provide a Basis for Personal Jurisdiction**

In addition to New York's long-arm statute (discussed below), § 301 of the New York Civil Practice Law and Rules ("CPLR"), New York's general jurisdiction provision, permits the general exercise of personal jurisdiction over a foreign person or corporation if it is "engaged in such a continuous and systematic course of doing business [in New York] as to warrant a finding of its presence in this jurisdiction."  Maurice Silvera, Inc. v. Nat. Ctr. for Employment of the Disabled, No. 02 Civ. 6223 (LMM), 2003 WL 262508, at *3 (S.D.N.Y. Feb. 6, 2003) (internal quotation and citation omitted).[2/]  "The court must be able to say from the facts that the corporation is 'present' in the State, 'not occasionally or casually, but with a fair measure of permanence and continuity."  Id. (quotation and citation omitted).  "In determining

---

2/    CPLR § 301 provides that "[a] court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore."  It is intended to preserve the caselaw that developed regarding personal jurisdiction prior to New York's enactment of its long-arm statute, CPLR § 302.  See generally Berk v. Nemetz, 646 F. Supp. 1080, 1082 (S.D.N.Y. 1986).

**TABLE OF CONTENTS**

(continued)

**Page**

jurisdiction, New York courts have generally focused on the following factors:  The existence of an office in New York; the solicitation of business in New York; the presence of bank accounts and other property in New York; and the presence of employees or agents in New York."  Id. (quotation and citation omitted).  "The mere solicitation of business in New York by a foreign entity [alone] does not constitute doing business under § 301."  Berk, 646 F. Supp. at 1083.

Section 301 clearly provides no basis on which the Court might exercise personal jurisdiction over any of the Defendants.  Not one of the factors weighs in favor of a finding that any Defendant is "engaged in such a continuous and systematic course of doing business" in New York.  Indeed, there is no averment in the Complaint that remotely suggests that any Defendant is subject to the personal jurisdiction of this Court in this diversity action.

> **b.    CPLR § 302 Does Not Provide a Basis for Personal Jurisdiction**

CPLR § 302, New York's long-arm statute provides in relevant part:

(a)    Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1.    transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2.    commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3.    commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he:

-7-

**TABLE OF CONTENTS**
(continued)

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or  (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

> 4.    owns, uses or possesses property situated within the state.

CPLR § 302.  None of these four provisions is applicable here.

For a court to exercise jurisdiction under § 302(a)(1), "the claim must arise from the transaction of business within the state."  Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996).  "To invoke § 302(a)(1), a plaintiff must demonstrate that the defendants transacted business within New York and that the cause of action arises out of these activities."  Berk, 646 F. Supp. at 1083.  Here, there is no averment that any Defendant transacted business in New York and, more importantly, Mr. Henrich's claims do not arise out of any business transacted in New York.  To the contrary, his claims arise out of his employment in Delaware and his Delaware Employment Agreement.  Section 302(a)(1) provides no basis for the Court's exercise of personal jurisdiction over any of the Defendants.

Likewise, CPLR § 302(a)(2) is clearly not applicable because Mr. Henrich does not allege that any of the Defendants committed a tortious act within New York.  Again, all of the events that make up his claims – the purported misrepresentations that led to his hiring, his firing, and Innovations' valuation of the fair market value of his shares – are alleged to have occurred in Delaware.

TABLE OF CONTENTS
(continued)

Page

To establish jurisdiction under CPLR § 302(a)(3), a plaintiff must establish the following four elements: (1) the commission of a tort outside New York; (2) injury to the plaintiff inside New York; (3) that the defendant should reasonably have foreseen the consequences of its actions in New York; and (4) that the defendant derives substantial revenue from either goods or services consumed or rendered in New York or through interstate or international commerce. Roland v. Margi-Systems, Inc., 00-CV-0341E(M), 2001 U.S. Dist. LEXIS 2444 (W.D.N.Y. Feb. 28, 2001) (citation omitted). Assuming *arguendo* that Mr. Henrich can satisfy the first element, § 302(a)(3) is not applicable because none of the remaining three elements are met. Mr. Henrich's alleged injury did not occur in New York; he allegedly received false information which induced him to join Innovations in Delaware and was discharged in Delaware. Moreover, Innovations should not and could not have reasonably foreseen that any consequences of its alleged actions would be felt in New York since the company hired and fired Mr. Henrich in Delaware. Finally, none of the Defendants derives substantial revenue from New York. Section 302(a)(3) provides no basis for the Court's exercise of personal jurisdiction over any of the Defendants.

The final provision of New York's is obviously inapplicable. The Complaint contains no allegations that might establish that any of the Defendants "owns, uses or possesses any real property situated" in New York that might have any connection to the claims asserted in this case. Section 302(a)(4) provides no basis for the Court's exercise of personal jurisdiction over any of the Defendants.

**3.    The Constitutional Requirements for the Exercise of Personal Jurisdiction Are Not Met.**

Even if the Court were to find that New York's requirements for the exercise of personal jurisdiction were met, the Court should still dismiss Mr. Henrich's Complaint because

the exercise of such jurisdiction here would violate the due process clause of the United States

Constitution.  The due process requirement for personal jurisdiction, enunciated by the Supreme

Court in the seminal case of <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945), protects

a person without meaningful ties to the forum state from being subjected to binding judgments

within its jurisdiction.  By requiring "fair warning" that an individual's activities in a state may

subject him to suit there, the due process clause protects that person's liberty interest and "gives

a degree of predictability to the legal system that allows potential defendants to structure their

primary conduct with some minimum assurance as to where that conduct will and will not render

them liable to suit."  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 471-72 (1985).

  The due process test has two related components:  the "minimum contacts"

inquiry and the "reasonableness" inquiry.  The Court must determine whether the Defendants

have sufficient contacts with the forum state to justify the Court's exercise of personal

jurisdiction.  <u>Metropolitan Life Ins. Co.</u>, 84 F.3d at 567 (citing <u>International Shoe</u>, 326 U.S. at

316).  "The assessment of minimum contacts is fact-specific and must necessarily be tailored to

the circumstances of each case."  <u>Id.</u> at 570.  For purposes of this initial inquiry, a distinction is

made between specific and general jurisdiction.  <u>Id.</u> at 567.  Specific jurisdiction exists when "a

State exercises personal jurisdiction over a defendant in a suit arising out of or related to the

defendant's contacts with the forum."  <u>Id.</u>  (quotation omitted).  A court's general jurisdiction "is

based on the defendant's general business contacts with the forum state and permits a court to

exercise its power in a case where the subject matter of the suit is unrelated to those contacts."

<u>Id.</u> (citation omitted).  Because general jurisdiction is not related to the events giving rise to the

suit, "courts impose a more stringent minimum contacts test, requiring the plaintiff to

TABLE OF CONTENTS
(continued)

Page

demonstrate the defendant's 'continuous and systematic general business contacts.'" Id.

(quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)).

The second stage of the due process test "asks whether the assertion of personal

jurisdiction comports with 'traditional notions of fair play and substantial justice' – that is,

whether it is reasonable under the circumstances of the particular case." Id. (citing International

Shoe, 326 U.S. at 316).  The Supreme Court has held that the court must evaluate the following

factors as part of this reasonableness analysis:

> 1.    the burden that the exercise of jurisdiction
>        will impose on the defendant;
>
> 2.    the interests of the forum state in
>        adjudicating the case;
>
> 3.    the plaintiff's interest in obtaining
>        convenient and effective relief;
>
> 4.    the interstate judicial system's interest in
>        obtaining the most efficient resolution of the
>        controversy; and
>
> 5.    the shared interests of the states in furthering
>        substantive social policies.

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing

of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant

presents 'a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." Id. (quoting Burger King, 471 U.S. at 477).

### a.    The Minimum Contacts Test is Not Met

None of the Defendants have sufficient contacts with New York to satisfy the

minimum contacts test.  There are no New York contacts that have anything to do with the

claims in this case, and there is no basis alleged in the Complaint for the existence of minimum

contacts on the part of any Defendant.

None of the Defendants could or should not have reasonably believed that any of

them it would "haled into court" in New York regarding this matter.  All of the alleged events

occurred in Delaware.  This case is before this Court simply by virtue of Mr. Henrich's post-

employment migration to this jurisdiction.  His decision to resettle in New York after his

relationship with the Defendants ended does not establish the requisite minimum contacts

between each of the Defendants and New York.

> **b.      The Court's Assertion of Personal Jurisdiction Over the
> Defendants Would Be Unreasonable.**

Even if the Court were to find that some or all of the Defendants have sufficient

minimum contacts with New York, the assertion of personal jurisdiction over them would be

unreasonable.  None of the five factors weighs in favor of Mr. Henrich's choice of this forum.

First, litigating this case in Buffalo, New York will obviously impose a significant burden on the

Defendants.  As the Complaint correctly alleges, all of the Defendants are located in Delaware.

The relevant witnesses including those that work for the Corporate Defendants and third parties

are located in Delaware; neither Corporate Defendant employs any employees in New York.  All

of the relevant documents are located in Delaware.  The Defendants should not be required to

travel the roughly 450 miles between their homes and places of work in Newark, Delaware to

Buffalo, New York to defend themselves against claims that arise exclusively out of events

occurring in Delaware.

Second, New York has no greater interest in adjudicating this case than Delaware,

an obviously more appropriate forum for this case.  As all of the events at-issue occurred in

Delaware, Delaware law will govern.  Indeed, the parties agreed that Delaware law would

govern any disputes based on or arising out of the Agreement; all of Mr. Henrich's claims are either based on that Agreement or arise out of it.

Third, there is no reason Mr. Henrich must litigate his claims in this Court in order to obtain convenient and effective relief. Indeed, because of the physical location of the relevant witnesses, even if this litigation were to proceed in this Court, Mr. Henrich still would be required to travel significantly to Delaware, for example, to conduct discovery or trial depositions. Any argument that Mr. Henrich cannot obtain convenient and effective relief is undercut by his Agreement with Innovations, in which he specifically consented to the jurisdiction of the federal and state court systems in Delaware.

Fourth, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy does not point to this Court. "In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located." Metropolitan Life Ins. Co., 84 F.3d at 574. Again, all of relevant events occurred in Delaware. All of the relevant witnesses – save Mr. Henrich – are located there. Moreover, while this Court has the ability to interpret and apply the Delaware law that governs Mr. Henrich's claims, Delaware courts are certainly more familiar with that body of law and in a better position to apply it here. This jurisdiction is certainly not the most efficient forum in which to adjudicate Mr. Henrich's claims.

Finally, there are no substantive social policies that would be furthered by permitting this case to be heard in this Court as opposed to more appropriate venue such as the District of Delaware.

In short, none of the reasonableness factors weigh in favor of finding that it would reasonable to conduct this litigation before this Court. Subjecting the Defendants to this suit in the Western District would be contrary to "traditional notions of fair play and substantial justice"

and, thus, the Complaint should be dismissed for want of personal jurisdiction over the

Defendants.

>   **B.**    <u>**Venue is Improper**</u>

>        This Court is not an appropriate venue for this action.  Section 1391(a) of Title 28

sets forth the three general circumstances under which venue is appropriate in federal district

courts.  That section provides in relevant part:

>> A civil action wherein jurisdiction is founded only
>> on diversity of citizenship may, except otherwise
>> provided by law, be brought *only* in (1) a judicial
>> district where any defendant resides, if all
>> defendants reside in the same State, (2) a judicial
>> district in which a substantial part of the events or
>> omissions giving rise to the claim occurred, or a
>> substantial part of property that is the subject of the
>> action is situated, or (3) a judicial district in which
>> any defendant is subject to personal jurisdiction at
>> the time the action is commenced, if there is no
>> district in which the action may otherwise be
>> brought.

28 U.S.C. § 1391(a) (emphasis added).  None of these three options is applicable here.

>        Section 1391(a)(1) clearly does not render the Western District an appropriate

venue.  That section requires that "*all* defendants reside in the same State" as the federal district

court in which the action is filed.  That is obviously not the case here.  According to the

Complaint, all of the Individual Defendants reside in Delaware[3] and the Corporate Defendants

---

[3]     <u>See</u> Compl. at ¶ 11 ("Defendant John W. Field … was and is, at all times herein
        mentioned, an individual *residing in the County of New Castle, State of Delaware*")
        (emphasis added); ¶ 14 ("Defendant Joseph B. Elad … was and is, at all times herein
        mentioned, an individual *residing in the County of New Castle, State of Delaware*")
        (emphasis added); ¶ 17 ("Defendant Faith B. Elad … was and is, at all times herein
        mentioned, an individual *residing in the County of New Castle, State of Delaware*")
        (emphasis added).

are Delaware residents as well.[4/]  Section 1391(a)(1) indicates that the District of Delaware

would be an appropriate venue for this action.  It clearly provides no basis under which Mr.

Henrich may maintain suit in the Western District of New York.[5/]

Section 1391(a)(2) is likewise inapplicable.  A "substantial part of the events or

omissions giving rise to the claim" did not occur within the Western District; all of the alleged

events occurred (to the extent they occurred at all) in Delaware.  Similarly, there is no "property

that is the subject of the action" and there is certainly no such "property" located in the Western

District, in "substantial part" or otherwise.

Finally, § 1391(a)(3) is not applicable since this action could have been and

should have been brought in Delaware, the venue:  (1) where, according to the Complaint, "all

---

[4/]    See Comp. at ¶ 7 ("Defendant Innovations was and is, at all times herein mentioned, a
        corporation *organized under the laws of the state of Delaware* with its principal place of
        business at 3 Innovation Way, Suite 100, *Newark, Delaware*") (emphasis added); ¶ 9
        ("Defendant … Holdings was and is, at all times herein mentioned, a corporation
        *organized under the laws of the state of Delaware* with its principal place of business at 3
        Innovation Way, Suite 100, *Newark, Delaware*") (emphasis added).

[5/]    Section 1391(c) expands the number of districts in which a corporation might be found to
        "reside" for purposes of § 1391(a).  That section provides in relevant part:

> For purposes of venue under this chapter, a
> defendant that is a corporation *shall be deemed to
> reside in any judicial district in which it is subject
> to personal jurisdiction at the time the action is
> commenced.*

        (emphasis added).  Nevertheless, that expansion provides no basis on which to find that
        venue is appropriate.  As explained above, neither of the Corporate Defendants are
        subject to personal jurisdiction in the Western District and, thus, they cannot be found to
        "reside" in the Western District for purposes of § 1391(a).  Even if *arguendo* either or
        both Corporate Defendants were found to be subject to the Court's personal jurisdiction,
        the Court would still have to find that *all* of the Individual Defendants also "resided" in
        the New York; § 1391(a)(1) requires that "*all* defendants reside *in the same State*."
        (emphasis added).  Given the Complaint's clear statements regarding the Individual
        Defendants' residences in Delaware, that cannot be the case.

defendants reside;" and (2) where, according to the Complaint, "a substantial part of the events or omissions giving rise to the claim occurred." §1391(a)(1)-(2).

In short, none of options set forth in § 1391(a) are applicable.  The Western District is not an appropriate venue.  Accordingly, the Court should dismiss the Complaint under Rule 12(b)(3).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Defendants respectfully request that this Court find that it does not have personal jurisdiction over any of the Defendants and dismiss the Complaint pursuant to Rule 12(b)(2).  The Defendants also request that the Court find that venue is improper and dismiss the Complaint pursuant to Rule 12(b)(3) as well.

Respectfully submitted,


/s/      Hugh M. Russ III
Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349 (facsimile)
mmaxwell@hodgsonruss.com

Edward S. Mazurek (general admission pending)
Michael E. Dash, Jr. (pro hac vice pending)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Dated:  February 21, 2006                    Attorneys for Defendants

NITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHRISTIAN J. HENRICH,

                              Plaintiff,


        v.                                              Civil No. 05 CV 0798 E/SC


JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                              Defendants.

_____


# <u>CERTIFICATE OF SERVICE</u>


        I hereby certify that on February 21, 2006, I electronically filed the forgoing:

**Notice of Motion**, **Declaration of Frank Abbott**, and **Memorandum of Law in Support of**

**Motion to Dismiss**, all dated February 21, 2006, with the Clerk of the District Court using the

CM/ECF system, which then sent notification to the following CM/ECF participants in this case:


                David S. Widenor, Esq.
                Damon & Morey LLP
                1000 Cathedral Place
                298 Main Street
                Buffalo, New York 14202



                                        <u>s/Hugh M. Russ, III</u>


000161/00867 BFLODOCS 1472226v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

CHRISTIAN J. HENRICH,                                                        05-CV-0798E(Sc)

               Plaintiff,

     -vs-

JOHN W. FIELD, individually,                                                ORDER
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC. and
QUANTUM LEAP INNOVATIONS, INC.,

               Defendant.

———————————————————————

        Pursuant to the motion of Michael E. Maxwell, Esq., seeking leave for an order

permitting MICHAEL E. DASH, JR., Esq., of the law firm of Morgan, Lewis & Bockius,

LLP, 1701 Market St., Philadelphia, PA  19103  to appear *pro hac vice* as counsel in this

action on behalf of defendants,

        IT IS HEREBY **ORDERED** that, MICHAEL E. DASH, JR., Esq., be and hereby is,

upon satisfaction of Local Rule 83.1(l) and upon completion and filing of this Court's

Oath of Office, granted leave to appear *pro hac vice* as counsel for defendants in this

action.

DATED:        Buffalo, N.Y.

              February 23, 2006


                                        _____/s/ John T. Elfvin_____
                                                   JOHN T. ELFVIN
                                                      S.U.S.D.J.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| CHRISTIAN J. HENRICH, | ) | |
| | ) | Case No. 05 CV 0798 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN W. FIELD, individually, | ) | |
| JOSEPH B. ELAD, individually, | ) | |
| FAITH B. ELAD, individually, | ) | |
| QUANTUM LEAP HOLDINGS, INC., | ) | |
| QUANTUM LEAP INNOVATIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN OPPOSITION OF
## DEFENDANTS' MOTION TO DISMISS

DAMON & MOREY LLP
*Attorneys for Plaintiff*
1000 Cathedral Place
298 Main Street
Buffalo, New York  14202-4096
(716) 856-5500

David S. Widenor, Esq.
of Counsel

## TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

Preliminary Statement ............................................................................................ 1

Introduction ............................................................................................................ 1

Statement of Relevant Facts .................................................................................. 2

    a. The Plaintiff was not only an employee of Defendant
       Quantum, but was and is a shareholder of the Defendants
       Holdings and Quantum ................................................................................ 2

    b. The Defendants wrongfully sought to exercise their
       "right to repurchase" the Plaintiff's Shares while the
       Plaintiff was in New York .......................................................................... 3

    c. The Defendants engages in substantial interstate commerce,
       especially with the State of New York ....................................................... 5

Argument ............................................................................................................... 7

    A. Defendants have committed tortuous acts outside of New York
       that have injured the Plaintiff in New York, derive substantial
       revenue from interstate commerce, and should have reasonably
       foreseen the consequences of this action in New York pursuant to
       CPLR §302(a)(3). ....................................................................................... 9

    B. This Court has personal jurisdiction over the Defendants
       because the Defendants have "transacted business" in New York
       pursuant to CPLR §302(a)(1). .................................................................. 11

    C. This Court has personal jurisdiction over the Defendants
       because the Defendants have committed a tortuous act within
       the state pursuant to CPLR §302(a)(2). .................................................... 12

    D. Due Process is satisfied by the Defendants' contacts with
       New York and the Plaintiff's choice of forum is reasonable ......................... 13

    E. This Court has personal jurisdiction over the Defendants
       because the Defendants have "engaged in such a continuous
       and systematic course of doing business in New York as to
       warrant a finding of their presence in this jurisdiction." ................................ 15

II.     Without Question, Venue is proper in this District ........................................... 15

Conclusion ........................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

Alan Lupton Associates, Inc. v. Northeast Plastics, Inc.,
    482 N.Y.S.2d 647 (4th Dep't 1984) .............................................................................11

Bates v. C&S Adjusters, Inc.,
    980 F.2d 865 (2d Cir. 1992) ......................................................................................17

Black River Associates v. Newman,
    637 N.Y.S.2d 880 (4th Dep't 1996) ...........................................................................11

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985)......................................................................10, 13, 14, 15

DiStefano v. Corozzi,
    286 F.3d 81 (2d Cir. 2001) .......................................................................................7, 10

Hurn v. Oursler,
    289 U.S. 238 (1933)...........................................................................................7

Int'l Shoe Co. v. Washington,
    326 U.S. 310, 316, n15 (1945)...........................................................................13, 15

Kreutter v. McFadden Oil Corp.,
    71 N.Y.2d 460 (1988)........................................................................................9, 11

Marine Midland Bank, N.A. v. Miller,
    664 F.2d 899 (2d Cir. 1981) ......................................................................................7

Maurice Silvera, Inc. v. Nat. Ctr. For Employment of Disabled,
    2003 U.S. Dist. LEXIS 1755 (S.D.N.Y. 2003)...........................................................15

Parke-Bernet Galleries, Inc. v. Franklyn,
    26 N.Y.2d 13 (1970)...................................................................................10, 11

Polish v. Threshold Technology Inc.,
    72 Misc. 2d 610, 612 (Sup. Ct. 1972)........................................................................12

Retail Software Services v. Lashlee,
    854 F.2d 18 (2d Cir. 1988) .......................................................................................9

Roberts-Gordon, LLC v. Superior Radiant Products, Ltd.,
    85 F. Supp.2d 202 (W.D.N.Y. 2000)...............................................................7

Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, PC,
    927 F. Supp. 731 (S.D.N.Y. 1996) ...............................................................17

Steuben Foods, Inc. v. Morris,
    2002 U.S. Dist. LEXIS 13827 (W.D.N.Y. 2002) .....................................8, 11

Wachtel v. Storm,
    796 F. Supp. 114 (S.D.N.Y. 1992) ...............................................................18

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980)......................................................................................13

**Statutes**

28 U.S.C. §1391(a) ............................................................................................16
Civil Practice Law and Rules section 302(a)(1), (2) and (3)..................... passim
Civil Practice Law and Rules, section 301 .......................................................16

## PRELIMINARY STATEMENT

Plaintiff Christian J. Henrich ("Plaintiff"), by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to defendants John W. Field, Joseph B. Elad, Faith B. Elad, Quantum Leap Holdings, Inc. ("Holdings"), and Quantum Leap Innovations, Inc. ("Quantum") (hereinafter each individual defendant together with "Holdings" and "Quantum" will be collectively referred to as the "Defendants") motion to dismiss pursuant to Rule 12(b)(2) (lack of personal jurisdiction) and (b)(3) (improper venue) of the Federal Rules of Civil Procedure ("FRCP") (the "Motion"). For the following reasons, this Court should deny the Defendants' Motion in its entirety.

## INTRODUCTION

The Defendants' Motion fails in large part because the Defendants conveniently ignore a significant aspect of the nature of this action (i.e., Defendants ignore 5 out of 7 of the causes of action alleged in the Plaintiff's complaint, despite the fact that all causes of action are factually interrelated). Contrary to what the Defendants would have this Court believe, this action is not just about a breach of an employment agreement, but is primarily about the unlawful taking of a significant number of shares of stock that the Plaintiff owns in the corporate Defendants, Holdings and Quantum (hereinafter referred to as the "Shares"). The Defendants wrongly claim "This case has absolutely no connection with the State of New York, much less the Western District of New York." (Defendants' Memorandum of Law in Opposition ("MOL") at 1). When the full extent of the Plaintiff's complaint is considered, as it must for purposes of this Motion (rather than the self-serving abridged version offered by the Defendants), this Court will find that

this case has more than adequate connection with the State of New York and, in particular, the Western District of New York.

## STATEMENT OF RELEVANT FACTS

Primarily, this case is about how a substantial corporation which conducts interstate commerce and, in particular, regular and systematic commerce with New York, through its officers and directors, unlawfully took (or attempted to take) shares from its shareholder. As this Motion is limited to determining whether this Court has personal jurisdiction over the Defendants or whether this Court is a proper venue, facts relevant to these legal issues only will be considered and briefly set forth herein.[1]

### a.    The Plaintiff was not only an employee of Defendant Quantum, but was and is a shareholder of the Defendants Holdings and Quantum.

On or about November 17, 2000, the Plaintiff (at this time a non-employee) started providing consulting and advisory services to Defendant Quantum and its related parent corporation, Defendant Holdings. On August 27, 2001, the Plaintiff entered into an employment agreement with Defendant Quantum and served, at first, as Defendant Quantum's Chief Network Building Officer (the "Employment Agreement"). Subsequently, the Plaintiff was promoted to Chief Operating Officer.

The Employment Agreement entered into between Defendant Quantum and the Plaintiff provided not only for a base salary, but also the issuance of three thousand two hundred and fifty (3,250) shares of stock of Defendant Quantum. (Complaint at ¶42). On November 5, 2001, the Board of Directors of Holdings held a special meeting

---

[1] The Plaintiff refers the Court to the Plaintiff's complaint as well as the Declarations of Christian J. Henrich, dated March 31, 2006, and Irene Phillips, dated March 31, 2006, both made in opposition to the Defendants' Motion.

wherein the Board of Directors ratified the issuance of an additional 3,250 shares of restricted common stock of Holdings to the Plaintiff. (Complaint at ¶46).

As alleged in the Complaint, Defendant John W. Field is the Chairman of the Board of Directors of Defendant Holdings. (Complaint at ¶12). Defendant Joseph B. Elad is the Chief Executive Officer and/or President of Quantum. (Complaint at ¶15). Defendant Faith B. Elad is President of Defendant Holdings and Secretary of Defendant Quantum. (Complaint at ¶20). The individual Defendants, as members of the Boards of Directors of the corporate Defendants, purportedly passed corporate resolutions allowing the corporate Defendants to wrongfully take certain Shares without the Plaintiff's authority or consent, or upon any other legal basis upon which to lawfully claim the Plaintiff's Shares. Moreover, as the individual Defendants are shareholders in the corporate Defendants, the individual Defendants directly benefit from any unlawful taking of the Shares.

> **b.    The Defendants wrongfully sought to exercise their "right to repurchase" the Plaintiff's Shares while the Plaintiff was in New York.**

Although the Employment Agreement provides for the repurchase of the Shares upon termination of the Agreement (Complaint, Ex. A, at §§3(ii) and 8(d))[2], it is undisputed that the Defendants did not exercise this right "upon termination" of the

---

[2]    The Employment Agreement, at Section 8, provides, in part, that: "Upon termination for any reason, [Quantum] shall have the right to repurchase each of the Vested Shares held by the [Plaintiff] for the fair market value of such shares as shall be reasonably determined by the Board."

The Employment Agreement, at Section 18 entitled "Survival", provides that: "The obligations of the parties in Section 6, shall survive termination of this Agreement indefinitely. The obligations of the parties in Section 5 shall survive for one (1) year upon termination of this Agreement."

Because the Survival Clause does speak to Section 8, the Employment Agreement expressly provides that Quantum's right to repurchase does not survive termination of the Employment Agreement. Moreover, the repurchase of the Shares was to be fixed at the time of termination because that is the time when the "fair market value" of the Shares was to be determined to protect the employee from having the employer selectively, and in bad faith, determine the value of the shares at any point subsequent to termination.

Employment Agreement. (Henrich Decl. at ¶9).   Therefore, the Defendants' wrongful conduct in this case did not end when the Defendants wrongfully terminated the Plaintiff on November 8, 2002.

As the Plaintiff's Complaint alleges, the Defendants wrongful conduct extends beyond the termination and reaches well into New York. The individual Defendants, at the time of termination, were well aware that the Plaintiff would be returning home to Buffalo, New York. (Henrich Decl. at ¶¶4-6). Therefore, the Defendants should have reasonably anticipated that any future dealings with the Plaintiff which projected the Defendants into New York would make the Defendants amenable to the courts in New York.

For purposes of this Motion, the Defendants' wrongful conduct projected the Defendants into New York, among other ways, when the Defendants' purchased (or attempted to purchase) the Plaintiff's Shares from the Plaintiff at a time when the Plaintiff resided in New York. In particular, Defendant John W. Field, on behalf of Holdings (a shareholder of Quantum) and the other directors and officers of the corporate Defendants, purposefully conducted business in New York by telephoning the Plaintiff on at least one occasion to discuss the Defendants' desire to take the Shares. (Henrich Decl. at ¶11).

In addition, Defendant Joseph B. Elad sent a check made payable to the Plaintiff for the purpose of purchasing the Shares, and which check was received by the Plaintiff in New York. (Henrich Decl. at ¶12). Furthermore, in response to the Plaintiff's dispute about the purported price of the Shares, Defendant Joseph B. Elad allegedly confirmed the purchase by sending a letter addressed to the Plaintiff at the Plaintiff's New York

4

business address. This letter also conclusively establishes that Defendant Joseph B. Elad and the other Defendants deliberately met and agreed to purchase the Plaintiff's Shares. (Henrich Decl. at Ex. "A").

Therefore, the Defendants engaged in purposeful activities in New York (by seeking to obtain the Shares), all of whom benefited from those activities and exercised extensive control over the transaction or conduct underlying this suit, which (contrary to what the Defendants claim) is interrelated with the facts surrounding termination of the Employment Agreement. As the purported "repurchase" of the Shares has a direct connection with this District and either constitutes "transacting business in New York," or a "tort committed either within or outside the state causing injury in the state," this Court has personal jurisdiction over the Defendants.

### c.    The Defendants engage in substantial interstate commerce, especially with the State of New York.

Conducting or transacting business in New York is not foreign to the Defendants. The Defendants have been transacting business in New York for almost as long as the Defendants have been in business. For example, the Defendants have solicited significant business from International Business Machines, Inc. ("IBM") since at least 1990, which business enabled the Defendants to remain an on-going concern during certain years due to the substantial licensing payments that IBM has made and continues to make to the Defendants. (Philps Decl. at ¶5).

And, in fact, the Defendants, despite claiming to have absolutely no connection with New York, continue to solicit from and do business for companies located in New York. As recently as 2005 (about the time this action was commenced), the United States Air Force, located in Rome, New York, awarded the Defendants a lucrative contract

valued at over $500,000.00.  As the record reflects, the Defendants, to this day, routinely and systematically solicit business from the Air Force located in Rome, New York as well as other companies (such a financial institutions) located in and around New York. (Phillips Decl. at ¶10-11).

The Defendants cannot help but solicit business from companies across the United States, as the Defendants' customers are niché customers located in states across the United States in need of sophisticated software search engines. (Henrich Decl. at ¶25).  Consequently, the Defendants not only engage in transacting substantial business with companies located in New York, but in other states, typically with the assistance of federal funding   (Phillips Decl. at ¶12).  For example, the Defendants have done work for Texas Instruments Inc., which is headquartered in Texas.   More telling, the Defendants (in particular Defendant Quantum's CEO, Joseph B. Elad) have promoted their business as "being everywhere." (Henrich Decl. Ex. B).

The Defendants actively and aggressively engage in interstate commerce on an increasingly regular basis, which includes significant, direct connections with New York. Therefore, Mr. Frank Abbott (a Quantum employee hired by the Plaintiff) is completely wrong when he states, under penalty of perjury, that "[Quantum] does not actively solicit business in New York." Moreover, despite doing substantial business in New York, Mr. Abbott also claims that the Defendants have "absolutely no connection with New York." (Dfnt MOL at 4).  The Defendants are completely wrong as the Plaintiff, at a minimum, has established (and met its *prima facie* burden) that the Defendants have and continue to actively solicit business not only in New York but across the United States.

6

## ARGUMENT

### I.    *This Court has Personal Jurisdiction Over the Defendants in this District.*

The parties agree that the Plaintiff bears the burden of establishing that the Court has jurisdiction over the Defendants when responding to a Rule 12(b)(2) motion. See DiStefano v. Corozzi, 286 F.3d 81, 84 (2d Cir. 2001). Absent conducting a full blown evidentiary hearing, however, the Plaintiff need only make a *prima facie* showing (by pleading and affidavits) that the Court has personal jurisdiction over the Defendants. Moreover, the Court "must construe the pleadings and affidavits in the light most favorable to the plaintiff." DiStefano, 286 F.3d at 84 (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). Furthermore, it is established law that any doubts as to jurisdiction at this stage of litigation must be resolved in favor of the plaintiff. See Roberts-Gordon, LLC v. Superior Radiant Products, Ltd., 85 F. Supp.2d 202, 209 (W.D.N.Y. 2000). When dealing with diversity cases, the Court must look to state law (i.e., the long-arm statute) to determine whether personal jurisdiction may be had. See DiStefano, 286 F.3d at 84. Moreover, as all the causes of action are factually interrelated the claims are considered as a single cause of action. See Hurn v. Oursler, 289 U.S. 238, 245-26 (1933) (factually interrelated copyright and unfair competition claims were same cause of action).

Once personal jurisdiction has been obtained under state law, the Court must also insure that due process is satisfied. "This analysis requires courts to determine (1) whether defendant has sufficient 'minimum contacts' with the state and (2) whether exercising personal jurisdiction over the defendant would offend 'traditional notions of fair play and substantial justice' – i.e., whether it is 'reasonable' to exercise personal

jurisdiction over the defendant under the circumstances of the case." See Steuben Foods,

Inc. v. Morris, 2002 U.S. Dist. LEXIS 13827 (W.D.N.Y. 2002) (copy attached).

For the reasons set forth herein, the Court has personal jurisdiction over the

Defendants.

**A.**     *Defendants have committed tortious acts outside of New York that have injured the Plaintiff in New York, derive substantial revenue from interstate commerce, and should have reasonably foreseen the consequences of this action in New York pursuant to CPLR §302(a)(3).*

The Plaintiff asserts jurisdiction under New York's long-arm statute set forth in

CPLR section 302(a). In particular, this Court should find that it may exercise personal

jurisdiction over the Defendants under section 302(a)(3). Section 302(a)(3) provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary . . . who in person or through an agent:

> (3) Commits a tortuous act outside the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered, in the state, or

> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . .

Accordingly, this Court may exercise jurisdiction over the Defendants under

either section 302(a)(3)(i) or section 302(a)(3)(ii) where the Defendants allegedly

committed a tort outside of New York that caused injury in New York.

It is well-settled New York law that an individual (such as the individual

Defendants) will not be insulated from personal jurisdiction merely because his or her

dealings with this forum were conducted through a corporate entity. Kreutter v.

McFadden Oil Corp., 71 N.Y.2d 460 (1988). The Court of Appeals of New York in Kreutter further established that, under certain circumstances, a corporate entity may be deemed to be the corporate employee's "agent" in New York so as to render the employee amenable to jurisdiction for the purposes of C.P.L.R. §302. Plaintiff need not establish a formal agency relationship. Id. at 467. As long as the employee was a "primary actor" in the transaction, the Court has personal jurisdiction over the Plaintiff. See id. at 470, 527 N.Y.S.2d at 201, 522 N.E.2d at 45. In particular, it must be established that: (i) the corporate entity engaged in *purposeful activities* in New York in relation to his transaction (which was done in our case when Defendant Quantum attempted to acquire the Plaintiff's Shares), (ii) the employee *consented to* and *benefited from* that transaction (which is the case here as each individual Defendant's percentage ownership of the corporate Defendants will increase because the Defendants wrongfully took the Shares), and (iii) the employee exercised some *control* over the entity in relation to that transaction (which, again, is the case here as the individual Defendants allegedly passed corporate resolutions to acquire the Shares and directed the corporate Defendants to take the Shares). Id.; see also Retail Software Services v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988). Therefore, this Court has personal jurisdiction over both the corporate Defendants and the individual Defendants, equally.

As applied to our case, the Defendants (through the individual Defendants) wrongfully converted the Shares of the Plaintiff at an alleged meeting of the Board of Directors wherein the Defendants resolved to acquire the Shares, without Plaintiff's authority and/or consent. This wrongful conduct constitutes tortious conduct outside of New York that caused injury to the Plaintiff in New York. Moreover, the Defendants

should have reasonably expected that purchasing the Plaintiff's Shares without his authority would have consequences in the State of New York. As the supporting Declarations attest, the Defendants regularly solicit business from New York and have engaged in a persistent course of conduct within the state. Finally, and alternatively, as the Defendants' business is not localized to Delaware, the Defendants derive substantial revenue from interstate commerce with a variety of interstate companies such as IBM and Texas Instruments. See Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16 (1970) ("it is important to emphasize that one need not be physically present in order to subject to the jurisdiction of our courts under CPLR section 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activities here without actually setting foot in the State"); Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) ("it is an inescapable fact of modern commercial life that a substantial amount of business is transaction solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.").

The Defendants cannot argue that the Plaintiff was not harmed in New York when the Defendants wrongfully took the Shares and breached their fiduciary duties to Plaintiff. Courts generally determine whether the injury occurred in New York by applying the "situs-of-injury" test, which tests asks Courts to locate the "original event which caused the injury". Which essentially means that the Court is looking for "where the first effect of the tort occurred and ultimately produced the final economic injury. The Plaintiff suffered economic injury in New York when the Defendants took the Shares

by tortuous conduct outside the state. See DiStefano, 286 F.3d at 84-85; Bank Brussels, 171 F.3d at 791.

Accordingly, personal jurisdiction exists over the Defendants under CPLR 302(a)(3).

### B.    This Court has personal jurisdiction over the Defendants because the Defendants have "transacted business" in New York pursuant to CPLR §302(a)(1).

This Court may find that it has personal jurisdiction over the Defendants pursuant to CPLR §302(a)(1) because the Defendants "transacted business within the state." CPLR 302(a)(1) is a "single act statute ... meaning that proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never entered New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988). "Thus, it is clear that a single transaction may suffice for purposes of Section 302(a)(1) 'so long as the relevant cause of action also arises from the transaction.'" Steuben Foods, Inc. v. Morris, 2002 U.S. Dist. LEXIS 13827, at *12 (quoting Bank Brussels, 171 F.3d at 787). See also Black River Associates v. Newman, 637 N.Y.S.2d 880 (4th Dep't 1996); Alan Lupton Associates, Inc. v. Northeast Plastics, Inc., 482 N.Y.S.2d 647 (4th Dep't 1984), both holding that one transaction in New York was sufficient to invoke jurisdiction even though the defendant never entered the state.

It is sufficient that a defendant, who may have never entered the forum state, be deemed to have intentionally conducted activities within the state by conducting business telephonically and thereby taking advantage of the privileges and protections of New York laws. See Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13 (1970) (where the

defendant projected himself into New York by participating by phone in purchasing artwork). As the defendant in <u>Parke-Bernet</u>, the Defendants purposefully projected themselves in New York by "purchasing" by telephone and letters the Plaintiff's Shares while the Plaintiff was in New York.

Accordingly, personal jurisdiction exists over the Defendants under CPLR 302(a)(1).

### C. This Court has personal jurisdiction over the Defendants because the Defendants have committed a tortious act within the New York pursuant to CPLR §302(a)(2).

The Plaintiff argues that this Court has personal jurisdiction over the Defendants pursuant to CPLR §302(a)(2), which gives the court "personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortous act within the state . . ." Although many of the acts related to the conversion of the Shares took place outside the New York as alleged above, the conversion itself took place within New York, as the Defendants deprived the Plaintiff of a property right while the Plaintiff was in New York.

When the individual Defendants elected to purchase the Plaintiff's Shares without the Plaintiff's consent or authorization and proceeded to deprive the Plaintiff of his Shares, the Defendants committed the tort of conversion and breached their fiduciary duties as majority shareholders to the Plaintiff. Defendant Joseph B. Elad acting on behalf of the corporate Defendants also converted the Shares when he sent a letter to the Plaintiff's business address in New York stating that the Defendants had already taken the Shares. (Henrich Decl., Ex. A). Therefore, the Defendants committed a tortuous act within the state (by sending the letter to the Plaintiff taking the Shares while he resided in

New York), despite not being physically present in the state. See Polish v. Threshold
Technology Inc., 72 Misc. 2d 610, 612, 340 N.Y.S.2d 354 (Sup. Ct. 1972) (finding
jurisdiction under §302(a)(2) over defendant who sent letter containing affirmative
misrepresentation into New York because plaintiff perused fraudulent letter in the state
and parted with stock certificates there in reliance on the letter).

Accordingly, this Court may exercise personal jurisdiction over the Defendants
pursuant to CPLR 302(a)(2).

### D.    *Due Process is satisfied by the Defendants' contacts with New York and the Plaintiff's choice of forum is reasonable.*

Insofar as this Court may exercise personal jurisdiction over the Defendants under
the long-arm statute contained in CPLR 302(a), the Court must determine whether
exercising personal jurisdiction over the Defendants comports with due process rights of
the Fourteenth Amendment of the United States Constitution.

In determining whether the Defendants have "certain minimum contacts with [the
forum] such that the maintenance of the suit does not offend 'traditional notions of fair
play and substantial justice,'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, n15
(1945), the Court must consider whether the Defendants' "conduct and connection with
the Forum State are such that [the Defendants] should reasonably anticipate being haled
into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980).

In our case, the Defendants should have reasonably anticipated being haled into a
New York court when they allegedly acquired (either by purchase or conversion) the
Plaintiff's Shares from the Plaintiff in New York without his authority or consent and/or
in violation of the fiduciary duties the Defendants owed to the Plaintiff, as shareholder.
Indeed, by allegedly purchasing the Plaintiff's Shares, the Defendants "purposefully

directed" their activities at a New York resident and consequently had "fair warning" that they could be subject to suit in New York. See Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985). Moreover, the Defendants' business relationships within the State are, as documented herein, systematic, continuous, and substantial.

In determining whether it would be "reasonable" to exercise personal jurisdiction over the Defendants (i.e., it would not offend the "traditional notions of fair play and substantial justice"), this Court generally weighs the following factors:

(1)    the burden on the defendant in defending in the forum state;
(2)    the interests of the forum state in adjudicating the matter;
(3)    the plaintiff's interest in obtaining effective and convenient relief;
(4)    the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and
(5)    the shared interests of the states in furthering substantive social policies;

After weighing these factors, this Court should find that it is reasonable to exercise jurisdiction over the Defendants. Burger King, 471 U.S. at 477 ("where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other consideration would render jurisdiction unreasonable.") First, it will not unduly burden the Defendants to defend this action in New York because the Defendants engage in substantial interstate commerce. See Stuben Foods, 2002 U.S. Dist. LEXIS 13827, at *12; Burger King, 471 U.S. at 474 ("And because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.").

Second, New York has a strong interest in adjudicating the interests of an individual resident for injuries principally felt in New York.

14

Third, the Plaintiff has a strong interest in obtaining effective and convenient relief in the forum of his choice, which should be given deference. Burger King, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.")

Fourth, the interstate judicial system's interest in an efficient resolution of the controversy is evenly split inasmuch as the witnesses are located in Delaware and New York.

Fifth, the shared interest of the several states in furthering substantive social policy is also evenly split inasmuch as the adjudication of this matter in New York would not further either state's interest anymore than if the adjudication of this action would take place in Delaware. Accordingly, the reasonableness factors weigh in favor of this Court exercising personal jurisdiction over the Defendants such that "traditional notions of fair play and substantial justice" would not be offended. Int'l Shoe, 326 U.S. at 316.

Therefore, it is constitutionally permissible for this Court to exercise personal jurisdiction over the Defendants.

### E.    This Court has personal jurisdiction over the Defendants because the Defendants have "engaged in such a continuous and systematic course of doing business in New York as to warrant a finding of their presence in this jurisdiction."

Pursuant to CPLR 301, this Court must find that the Defendants are present in the state "with a fair measure of permanence and continuity." See Maurice Silvera, Inc. v. Nat. Ctr. For Employment of Disabled, 2003 U.S. Dist. LEXIS 1755 (S.D.N.Y. 2003). The Defendants have more than just regularly solicited business from Fortune 500 companies in New York. (Phillips Decl. at 4). The Defendants have a continuing (and

substantial) relationship with IBM and the Air Force in New York (likely other companies as well) to such an extent that the Defendants routinely receive licensing fees from New York companies with whom the Defendants do business on a regular basis. Ten percent or more of the corporate Defendants' revenues are currently derived from New York business. (Henrich Decl. at ¶33). Given the nature of the Defendants' services and goods provided to their customers, the Defendants maintain a "fair measure of permanence and continuity" because of the Defendants' systematic and continuous business relations. Contrary to what the Defendants claim are the Defendants' ties, the Defendants are (and have been practically since they started doing business) "engaged in such a continuous and systematic course of doing business" in New York.

Accordingly, the Plaintiff has met its burden that this Court has personal jurisdiction over the Defendants pursuant to CPLR §301.

**II.     Without Question, Venue is proper in this District.**

Neither citing case law nor providing persuasive legal analysis, the Defendants also seek dismissal of this action on the basis that venue is improper. The Defendants are wrong. For the reasons stated herein, this Court should deny this aspect of the Defendants' Motion.

The pertinent venue provision is 28 U.S.C. §1391(a), which provides as follows:

> A civil action wherein jurisdiction is founded only on
> diversity of citizenship may, excepts as otherwise provided
> by law, be brought only in (1) a judicial district where any
> defendant resides, if all defendants reside in the same State,
> (2) a judicial district in which a substantial part of the
> events or omissions giving rise to the claim occurred, or a
> substantial part of the property that is the subject of the
> action is situated, or (3) a judicial district in which any
> defendant is subject to personal jurisdiction at the time the

action is commenced, if there is no district in which the action may otherwise be brought.

The Plaintiff invokes the second of these three grounds to sustain his choice of venue regarding both his contract-breach, conversion, and breach of fiduciary duty claims. This Court should find that the Plaintiff is correct on this point.

The cited provision, as suggested by its wording, permits the selection of a district in which "a substantial" portion of the relevant events took place, even if a greater portion of those events occurred elsewhere. See, e.g., Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, PC, 927 F. Supp. 731, 735 (S.D.N.Y. 1996).

The Plaintiff's tort claims (conversion and breach of fiduciary duty) occurred while the Plaintiff was located in New York. The telephone discussion, letters and check for the Shares were all sent and received by the Plaintiff when the Plaintiff was in New York. Bates v. C&S Adjusters, Inc., 980 F.2d 865, 867-68 (2d Cir. 1992), is an instructive case. There, the plaintiff commenced an action in the Western District of New York against the defendant on receipt of a collection notice. The plaintiff alleged violations of the Fair Debt Collection Practice Act. The plaintiff incurred the debt in question while a resident of Pennsylvania. The creditor was a resident of Pennsylvania as well, and did not conduct any business in New York State. The plaintiff moved from Pennsylvania to the Western District of New York, and a post office branch located in Pennsylvania began to forward mail to the new address. On receipt of the forwarded collection notice, the plaintiff instituted the action. The Second Circuit held that the receipt of the collection notice was enough to be considered a "substantial part of the events" giving rise to the claim, even though it was forwarded. If the Court found venue

proper in <u>Bates</u>, this Court should also find venue proper in the action at bar. Not only were letters sent to New York, but a telephone conversation and a check were received by the Plaintiff in New York. <u>See also</u> <u>Wachtel v. Storm</u>, 796 F. Supp. 114, 116 (S.D.N.Y. 1992) (where the court found venue proper because the defendant mailed the defamatory letter to offices located in the court's district).

Therefore, this Court should conclude that venue is proper in this District.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that this Court deny the Defendants' Motion because the Plaintiff has satisfied its burden of establishing that this Court has personal jurisdiction over the Defendants and that this Court is a proper venue, and grant any further relief as this Court may deem just and proper.

DATED:    Buffalo, New York
          March 31, 2006

                        **DAMON & MOREY LLP**

                        By:     *JSWidenn*
                               David S. Widenor, Esq.
                        Attorneys for Plaintiff
                        1000 Cathedral Place
                        298 Main Street
                        Buffalo, New York 14202
                        (716) 856-5500

TO:    Michael E. Maxwell, Esq.
       Hugh M. Russ III, Esq.
       HODGSON RUSS LLP
       One M&T Plaza, Suite 2000
       Buffalo, NY 14203
       716.856.4000
       716.849.0349

       Edward S. Mazurek, Esq.
       Michael E. Dash, Jr., Esq.
       MORGAN, LEWIS & BOCKIUS LLP
       1701 Market Street
       Philadelphia, PA 19103
       215.963.5000
       215.963.5001

       Attorneys for Defendants

-#994469-

2003 U.S. Dist. LEXIS 1755, *

1 of 2 DOCUMENTS

**MAURICE SILVERA, INC., Plaintiff, v. THE NATIONAL CENTER FOR EMPLOYMENT OF THE DISABLED, d/b/a SAHARA SPORTSWEAR, Defendant.**

**02 Civ. 6223 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 1755*

**February 6, 2003, Decided**
**February 6, 2003, Filed**

**DISPOSITION:** Defendant's motion to dismiss for lack of personal jurisdiction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendants, a corporation and a corporate division, alleging breach of contract and a claim for account stated. Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), (b)(2), (b)(3), and *28 U.S.C.S. 1406*(a) on the grounds of res judicata, lack of personal jurisdiction, and improper venue.

**OVERVIEW:** The initial complaint was filed in March 2002. Defendants' motion to dismiss was unopposed. The company filed an amended complaint on August 5, 2002. Since the earlier action was dismissed without prejudice, there was no res judicata effect on the amended complaint. Neither N.Y. CP.L.R. 301 or 302 allowed the court to exercise personal jurisdiction over defendants. The court determined that the corporate division was not doing business in New York with the continuity required to confer jurisdiction under 301. Under 302, the company did not allege that it had an ongoing relationship with the corporate division. The complaint also failed to specify where the agreement was negotiated and whether it required the corporate division to send payments to, or perform in, New York. The fact that the corporate division operated a website accessible to residents of New York did not give the court personal jurisdiction. Determining that it could not exercise personal jurisdiction over defendants, the court did not address the motion to dismiss based on improper venue.

**OUTCOME:** Defendants' motion to dismiss on res judicata grounds was denied, but their motion to dismiss

for lack of personal jurisdiction was granted.

**CORE TERMS:** lack of personal jurisdiction, judicata, personal jurisdiction, motion to dismiss, venue, apparel, non-domiciliary, transact, res judicata, manufacturer, merchandise, website, Under Rule, exercise of personal jurisdiction, contractual relationship, statutory basis, account stated, doing business, non-resident, continuity, negotiated, distribute, catalogs, shirts

**LexisNexis(R) Headnotes**

*Civil Procedure > Preclusion & Effect of Judgments > Res Judicata*
[HN1] Under the doctrine of res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Preclusion & Effect of Judgments > Res Judicata*
[HN2] Res judicata challenges may properly be raised via a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] Under Fed. R. Civ. P. 12(b)(6) a complaint will be dismissed if there is a failure to state a claim upon which

2003 U.S. Dist. LEXIS 1755, *

relief can be granted. A court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. A court should dismiss a complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN4] For the purposes of Fed. R. Civ. P. 12(b), a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN5] Under Fed. R. Civ. P. 12(b)(2), a party may bring a motion to dismiss for lack of personal jurisdiction. Absent an evidentiary hearing on jurisdiction, the plaintiff bears the burden of making out a prima facie case that jurisdiction exists.

*Civil Procedure > Preclusion & Effect of Judgments > Res Judicata*
[HN6] It is well established that a dismissal without prejudice has no res judicata effect on a subsequent claim.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN7] Personal jurisdiction over a non-resident defendant in a diversity case is determined by the law of the jurisdiction in which the federal court sits. Accordingly, a court must follow a two-step procedure to determine whether personal jurisdiction exists. First, the court must decide whether a statutory basis for personal jurisdiction exists under the law of the forum state. Second, if a statutory basis does exist, the court must conduct a constitutional inquiry to determine whether the exercise of personal jurisdiction is consistent with the requirements of due process.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN8] N.Y. C.P.L.R. 301 permits the general exercise of

personal jurisdiction over a foreign corporation if it is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction. A court must be able to say from the facts that the corporation is present in the state, not occasionally or casually, but with a fair measure of permanence and continuity. In determining jurisdiction, New York courts generally focus on the following factors: (1) the existence of an office in New York, (2) the solicitation of business in New York, (3) the presence of bank accounts and other property in New York, and (4) the presence of employees or agents in New York.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN9] The mere sales of a manufacturer's product in New York, however substantial, has never made the foreign corporation manufacturer amenable to suit in New York.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN10] New York's long-arm statute, N.Y. C.P.L.R. 302, provides that a court may exercise personal jurisdiction over any non-domiciliary who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state. N.Y. C.P.L.R. 302(a)(1). Accordingly, the non-domiciliary must transact business within the state, and the claim against the non-domiciliary must arise out of that business activity.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN11] In determining whether a non-resident defendant transacts business in New York under N.Y. C.P.L.R. 302, a court must consider the totality of the circumstances. Courts will review a variety of factors in making that determination, including whether (1) the defendant has an ongoing contractual relationship with a New York business, (2) the contract was negotiated or executed in New York, (3) after executing such a contract, the defendant visited New York to meet with parties to the contract regarding performance thereof, and (4) the contract requires the defendant to send notices and payments into New York or otherwise to perform in New York. The overriding criterion which informs the analysis is whether the defendant has 'purposely availed itself of the privilege of conducting activities within the forum state.

2003 U.S. Dist. LEXIS 1755, *

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN12] A single meeting in New York will rarely provide the basis for jurisdiction pursuant to N.Y. C.P.L.R. 302(a)(1), unless the meeting is significant to the development of the contractual relationship and other factors are present.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN13] Only in a rare case should a defendant be compelled to answer a suit in a jurisdiction in which it has the barest of contact.

*Cyberlaw > Jurisdiction > Constitutional Requirements*
[HN14] Personal jurisdiction over a defendant is not appropriate simply because the defendant maintains a website which residents of the forum state may visit. Rather, courts must examine the nature and quality of commercial activity that an entity conducts over the internet.

**COUNSEL:** [*1] For Maurice Silvera, Inc, PLAINTIFF: Jed R Schlacter, Schlacter & Associates, New York NY, USA.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINIONBY:** Lawrence M. McKenna

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiff Maurice Silvera, Inc. ("Silvera") brings this action against The National Center for Employment of the Disabled ("NCED") d/b/a Sahara Sportswear ("Sahara") alleging breach of contract and a claim for account stated. Defendants move to dismiss under *Federal Rules of Civil Procedure 12(b)(6)* ("Rule 12(b)(6)"), 12(b)(2) ("Rule 12(b)(2)"), 12(b)(3) ("Rule 12(b)(3)"), and *28 U.S.C. § 1406*(a) on the grounds of res judicata, lack of personal jurisdiction, and improper venue. For the reasons discussed below, the Court denies the motion to dismiss based on res judicata, but grants the motion to dismiss for lack of personal jurisdiction.

BACKGROUND

A. The Parties

Silvera is a corporation organized under the laws of the State of New York with an office and principal place of business in New York. (Compl. P 2.) NCED is a corporation organized under the laws of the State of Texas, with a place of business in Texas. (Id. P 3.) Sahara, which is a [*2] division of NCED, distributes catalogs throughout the United States. (Id. P 4-5.) In addition, Sahara purchases apparel products from New York manufacturers, and sells these products to consumers in various states, including New York. (Id. P 9.) Sahara has a sales representative in New York, who procures orders from New York customers. (Id. P 10.) According to Sahara, this representative "is a non-employee, independent selling agent that is available for contact if persons wish to inquire about the SAHARA apparel line." (Def.'s Mem. at 3, n.1.) Sahara also has a website "for the sale of its apparel products." (Id. P 7.)

B. Transactions Between Silvera and Sahara

Between June and November 2001, Silvera manufactured men's shirts and other goods, wares and merchandise for Sahara at an aggregate price of $ 299,921.15. (Id. P 13.) Sahara sent samples and specifications for the shirts Silvera was to manufacture to Silvera's New York City offices. (Id. P 14.) In November 2001, Silvera alleges that there was a meeting in New York between Sahara's principal owner and officer, Robert Jones ("Jones"), and one of Silvera's principal owners and officers, Dean [*3] Silvera, to discuss the status of production and delivery of the goods. (Id. P 17.) Sahara denies the meeting took place. (Def.'s Mem. at 3 n.1) Subsequently, Silvera delivered the merchandise to Sahara. (Id. P 19.) However, Sahara allegedly did not remit payment to Silvera for these goods. (Id. P 22.)

C. Procedural History

In March 2002, Silvera filed this action against Sahara based on the above events, asserting breach of the parties agreement and a claim for account stated. Sahara moved to dismiss the action under Rule 12(b)(2), 12(b)(3) and *28 U.S.C. § 1406*(a) for lack of personal jurisdiction and improper venue. Silvera did not oppose the motion. As a result, the Court endorsed Sahara's Memorandum of Law in Support of Their Motion to Dismiss, granting the motion for lack of personal jurisdiction and improper venue, and dismissing the complaint without prejudice.

On August 5, 2002, Silvera filed an amended complaint in this action. Defendants now move to dismiss the amended complaint under the doctrine of res judicata, arguing that the Court's prior judgment dismissing the suit for lack of personal jurisdiction and improper venue

[*4] bars Silvera from reasserting its claims. Alternatively, defendants move to dismiss for lack of personal jurisdiction and improper venue.

## STANDARD OF REVIEW

### A. Res Judicata

[HN1] Under the doctrine of res judicata, "'[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Saud v. Bank of New York, 929 F.2d 916, 919 (2d Cir. 1991)* (quoting *Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 69 L. Ed. 2d 103, 101 S. Ct. 2424 (1981))*. [HN2] "Res judicata challenges may properly be raised via a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Thompson v. County of Franklin, 15 F.3d 245, 253 (2d Cir. 1994)* (emphasis added).

[HN3] Under Rule 12(b)(6) a complaint will be dismissed if there is a failure "to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6).* The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. See *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).* A court should dismiss a complaint [*5] only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* [HN4] For the purposes of Rule 12(b), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)* (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991)).*

### B. Rule 12(b)(2)

[HN5] Under Rule 12(b)(2), a party may bring a motion to dismiss for lack of personal jurisdiction. Absent an evidentiary hearing on jurisdiction, the plaintiff bears the burden of making out a prima facie case that jurisdiction exists. *Fort Knox Music, Inc. v. Baptiste, 139 F. Supp. 2d 505, 508 (S.D.N.Y. 2001).*

## DISCUSSION

### A. Whether the Current Action is Barred by Res Judicata

[HN6] "It is well established that a dismissal without prejudice has no res judicata effect [*6] on a subsequent claim." *Camarano v. Irvin, 98 F.3d 44, 47 (2d Cir.*

*1996).* In dismissing the first complaint, the Court specified in its endorsement that it was dismissing Silvera's first complaint without prejudice. Therefore, Silvera is not barred by res judicata from filing an amended complaint.

### B. Whether there is Personal Jurisdiction over Sahara in New York

[HN7] "Personal jurisdiction over a non-resident defendant in a diversity case is determined by the law of the jurisdiction in which the federal court sits." *Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000).* Accordingly, the Court must follow a two-step procedure to determine whether personal jurisdiction exists. First, the Court must decide whether a statutory basis for personal jurisdiction exists under the New York Civil Practice Law and Rules (the "C.P.L.R.") Second, if a statutory basis does exist, the Court must conduct a constitutional inquiry to determine whether the exercise of personal jurisdiction is consistent with the requirements of due process. See *Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).*

#### 1) C.P.L.R. 301 ("Section 301") [*7]

Section 301 [HN8] permits the general exercise of personal jurisdiction over a foreign corporation if it is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *J.L.B. Equities, Inc. v. Ocwen Fin. Corp., 131 F. Supp. 2d 544, 547-48 (S.D.N.Y. 2001)* (citations omitted). "The court must be able to say from the facts that the corporation is 'present' in the State, 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 77 N.Y.2d 28, 33-34, 565 N.E.2d 488, 563 N.Y.S.2d 739 (1990)* (citations omitted). In determining jurisdiction, New York courts have generally focused on the following factors: "The existence of an office in New York; the solicitation of business in New York; the presence of bank accounts and other property in New York; and the presence of employees or agents in New York." *J.L.B. Equities, Inc., 131 F. Supp. 2d at 548.*

In the present case, Sahara does not have a New York office, or any bank accounts, property, or employees in New York. It does distribute catalogs, and [*8] purchase and sell apparel products in the state, partially through the aid of an independent New York agent. (Def.'s Mem. at 3.) It does, [HN9] "mere sales of a manufacturer's product in New York, however substantial, have never made the foreign corporation manufacturer amenable to suit in this

Case 1:06-cv-00591-SLR    Document 18-15    Filed 09/22/2006    Page 5 of 14

Page 6
2003 U.S. Dist. LEXIS 1755, *

jurisdiction." *Landoil Res. Corp., 77 N.Y.2d at 34* (citations omitted). Upon balancing the relevant factors, the Court fails to find that Sahara is "doing business" in New York with the continuity required to confer jurisdiction under Section 301. Therefore, the Court continues its analysis under C.P.L.R. § 302.

2) C.P.L.R. § 302 ("Section 302")

[HN10] New York's long-arm statute, Section 302, provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). Accordingly, the non-domiciliary must transact business within the state, and the claim against the non-domiciliary must arise out of that business activity. *J.L.B. Equities, Inc. 131 F. Supp. 2d at 550.* [*9]

[HN11] In determining whether a non-resident defendant "transacts business" in New York under Section 302, a court must consider the totality of the circumstances *PaineWebber Inc. v Westgate Group, Inc., 748 F. Supp. 115, 118 (S.D.N.Y. 1990)* (citing *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 457, 209 N.E.2d 68, 261 N.Y.S.2d 8 (1965))*. Courts will review a variety of factors in making this determination, including whether the defendant has an ongoing contractual relationship with a New York business; whether the contract was negotiated or executed in New York; whether, after executing such a contract, the defendant visited New York to meet with parties to the contract regarding performance thereof; and whether the contract requires the defendant to send notices and payments into New York or otherwise to perform in New York. *Agency Rent a Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)*. "The overriding criterion' which informs this analysis is whether the defendant has 'purposely availed itself of the privilege of conducting activities within the forum State." *Cooper, Robertson & Partners, LLP v. Vail, 143 F. Supp. 2d 367, 370 (S.D.N.Y. 2001)* [*10] (citing *McKee Elec. Co., Inc. v. Rauland-Borg Corp., 20 N.Y.2d 377, 229 N.E.2d 604, 283 N.Y.S.2d 34 (1967))*.

In the present case, Silvera has not alleged that it has a continuing relationship with Sahara. In addition, the complaint fails to specify where the agreement between the parties was negotiated, and whether that agreement required that Sahara send payments or perform in New York. Jones, a Sahara representative, allegedly came to

New York on one occasion to discuss Silvera's production of the merchandise which Sahara had ordered. However, [HN12] "a single meeting in New York will rarely provide the basis for jurisdiction pursuant to § 302(a)(1)," unless the meeting is "significant to the development of the contractual relationship and other factors are present." *Cooper, Robertson & Partners, LLP, 143 F. Supp. 2d at 372 (S.D.N.Y. 2001)*. The Court fails to find such other factors present. Therefore the single alleged meeting between the parties in New York does not establish that Sahara "transacts business" within the meaning of Section 302. See *McKee Elec. Co., 20 N.Y.2d at 383* [HN13] ("Only in a rare case should [defendants] be compelled to answer a suit in a jurisdiction [*11] in which they have the barest of contact.") n1

n1 Silvera also seems to argue that there should be jurisdiction over Sahara because Sahara has a website. (Opp. at 3.) However, [HN14] "personal jurisdiction over a defendant is not appropriate simply because the defendant maintains a website which residents of New York may visit." *Hsin Ten Enter. USA, Inc. v. Clark Enter., 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000)* (citing *Bensusan Rest. Corp. v. King, 126 F.3d 25, 29 (2d Cir. 1997))*. "Rather, courts must examine the 'nature and quality of commercial activity that an entity conducts over the internet.'" Id. Silvera has failed to provide the Court with any such information.

In summary, the Court finds that there is no jurisdiction over Sahara in New York. Because the Court does not find personal jurisdiction in New York, it need not address the issue of venue.

## CONCLUSION

For all of the above reasons, the Court denies the motion to dismiss on res judicata grounds. The Court [*12] grants the motion to dismiss for lack of personal jurisdiction.

Dated: February 6, 2003

SO ORDERED.

Lawrence M. McKenna

U.S.D.J.

Case 1:06-cv-00591-SLR    Document 18-15    Filed 09/22/2006    Page 6 of 14

Page 2
2002 U.S. Dist. LEXIS 13827, *

LEXSEE 2002 U.S. DIST. LEXIS 13827

**STEUBEN FOODS, INCORPORATED, Plaintiff, -vs- GABRIEL ANDREW MORRIS and SAVANNAH MANUFACTURING COMPANY, Defendants.**

**01-CV-0521E(Sc)**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 13827*

**May 29, 2002, Decided**

**DISPOSITION:** [*1] Defendant Savannah's motion to dismiss denied and defendants' motion to transfer venue denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employer sued defendants, its former employee and his new employer, alleging that defendants unlawfully solicited several employees of the employer in violation of a non-solicitation agreement. The new employer moved to dismiss under Fed. R. Civ. P. 12 for lack of personal jurisdiction, and alternatively, to transfer venue to the United States District Court for the Southern District of Georgia under *28 U.S.C. § 1404*(a).

**OVERVIEW:** After the employee quit to take a job with the new employer, he and the new employer solicited the employer's employees. The court found that (1) it had jurisdiction over the new employer under N.Y. C.P.L.R. § 302(a)(3)(ii) where the new employer committed a tort outside of New York causing injury in New York where it expected (or should have expected) the act to have consequences in New York, i.e., the employer notified the new employer that its continued recruitment of the employer's employees could have consequences in New York, and where the it derived substantial revenue from interstate commerce; (2) it also had jurisdiction under N.Y. C.P.L.R. § 302(a)(1) as the new employer transacted business in New York where it projected itself into New York to recruit the solicited employees because such recruitment was purposeful and was substantially related to the employer's claims; (3) the new employer had minimum contacts with the forum so as not to offend due process concerns; and (4) defendants failed to show that the balance of convenience and justice weighed in favor of the transfer where the witnesses and evidence were divided, and the employees were recruited in New

York.

**OUTCOME:** The motion to dismiss was denied, and the motion to transfer venue was denied.

**CORE TERMS:** savannah, non-solicitation, personal jurisdiction, exercise personal jurisdiction, recruitment, interstate, recruited, long-arm, notions of fair play, forum state, unlawfully, haled, purposeful, deference, motion to dismiss, southern district, inasmuch, situs-of-injury, solicited, resident, offend, international commerce, tortious conduct, cause of action, tortious act, confidentiality, nondomiciliary, economically, solicitation, convenience

**LexisNexis(R) Headnotes**

*Civil Procedure > State & Federal Interrelationships > Application of State Law*
[HN1] Whether a federal court has personal jurisdiction over a given defendant in a diversity case is determined according to the law of the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN2] Under New York law, the United States District Court for the Western District of New York's two-step inquiry involves consideration of the relevant long-arm provisions -- N.Y. C.P.L.R. § 302 -- and of federal due process requirements. Where personal jurisdiction is challenged prior to discovery or an evidentiary hearing, the plaintiff may overcome the challenge by making a prima facie showing of personal jurisdiction over the defendant. The court considers the pleadings and affidavits in the light most favorable to the plaintiff.

2002 U.S. Dist. LEXIS 13827, *

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN3] See N.Y. C.P.L.R. § 302(a)(3).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN4] The conferral of jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii) rests on five elements: (1) that defendant committed a tortious act outside the state; (2) that the cause of action arises from that act; (3) that the act caused injury to a person or property within the state; (4) that defendant expected or should reasonably have expected the act to have consequences in the state; and (5) that defendant derived substantial revenue from interstate or international commerce.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN5] Courts determining whether there is injury in New York sufficient to warrant N.Y. C.P.L.R. § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN6] Unlawfully recruiting employees who work in New York constitutes a New York injury to the New York employer that loses (or risks losing) such employees for purposes of personal jurisdiction under N.Y. C.P.L.R. § 302(a)(3).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN7] A defendant who unlawfully recruits a plaintiff's employees located in New York certainly expects or should expect their alleged acts to have consequences in New York for purposes of determining whether personal jurisdiction exists under N.Y. C.P.L.R. § 302(a)(2).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN8] The expectation element of N.Y. C.P.L.R. § 302(a)(3)(ii) is a "foreseeability requirement" that relates to forum consequences generally and not to the specific event which produced the injury within the state. This ensures that there is some link between a defendant and New York State to make it reasonable to require a

defendant to come to New York to answer for tortious conduct committed elsewhere. Where a company unlawfully raids a New York company for its employees located in New York, it is foreseeable that the corporate raider will cause injury in New York and reasonable that it may be haled into court there.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN9] The substantial interstate commerce revenue element of N.Y. C.P.L.R. § 302(a)(3)(ii) narrows the long-arm reach to preclude the exercise of jurisdiction over entities not domiciled in the state who might cause direct, foreseeable injury within the state, but whose business operations are of a local character. In other words, this provision attempts to ensure that the defendant is economically big enough to defend suit in New York.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN10] It is well settled that a defendant need not be physically present in New York to be found to have transacted business there. Indeed, the New York Court of Appeals holds that N.Y. C.P.L.R. § 302(a)(1) is a "single act statute" and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities there are purposeful, and there is a substantial relationship between the transaction and the claims asserted. It is sufficient that a defendant be deemed to have intentionally conducted activities within the state and have, thereby, taken advantage of the privileges and protections of New York laws. Thus, it is clear that a single transaction may suffice for purposes of § 302(a)(1) so long as the relevant cause of action also arises from the transaction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN11] The analysis for determining whether a court may exercise personal jurisdiction over a non-resident under the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires courts to determine (1) whether defendant has sufficient "minimum contacts" with the forum state and (2) whether exercising personal jurisdiction over the defendant would offend "traditional notions of fair play and substantial justice," i.e., whether it is "reasonable" to exercise personal jurisdiction over the defendant under the circumstances of the case.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN12] The establishment of long-arm jurisdiction in connection with a New York injury under either N.Y. C.P.L.R. § 302(a)(3)(i), or (ii) does not implicate constitutional due process concerns. Section 302(a)(3) was not designed to go to the full limits of permissible jurisdiction. The limits contained in subparagraphs (i) and (ii) were deliberately inserted to keep the provision well within constitutional bounds. Thus, courts are bound by a limitation more stringent than any constitutional requirement -- the specific requirements of N.Y. C.P.L.R. § 302(a)(3).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN13] In determining whether a party has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice, the United States District Court for the Western District of New York must consider whether the party's conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN14] In determining whether it is "reasonable" to exercise personal jurisdiction over a party, i.e., it does not offend the "traditional notions of fair play and substantial justice," the United States District Court for the Western District of New York must consider the following factors: (1) the burden on the defendant in defending in the forum; (2) the interests of the forum state in adjudicating the matter; (3) the plaintiff's interest in obtaining effective and convenient relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering substantive social policies. These factors are applied on a sliding scale relative to the "minimum contacts" test; in other words, where there is a strong showing of minimum contacts, there need not be as strong a showing of "reasonableness" and vice versa.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN15] See *28 U.S.C.S. § 1404*(a).

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN16] The objective of *28 U.S.C.S. § 1404*(a) is to prevent waste of time, energy, and money, and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. By the same token, a plaintiff's choice of forum should be given special deference where the plaintiff is located in the district where the suit was filed, and should be upheld by the court unless the following criteria weigh strongly in the defendant's favor -- the convenience of the parties, the convenience of material witnesses, the relative means of the parties, the locus of operative fact, and relative ease of access to sources of proof, attendance of witnesses, the required deference to the plaintiff's forum choice, the availability of process to compel any unwilling witnesses, the desirability of having the case tried by the forum familiar with the substantive law to be applied, relative efficiency and cost, and how best to serve the interests of justice based on the totality of material circumstances.

**COUNSEL:** For Steuben Foods, Incorporated, PLAINTIFF: Michael R McGee, McGee & Gelman, Buffalo, NY USA.

For Gabriel Andrew Morris, Savannah Manufacturing Company, DEFENDANTS: Edward S Bloomberg, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

For Gabriel Andrew Morris, Savannah Manufacturing Company, DEFENDANTS: Wade W Herring, II, Esq, Kirby G Mason, Esq, Hunter, MacLean, Exley and Dunn PC, Savannah, GA USA.

**JUDGES:** JOHN T. ELFVIN, S.U.S.D.J.

**OPINIONBY:** JOHN T. ELFVIN

**OPINION:**

MEMORANDUM and ORDER

Plaintiff ("Steuben") commenced this action against its former employee ("Morris") and Morris's new employer ("Savannah") alleging that defendants unlawfully solicited several employees of Steuben in violation of a nonsolicitation agreement that Morris had executed when he was a Steuben employee. Presently before this Court is Savannah's motion to dismiss pursuant to *Rule 12 of the Federal Rules of Civil Procedure* for lack of personal jurisdiction n1 and defendants' alternative motion to transfer venue to the United States District Court for the Southern District of

Case 1:06-cv-00591-SLR    Document 18-15    Filed 09/22/2006    Page 9 of 14

Page 5
2002 U.S. Dist. LEXIS 13827, *

Georgia pursuant to *28 U.S.C. § 1404*(a) [*2] . For the reasons stated herein, such motions will be denied.

> n1 Morris does not contest personal jurisdiction. Although the notice of motion indicates that it is made on behalf of both defendants, the Brief in support thereof is made only on behalf of Savannah.

[HN1] Whether a federal court has personal jurisdiction over a given defendant in a diversity case is determined according to the law of the forum state. n2 [HN2] Under New York law, this Court's two-step inquiry involves consideration of the relevant long-arm provisions -- section 302 of New York's Civil Practice Law and Rules ("CPLR") is relevant here -- and of federal due process requirements. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999).* Where personal jurisdiction is challenged prior to discovery or an evidentiary hearing, the plaintiff may overcome the challenge by making a *prima facie* showing of personal jurisdiction over the defendant. *DiStefano v. Carozzi North Amer., Inc., 286 F.3d 81, 84 (2d Cir. 2001).* [*3] The Court considers the pleadings and affidavits in the light most favorable to the plaintiff. *Id.*

> n2 *Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).*

Steuben employed Morris as the manager of its Tetra Brik Department from January 4, 1999 until March of 2000, when Morris accepted employment with Savannah as its Plant Manager. n3 Compl. at PP 9, 19. As part of his employment with Steuben, Morris executed a non-solicitation agreement dated December 4, 1998 ("Non-Solicitation Agreement") in which Morris agreed, *inter alia,* as follows

> "*** I agree that following termination of my employment with the Company, I will not entice, solicit, or in any manner encourage or induce employees of the Company to leave its employ. Further, I will not make known the names or any other information regarding any employees of the Company to any third party." Compl. at P 12, Exh. A at P 4.

The Non-Solicitation Agreement also contained confidentiality provisions prohibiting [*4] Morris from using Steuben's confidential and proprietary information for the benefit of himself or third parties. Compl. at PP 13-15.

> n3 Steuben and Savannah are rivals in the business of co-manufacturing food and beverage products for companies that sell brand-name products. Compl. P at 16. For example, Savannah, a Georgia corporation, processes raw materials for products for companies -- such as Hershey Foods (chocolate milk), E.A.S. (Nutritional drinks), and SoBe (fruit flavored botanical drinks) -- that own name-brand products. Schlossberg Aff. at P 8. Steuben has expertise in aseptic processing and Tetra Brik packaging methods, which allow perishable products to have an unrefrigerated shelf-life of up to one year. Compl. at P 16. Including Savannah and Steuben, there are only five co-manufacturers in the country with expertise in these specialized processing and packaging methods. *Id.* at PP 16-18. It is expensive and time-consuming to train employees in these specialized processes; it takes approximately 1 1/2 years to train Tetra Brik mechanics and even longer for higher-level Tetra Brik personnel. *Ibid.*

[*5]

While employed at Steuben, Morris was "intimately involved in all aspects of plant operations, including but not limited to recruitment of personnel." Compl. at P 10. Morris also supervised various personnel, including Tetra Brik mechanics John Law and Lawrence Wilkins and Tetra Brik Department Manager David Schmitt (collectively "Solicited Employees"). *Ibid.* It is alleged that Morris, on behalf of and ostensibly in concert with Savannah, recruited the Solicited Employees in violation of the Non-Solicitation Agreement. Compl. at PP 19-32. n4

> n4 Steuben alleges that Morris acted on behalf of and in concert with Savannah. Accordingly and as the alleged agent of Savannah, Morris's conduct will be imputed to Savannah for purposes of this motion. *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).*

In August 2000 Morris and/or Savannah successfully

solicited Law to leave Steuben to join Savannah. *Id.* at P 20. n5 On August 1, 2000 Steuben's general [*6] counsel wrote a letter to Savannah (to the attention of Morris) advising Savannah of Morris's obligations under the Non-Solicitation Agreement ("Warning Letter"). *Id.* at P 22. In this same July-August 2000 time period, Morris and/or Savannah also solicited Wilkins. *Id.* at PP 23-26. As part of this solicitation, Morris picked Wilkins up at the airport and entertained him. *Ibid.* Wilkins, however, ultimately remained at Steuben at the behest of Steuben's Human Resources Manager. *Ibid.* Furthermore, Morris used Steuben's proprietary information in soliciting Schmitt to leave Steuben for employment with Savannah in June of 2001. *Id.* at PP 27-30. Steuben further alleges that Morris provided Savannah with the names and employment information of the Solicited Employees in violation of the confidentiality provisions of the Non-Solicitation Agreement. *Id.* at P 32. Accordingly, plaintiff asserts claims against Morris for breaching the Non-Solicitation Agreement (including its confidentiality provisions) and claims against Savannah for inducement of breach of the non-solicitation agreement and for unfair competition. Plaintiff seeks damages and injunctive relief (to prevent [*7] further solicitation by Morris/Savannah). n6

> n5 Law returned to Steuben six months later. Compl. at P 31.

> n6 Plaintiff's second and fifth "causes of action" seek injunctive relief, which is a remedy rather than a cause of action.

Steuben asserts jurisdiction under New York's long-arm jurisdictional provisions contained in CPLR section 302(a). As discussed below, this Court finds that it may exercise personal jurisdiction over Savannah under either section 302(a)(1) or section 302(a)(3).

[HN3] Section 302(a)(3) provides:

> "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary *** who in person or through an agent: *** (3) commits a tortious act without the state causing injury to person or property within the state *** if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods

used or consumed or services rendered, in the state, [*8] or (ii) expects or reasonably should expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;"

Accordingly, this Court may exercise jurisdiction over Savannah under section 302(a)(3)(ii) where Savannah allegedly committed a tort outside of New York that caused injury in New York where it expected (or should reasonably should have expected) the act to have consequences in New York and where Savannah derives substantial revenue from interstate or international commerce. See *LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 735 N.E.2d 883 (2000)* (holding that [HN4] the "conferral of jurisdiction under [CPLR section 302(a)(3)(ii)] rests on five elements: first, that defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.").

As applied, Savannah (either [*9] through or with Morris) recruited the Solicited Employees, allegedly in violation of Morris's Non-Solicitation Agreement with Steuben. This alleged conduct constitutes tortious conduct outside of New York that caused injury to Steuben in New York. n7 Moreover, Savannah should have reasonably expected that its recruitment of the Solicited Employees would have consequences in the State of New York. n8 Finally, Savannah derives substantial revenue from interstate commerce n9 where it does $ 15 million in business with a variety of interstate companies such as Hershey Foods and Pepsi Cola. n10 Pl's Mem. Of Law at 11. Accordingly, personal jurisdiction exists over Savannah under CPLR 302(a)(3)(ii).

> n7 *Bank Brussels* held that, [HN5] "courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Bank Brussels,* at 791 (citation omitted). Under the situs-of-injury test, Steuben was injured in New York, which is where it felt the loss of its Solicited Employees.

*DiStefano*, at 84-85 (applying situs-of-injury test and holding that an employee, working in New York for a nondomiciliary with few New York contacts, was injured in New York despite the fact that he was terminated in New Jersey); *McCrory Corp. v. Cloth World, Inc., 378 F. Supp. 322, 325 (S.D.N.Y. 1974)* (holding that unlawful recruitment of plaintiff's employees in New York constituted New York injury). In *DiStefano*, the Second Circuit Court of Appeals held that, "when a person is employed in New York (or performs a substantial part of the duties of his or her employment in New York), his or her removal from that employment (or from those duties) is a New York event that constitutes 'the first effect of the tort' of discharging the employee." *DiStefano*, at 85 (holding that the removal of an employee constituted a New York injury within the meaning of section 302(a)(3)). Likewise, [HN6] unlawfully recruiting employees who work in New York constitutes a New York injury to the New York employer that loses (or risks losing) such employees. *McCrory*, at 325. Defendants' attempt to distinguish *McCrory* is unavailing because they apparently misread such decision (as did plaintiff), which applied section 302(a)(3)(ii), whereas defendants contend that it stands for the proposition that "phone calls from outside of New York constitute a *tortious act within New York.*" Def. Reply Br. at 9 (emphasis added). This assertion, and the cases cited by defendant in an attempt to distinguish *McCrory*, relate to section 302(a)(2) -- which is not the basis for the *McCrory* decision.

[*10]

n8 Indeed, Steuben's Warning Letter dated August 1, 2000 provided Savannah with express notice that its continued recruitment of Steuben's employees could potentially have consequences in New York. Despite the Warning Letter, Savannah allegedly recruited Schmitt in June, 2001 -- after Savannah had ample reason to expect that it might well be haled into a court in New York to defend against Steuben' claims. Regardless of the Warning Letter, however, Savannah should have reasonably expected that its recruitment of Steuben's employees would have consequences in New York. *McCrory Corp.*, at 325 -- see footnote 7, *supra* -- (finding that [HN7] defendant who unlawfully recruited plaintiff's employees located in New York

"certainly expected or should have expected their alleged acts to have consequences in New York"); *cf. Sybron Corp. v. Wetzel, 46 N.Y.2d 197, 206, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1978)* (corporation suffered injury in New York where it lost New York customers such as Eastman Kodak as a result of allegedly unlawful use of its trade secrets by former employee and his new employer located in New Jersey). [HN8] The expectation element of section 302(a)(3)(ii) is a "foreseeability requirement" that "relates to forum consequences generally and not to the specific event which produced the injury within the state." *Fantis Foods, Inc. v. Standard Importing Co., 49 N.Y.2d 317, 327 n.4, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980)*. This ensures that there is "some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere." *Ingraham v. Carroll, 90 N.Y.2d 592, 598, 665 N.Y.S.2d 10, 687 N.E.2d 1293 (1997)*. Where a company unlawfully raids a New York company for its employees located in New York, it is foreseeable that the corporate raider will cause injury in New York and reasonable that it may be haled into court there.

[*11]

n9 [HN9] The substantial interstate commerce revenue element "narrows the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but 'whose business operations are of a local character.'" *Ingraham*, at 599 -- see footnote 8, *supra* -- (citations omitted). In other words, this provision attempts to ensure that the defendant is "economically big enough to defend suit in New York." *Ibid.* (citations omitted). Savannah is "economically big enough" to defend this suit in New York.

n10 See *LaMarca*, at 213-216 (finding that $ 18,245,292 constitutes "substantial revenue"); *Palace Exploration Co. v. Petroleum Dev. Co., 41 F. Supp. 2d 427, 436 (S.D.N.Y. 1998)* (finding that $ 378,000 constitutes "substantial revenue").

In the alternative, this Court finds that it may exercise personal jurisdiction over Savannah under CPLR 302(a)(1). [HN10] It is well settled that a

defendant need not be physically present in New York to be found to have transacted business here. Indeed, the New York Court of Appeals [*12] has held that section 302(a)(1) is

> "a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claims asserted." *Kreutter,* at 467. n11

See also *Bank Brussels,* at 787 (citing *Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)).* n12 It is sufficient that a defendant be deemed to have intentionally conducted activities within the state and thereby taken advantage of the privileges and protections of New York laws. n13 Thus, it is clear that a single transaction may suffice for purposes of section 302(a)(1) "so long as the relevant cause of action also arises from the transaction." *Bank Brussels,* at 787. Accordingly, Savannah transacted business within the meaning of section 302(a)(1) where it projected itself into New York to recruit the Solicited Employees because such recruitment was "purposeful" and is substantially related to plaintiff's claims.

n11 See footnote 4, *supra.*

[*13]

n12 For example, in *Parke-Bernet* -- the seminal New York Court of Appeals case -- the defendant was found to have engaged in "the sustained and substantial transaction of business here" where he "projected himself" into New York by participating by telephone from California in an art auction in New York. The Court of Appeals distinguished the defendant's conduct from the "simple placing of an order by telephone" in part because it affected not only the plaintiff but all those in the auction room. *Parke-Bernet,* at 17-18. Likewise here, solicitations by Savannah and/or Morris of the Solicited Employees affected the Solicited Employees and Steuben, and are thus distinguishable from the line of cases holding that merely placing an order

does not constitute "transacting any business" under section 302(a)(1). *Ibid.*

n13 *Parke-Bernet,* at 18 (citing *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)).*

Inasmuch as this Court may exercise personal jurisdiction over Savannah under the long-arm statutes contained in CPLR 302(a)(1) and 302(a)(3)(ii), [*14] it is now appropriate to determine whether exercising personal jurisdiction over Savannah comports with the Due Process Clause of the Fourteenth Amendment to the Constitution. n14 [HN11] This analysis requires courts to determine (1) whether defendant has sufficient "minimum contacts" with the forum state and (2) whether exercising personal jurisdiction over the defendant would offend "traditional notions of fair play and substantial justice" -- *i.e.,* whether it is "reasonable" to exercise personal jurisdiction over the defendant under the circumstances of the case. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)* (discussing *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).*

n14 *Ingraham,* at 596-597 -- see footnote 8, *supra* -- ("It is appropriate to point out that [HN12] establishment of long-arm jurisdiction in connection with a New York injury under either [clause (i) or (ii) of CPLR section 302(a)(3)] does not implicate constitutional due process concerns. The subdivision [302(a)(3)] was not designed to go to the full limits of permissible jurisdiction. The limits contained in subparagraphs (i) and (ii) were deliberately inserted to keep the provision 'well within constitutional bounds. Thus, in this case, we are bound by a limitation more stringent than any constitutional requirement -- the specific requirements of CPLR 302(a)(3).") (citations and internal quotations omitted); *Topps Co. v. Gerrit J. Verburg Co., 961 F. Supp. 88, 90 (S.D.N.Y. 1997)* (same).

[*15]

[HN13] In determining whether Savannah has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" *Int'l Shoe,* at 316, n15 this Court must consider whether Savannah's "conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,*

2002 U.S. Dist. LEXIS 13827, *

*444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).* As discussed above, Savannah should have reasonably anticipated being haled into court in New York when it allegedly recruited Steuben's employees located in New York despite its awareness of Morris's Non-Solicitation Agreement and the Warning Letter. n16 Indeed, by recruiting the Solicited Employees, Savannah "purposefully directed" its activities at New York residents such that Savannah had "fair warning" that it could be subject to suit in New York. n17 *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-476, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* Moreover, Steuben' claims arise from Savannah's contacts with the Solicited Employees in New York (*i.e.* [*16] , there is specific jurisdiction over Savannah). *Id. at 472-473.* Accordingly, this Court finds that Savannah has sufficient "minimum contacts" with New York. n18

n15 Citations omitted.

n16 *See* footnote 8, *supra.*

n17 *See Calder v. Jones, 465 U.S. 783, 789, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984)* (finding that a California court could exercise personal jurisdiction over defendants because their tortious conduct was "expressly aimed at California"); *Roberts-Gordon LLC v. Superior Radiant Prods., Ltd., 85 F. Supp. 2d 202, 217 (W.D.N.Y. 2000)* (noting that, for cases involving torts committed outside the forum, "the 'purposeful availment' threshold is lower and it is sufficient that the defendant's purpose was to target the forum state and its residents.") (citations omitted).

n18 *Kernan v. Kurz-Hastings, Inc., 997 F. Supp. 367, 377 (W.D.N.Y. 1998)* (noting that the Second Circuit Court of Appeals recognized in *Metropolitan Life* that "the due process 'minimum contacts' inquiry is similar to, and often 'merges with,' the 'foreseeability plus purposeful act' test for determining statutory jurisdiction under [section 302(a)(3)(ii)]"), *aff'd, 175 F.3d 236 (2d Cir.1999).*

[*17]

[HN14] In determining whether it would be "reasonable" to exercise personal jurisdiction over Savannah -- (*i.e.,* it would not offend the "traditional notions of fair play and substantial justice") -- this Court must consider the following factors: (1) the burden on the defendant in defending in the forum; (2) the interests of the forum state in adjudicating the matter; (3) the plaintiff's interest in obtaining effective and convenient

relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering substantive social policies. n19 These factors have been applied on a sliding scale relative to the "minimum contacts" test; in other words, where there is a strong showing of minimum contacts, there need not be as strong a showing of "reasonableness" and vice versa. *Metropolitan Life,* at 568 (citing *Burger King,* at 477).

n19 *World-Wide Volkswagen,* at 292; *Metropolitan Life,* at 568.

As applied [*18] here, this Court finds that it is reasonable to exercise jurisdiction over Savannah. First, it will not unduly burden Savannah to defend this action in New York because it is "economically big enough." Second, New York has a strong interest in adjudicating the interests of a resident corporation for injuries principally felt in New York. Third, Steuben has a strong interest in obtaining effective and convenient relief in the forum of its choice, which should be given deference. Fourth, the interstate judicial system's interest in an efficient resolution of the controversy is evenly split inasmuch as the witnesses appear to be located in both Georgia and New York. n20 Fifth, the shared interest of the several states in furthering substantive social policy is also evenly split inasmuch as the adjudication of this matter in New York would not anymore further any such interest than would the adjudication thereof in Georgia. Accordingly, on balance, the reasonableness factors weigh in favor of this Court exercising personal jurisdiction over Savannah such that "traditional notions of fair play and substantial justice" would not be offended. *Int'l Shoe,* at 316. Therefore, it is constitutionally [*19] permissible for this Court to exercise personal jurisdiction over Savannah.

n20 *See Metropolitan Life,* at 574 (In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located.").

Because Savannah's motion to dismiss for lack of personal jurisdiction will be denied, this Court must now turn its attention to defendants' request that this matter be transferred to the Southern District of Georgia pursuant to [HN15] *28 U.S.C. § 1404*(a), which provides that

"for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

[HN16] The objective of section 1404(a) "'is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" n21 By the same token, a plaintiff's choice of forum should be given special deference where, as here, the plaintiff [*20] is located in the district where the suit was filed, and should be upheld by the court unless the following criteria weigh strongly in the defendant's favor -- the convenience of the parties, the convenience of material witnesses, the relative means of the parties, the locus of operative fact and relative ease of access to sources of proof, attendance of witnesses, the required deference to the plaintiff's forum choice, the availability of process to compel any unwilling witnesses, the desirability of having the case tried by the forum familiar with the substantive law to be applied, relative efficiency and cost, and how best to serve the interests of justice based on the totality of material circumstances. *Schomann Int'l Corp. v. N. Wireless, Ltd., 35 F. Supp. 2d 205, 214 (N.D.N.Y. 1999)*.

n21 *Laumann Mfg. Corp. v. Castings USA, 913 F. Supp. 712, 720 (E.D.N.Y. 1996)* (quoting

*Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)*.

[*21]

After a careful assessment of the above factors -- particularly the equally divided presence of witnesses and evidence in the Western District of New York and in the Southern District of Georgia, the roughly comparable means and resources of the parties, the fact that the Solicited Employees were initially recruited here, the fact that the Non-Solicitation Agreement is governed by the law of New York and the deference due the plaintiff's choice of forum -- this Court finds that the defendants have failed to show "that the balance of convenience and justice weighs heavily in favor of transfer." *Central Sports Army Club v. Arena Assoc., Inc., 952 F. Supp. 181, 189 (S.D.N.Y. 1997)* (declining to transfer action related to contract dispute involving a Russian hockey prodigy).

Accordingly, it is hereby **ORDERED** that Savannah's motion to dismiss is denied and that defendants' motion to transfer venue is denied.

DATED: Buffalo, N.Y.

May 29, 2002

JOHN T. ELFVIN

S.U.S.D.J.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTIAN J. HENRICH, | ) | Case No. 05 CV 0798 |
| Plaintiff, | ) | |
| vs. | ) | |
| JOHN W. FIELD, individually, | ) | |
| JOSEPH B. ELAD, individually, | ) | |
| FAITH B. ELAD, individually, | ) | **DECLARATION OF** |
| QUANTUM LEAP HOLDINGS, INC., | ) | **IRENE PHILLIPS** |
| QUANTUM LEAP INNOVATIONS, INC., | ) | |
| Defendants. | ) | |

**I, IRENE PHILLIPS,** first duly declare, pursuant to U.S.C.§1746, under the penalty of perjury the following statements are true and correct, based on my own and personal knowledge unless otherwise stated and I will testify if so called to:

1.    I make this Declaration at the request of Christopher J. Henrich and his attorney. I have no interest, personal or otherwise, in the outcome of this action

2.    From 1989 to 2003, I was employed by one of the Defendants, Quantum Leap Innovations, as well as its predecessor corporate entities ("Quantum").

3.    When I left Quantum voluntarily in 2003, my job title was Chief Development Officer and I was primarily responsible for managing various projects and contracts that Quantum had throughout the United States (including the State of New York as well as the federal government).

4.    Quantum undertook a corporate strategy to solicit and engage Fortune 500 companies.

5.    From early 1990 to 2003, and upon information and belief, beyond 2003, Quantum performed work for International Business Machines Corp. ("IBM") whereby Quantum developed and implemented from scratch compensation planning software. IBM has used this software for many years. I further believe that Quantum continues to maintain this software for IBM and travels to New York to perform upgrades and or maintenance. When I was employed by Quantum, Quantum would routinely send invoices to IBM's headquarters in Tarrytown, New York and receive payment there from. Upon information and belief, Quantum is still receiving licensing fees from IBM for use of this software. In fact, when I was employed by Quantum, this licensing fee was a significant part of their income during the lean years.

6.    The compensation software plan that Quantum developed for IBM required Quantum employees to travel to New York at IBM's headquarter for training IBM personnel on this and other related software.

7.    Besides the long-standing business relationship that Quantum had with IBM, Quantum regularly solicited business from other Fortune 500 companies located in New York as well as other parts of the United States.

8.    As a direct result of Joseph B. Elad's contacts with IBM, Quantum was engaged again by IBM to develop resource planning software. The projected lasted approximately 9 months.

9.    Besides traveling to New York and other places to solicit business and manage existing contracts, I and other Quantum employees travel to New York to train IBM employees on certain software.

10.    I also solicited business from the Air Force Lab in Rome, New York.  I was responsible for drafting the bid for the Air Force project and was in direct communications with Air Force personnel during the bidding process.  Quantum was awarded business from Air Force Lab in Rome, New York.

11.    Besides the projects that Quantum actually obtained, I was also involved on behalf of Quantum in soliciting business from financial institutions located in New York.

12.    As a result of the support of United States Senator Joseph Biden (and others), Quantum and its parent and sister companies received substantial funding from the federal government furthering its efforts to engage in interstate commerce.

13.    During my time at Quantum, Quantum did not obtain significant project revenue from within the State of Delaware.


DATED:

    March 31, 2006


                                        _____
                                        Irene Phillips


-#993568-


3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTIAN J. HENRICH, | ) | |
| | ) | Case No. 05 CV 0798 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN W. FIELD, individually, | ) | |
| JOSEPH B. ELAD, individually, | ) | |
| FAITH B. ELAD, individually, | ) | **DECLARATION OF** |
| QUANTUM LEAP HOLDINGS, INC., | ) | **CHRISTIAN J. HENRICH** |
| QUANTUM LEAP INNOVATIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**I, CHRISTIAN J. HENRICH**, first duly declare, pursuant to U.S.C.§1746, under the penalty of perjury that the following statements are true and correct, based on my own and personal knowledge unless otherwise stated and I will testify if so called to:

1.      I am the named Plaintiff in the above captioned action and I make this declaration in opposition to Defendants' motion to dismiss my complaint, which motion was filed on February 21, 2006 (the "Motion").

2.      As an initial matter, this case is not just an employment dispute, but a shareholder dispute.

3.      Commencing on or about November 17, 2000, I provided consulting and advisory services to Defendant Quantum Leap Innovations, Inc. ("Quantum"). On August 27, 2001, I entered into an employment agreement with Quantum and served, at first, as Quantum's Chief Network Building Officer (the "Employment Agreement").

Subsequently, I was promoted to Quantum's Chief Operating Officer, a title I held until wrongfully terminated on November 8, 2002.

4.     During November and December 2002, after my termination, I had at least three meetings with Mr. J. Michael Bowman, a director of Defendant Quantum Leap Holdings, Inc., the parent of Quantum ("Holdings"), during which time I informed him directly that I was (i) relocating to Buffalo, New York (my home town, a fact everyone at Quantum knew), by the end of the December 2002 and (ii) was placing my home in Wilmington, Delaware on the market for sale.

5.     Throughout the period in which I provided services to and was employed by Quantum, Mr. Bowman was in near daily contact with Defendants Joseph B. Elad and John W. Field.

6.     Upon information and belief, each of Mr. Apperson Johnson, the Chief Scientist of Quantum and closest friend of Defendant Joseph Elad, and Mr. J. Michael Bowman, director of Holdings and close confidant of Defendant Joseph Elad, informed Defendants Joseph Elad and John Field that I had been hired by a law firm in Buffalo, New York and I had moved to Buffalo, New York shortly after my wrongful termination from Quantum.

7.     The Employment Agreement provided not only for a base salary, but also the issuance of three thousand, two hundred and fifty (3,250) shares of stock of Quantum. Although not pertinent to this Motion, on November 5, 2001, the Board of Directors of Holdings held a "special meeting" wherein the Board of Directors ratified the issuance of

three thousand, two hundred and fifty (3,250) shares of restricted common stock of Holdings to me as well.

8.      Immediately prior to my termination, pursuant to the Employment Agreement, I owned 1,896 worth of "Vested Shares" of Quantum and 1,354 of "Unvested Shares" of Quantum.

9.      Therefore, when I was wrongfully terminated, I owned a total of 3,250 shares of Quantum, which, at the time of my termination, Quantum did not elect to repurchase as the Employment Agreement required.

10.     By not electing at the time of termination to repurchase my Quantum shares, Quantum (by the express terms of the Employment Agreement) forever lost its right to repurchase any of my shares because Quantum's right to repurchase my shares did not survive termination of the Employment Agreement. (Complaint, Exhibit A at Section 18).

11.     After I returned to New York, Quantum attempted to purchase some of my shares. While in New York, Quantum representatives (for example, Defendants Joseph B. Elad and John Field) sent me letters and discussed with me over the telephone the purchase of some of my shares. I also received from Quantum, while in New York, Quantum's check seeking to purchase certain of my shares.

12.     On March 13, 2003, Mr. Joseph B. Elad sent me a letter to my New York business address advising me that Quantum had allegedly purchased certain of my shares pursuant to the Employment Agreement.

13.     A true and correct copy of that Mr. Elad's letter is attached hereto, **Marked as Exhibit "A"**, and incorporated herein by reference.

3

14.    Besides attempting to purchase some of my shares while I was in New York, Quantum has other significant ties to New York State as Quantum engages in interstate commerce.

15.    Upon information and belief, Quantum's most advanced and core software, the Problem Solving Engine, was developed in the early and mid-1990's in cooperation with and pursuant to funding from International Business Machines Corp., which corporation is and was located in New York ("IBM").

16.    Upon information and belief, in 1996, a predecessor corporation to Quantum purchased all rights to the Problem Solving Engine from IBM.

17.    During 1999, Quantum developed and implemented a human resource software program for IBM in its offices in New York.  The program enabled IBM to optimize allocation of bonuses and raises among employees in a manner that maximized performance.

18.    A true and correct copy of a New Castle Business Ledger article that I retrieved from the world wide web is attached hereto, **Marked as Exhibit "B"**, and incorporated herein by reference.  This article not only demonstrates that Quantum does significant business in New York but also has done (and may still do) significant business throughout the United States.

19.    Throughout 2000 and 2001, Quantum was in active discussions with and actively soliciting follow-on projects with IBM in New York.  Defendant Joseph Elad reviewed these discussions with me on several occasions while I was consulting for Quantum.

20.     Upon information and belief, Quantum continues to receive significant licensing fees from IBM.

21.     As representatives of Defendant Quantum, Defendant Joseph B. Elad and I made several sales trips to New York City soliciting interest in Quantum's technology from various organizations.

22.     Before and during my employment with Quantum, Defendant Quantum replied to several requests for proposals from the Air Force Research Laboratory located in Rome, New York (the "AFRL"). Responding to requests for proposals required a substantial effort of upwards of 75 man-hours per proposal and typically involved substantive and active discussions with the AFRL as well as the exchange of software demonstrations, application materials, etc.

23.     A true and correct copy of an article entitled "Software Firm To Assist Air Force" is attached hereto, **Marked as Exhibit "C"**, and incorporated by reference.

24.     A true and correct copy of an article entitled "Quantum Leap Innovations Wins $510,281 Contract" from the United States Federal News is attached hereto, **Marked as Exhibit "D"**, and incorporated by reference. The article demonstrates that Quantum continues to engage in substantial business activity in the State of New York.

25.     The AFRL's focus on sensors made it an ideal customer for Quantum as Quantum's technology was ideally suited for sifting through and analyzing massive amounts of data. There is a limited customer base across the United States for Quantum's technology.

26.    During the term of my employment, Quantum's principle source of revenue was a project with the Air Force Research Laboratory, Space Vehicles. The revenue Quantum received for this project exceeded $900,000 over more than two years.

27.    Upon information and belief, after my wrongful termination, Quantum continued to pursue projects with the AFRL and other Fortune 500 companies located not only in New York, but across the United States as well.

28.    John W. Field, Jr., chairman of the Board of Directors of Quantum Leap Holdings, Inc., is a member of a golf course in or near Rye, New York.

29.    The officers and directors of Holdings direct Quantum's operations on a day-to-day basis. During my employment with Quantum, Quantum regularly paid for a full-time maintenance and cleaning person to service Defendants Joseph and Faith Elad's home.

30.    The board of directors of Quantum never met during my employment with Quantum.

31.    Upon information and belief, during my employment at Quantum, Quantum and Holdings commingled funds and expenses. Defendant Faith Elad regularly paid Quantum expenses from Holdings' bank account and vice versa.

32.    Defendants Faith and Joseph Elad owned, at the time of my wrongful termination, in excess of 70% of the shares of Holdings, and Defendant John Field owned in excess of 7% of the shares of Holdings. As a consequence, if the Defendants are allowed to wrongfully take or repurchase my shares of Quantum, the benefits of such action flow primarily to each of Defendants Joseph Elad, Faith Elad, and John Field.

33.    Upon information and belief, approximately ten percent of the Corporate Defendants' gross revenues are currently earned from business done with organizations located in New York.

DATED:    Buffalo, New York
          March 31, 2006

Christian J. Henrich

-#993657-

# EXHIBIT A



March 13, 2003


<u>VIA CERTIFIED MAIL</u>
Mr. Christian J. Henrich
Damon & Morey, LLP
1000 Cathedral Place
298 Main Street
Buffalo, New York 14202-5500


Dear Chris:

I received your letter of February 18th, 2003 regarding the value of the shares that we repurchased in accordance with the provisions of your Employment Agreement. At the time your vested shares were repurchased the fair market value as established by the Board of Directors was $.28/share. The 1896 Shares in question have been cancelled as of January 31, 2003.


Sincerely yours,

Joseph B. Elad
CEO, Quantum Leap Innovations, Inc.


cc:     J. Michael Bowman
        John W. Field
        Frank Abbott

3 Innovation Way
Suite 100
Newark, DE 19711

phone 302.894.8000
fax 302.894.8001

www.QuantumLeap.us

# EXHIBIT B

Case 1:06-cv-00591-SLR    Document 18-19    Filed 09/22/2006    Page 2 of 7

September 1998: Technology

NCBL Home Page

# Cellular crowd causes cost cut

In the fast-changing world of technology, six months means your product is a veteran; 12 months may make it passé. Telecommunications is no exception, especially when it comes to cellular phones.

A year ago, cellular meant analog wireless technology with just two providers-Bell Atlantic and Comcast Metrophone-offering a sampling of phones and volume-based pricing plans.

Today, there are six providers of cellular service in the Delaware/Philadelphia region with a choice of analog and three digital technologies as well as a bewildering array of extra features and services.

Confusing? Yes. Competitive? Fiercely so. But for a savvy shopper who doesn't get weighed down by technobabble touting marginal differences, it's a buyer's market.

Prices have dropped dramatically. Industry analyst Philip Redman, of the Yankee Group, said prices have fallen 15-30 percent nationwide since 1995 and current per-minute charges are 20-22 cents, half those of 1995.

"This has all spurred incredible subscriber growth," Redman commented-between 30 and 35 percent annually. Three years ago, about 10 percent of the population owned a cellular phone; today it's 25 percent-and 35 percent of U.S. households.

Digital phones, which debuted about a year ago, offer greater battery life, enhanced services such as voice mail and text messages and better call security.

Digital can process three calls on one channel, meaning more network capacity. That's why the FCC allows more digital carriers in a region,while limiting analog service to two providers.

To offset higher rates for long-distance calls which include toll charges as well as roaming rates, cellular offers huge local calling areas. In Delaware, that usually means the entire state, southeastern Pennsylvania and south Jersey. With some carriers, Cecil County is included; Comcast stretches from Boston to D.C. for its home area.

Customer complaints of spotty coverage stem from both physical obstacles to transmission and carriers' practice of building in large population centers first. In this region, with the exception of Comcast, digital carriers started off with partial networks, which meant that customers might need to use dual-mode phones which switch to analog operation when the caller is outside the digital network. Comcast waited until it could offer the same service area to both digital and analog customers.

Although Redman said "churn"-customer turnover-is high with digital providers due to incomplete coverage, overall, more than 90 percent of cellular customers are happy.

Digital carriers use one of three technologies-GSM, which is the standard in Europe, Africa and much of the far East, with over 100 million subscribers; TDMA and CDMA. The differences are minor in terms

of call clarity and strength and calls can be made between the different networks.

For a user, the only potential problem is in switching digital service from one provider to another. If the new provider uses a different technology, the customer will have to buy a new phone.

"Most providers don't sell on technology," Redman noted. "Better coverage or technology is not a valid argument; carriers compete on customer service, billing, pricing and features."

# Let's make a deal!

Deals abound. Some carriers have dispensed with contracts, activation and termination fees, roaming charges or landline costs. Service plans may include hundreds or even thousands of minutes per month and the first incoming minute is usually free. You can also rent a phone for a nominal monthly fee, upgrading as newer models become available.

Paging, voice mail and text messages, as well as call forwarding, caller ID and call waiting, may be included in the service plan. Bundling of services provides a package of advanced features and/or additional calling time.

For businesses, Comcast has begun offering volume discounting and aggregate billing (allowing plan minutes to be shared among all a company's users). Some providers can include cellular service with other telecommunications products sold by their parent company.

Nextel promotes its unique two-way radio technology through its Direct Connect service. Customers can create their own network of co-workers, business partners, suppliers, etc. and contact them instantly at a fraction of the cost of cellular service. To keep up, Bell is offering a $10/month service allowing communications with any other Bell customer in the region.

Several service providers now have retail stores as well as direct salespeople to offer knowledgeable service about their products. It pays to shop around and most providers will come to a business.

And re-evaluate every six months or so. "Everything's changing so quickly; it's a fast-growing market," noted Bell's Delaware sales manager Jean Burton.

# Quantum software tackles tough jobs tasks

In 1985, two University of Delaware students and three graduate students took a leap of faith and started a software company. Their mission? To utilize artificial intelligence and computer science and apply them to business problems.

Sound like HAL in the sci-fi flick 2001? Hardly. Fueled by data, Quantum Leap calls on 30 different problem-solving computer programs, which hash it out to present the solutions. From designing cars to cash flow planning, Quantum Leap's contributions are seemingly unlimited.

And it's set to take the Fortune 500 world by storm, according to Joseph B. Elad, president of Claymont, Del-based Quantum Leap Innovations, Inc. "We're really sitting on a gold mine," Elad said.

Originally founded as Quantum Development Corp., the fledgling business initially was funded by a research and development agreement with Simon & Schuster's software division. The publishing giant

wanted to create software versions of popular books, such as J.K. Lasser's tax preparation guide and Dr. Spock's child-care book.

The 1988 merger of Simon & Schuster and Prentice Hall, however, left Quantum in the cold. Yet the company persevered, attracting clients such as DuPont and Federated Department Stores. Increasingly, the founders noticed the same type of business problems.

"We were watching the way people use spreadsheets for projections and cash flow management, Elad said. "People weren't representing the problem, and they didn't have the tools to solve the problem once it was represented."

Necessity is the mother of invention. Quantum corralled concepts from spreadsheets, object-oriented programming and natural-language processing to produce more accurate results. That problem-solving process gave birth to a whole new direction for Quantum, which it wholeheartedly embraced in 1989.

It wasn't easy. One founder even mortgaged his house to fund the creation of a prototype to present to venture capital funds. But it was worth it. Quantum Leap caught the eye of Alan Scherr, an IBM fellow, who convinced IBM to partially fund the first commercial product. In 1993, the relationship expanded into a joint marketing agreement. Heralded as a next-generation spreadsheet, Quantum Leap was primarily presented to Wall Street firms.

But too much time was spent educating the customer. And it was time that busy IBM salespeople did not have. "You really have to have your own sales force to suffer the pain of the revolution," Elad said.

In 1995, Quantum broke with IBM. "A lot of people risked their careers," Elad recalled. "We decided to work with our customers, and see if we could make it happen."

For the most part, the software was just sitting on customers' shelves. So Quantum began servicing customers, explaining how the software could benefit them. In one instance, consulting Quantum Leap helped one company save money on plant improvements. In the face of such success, customers got excited. Quantum Leap soon was applied to issues involving product development, competitive pricing, manufacturing planning, performance metrics, global cash flow and corporate planning.

By 1996, Quantum bought back stock held by IBM. And it's seen its business soar ever since. In March, the company changed its name to Quantum Leap Innovations to capitalize on the software's cachet. A sister firm is called Quantum Leap Research and the holding company is Quantum Leap Holding "just to have Quantum Leap everywhere," Elad said.

To the layperson, Quantum Leap's mechanics can be bewildering. And the concepts are even harder to grasp considering that Quantum Leap can be applied to such a broad range of problems.

NASA's Langley Research Center, for instance, used it to analyze the design for an airliner. Instead of working on each separate piece, such as the fuselage or engine, the software offered up a complete design synthesis. Quantum can also assist in the design of tractors, trucks, satellites, ships and locomotives.

On the other hand, Quantum Leap aided Texas Instruments Inc. with its capital-spending plans, allowing the company to save at least 5 percent of a multibillion five-year budget. And it can even help companies decide which products to manufacture for which markets.

"It requires a fairly sophisticated user just to appreciate what it can do," said Steven D. Eppinger, a member of Massachusetts Institute of Technology's Center of Innovation in Product Development in a May 18 Business Week interview.

Which might be one reason why Quantum now focuses on Fortune 500 companies, for which it can tailor the software to meet specific needs.

"We're limiting ourselves to companies that are $500 million in revenue or more," Elad said. "Not to be arrogant, but because these are people who can justify our services."

Quantum Leap's core "Problem-Solving Engine" comes with an annual license fee that starts at $25,000. Additional applications can double the cost.

Quantum's main concern these days is controlled growth. In particular, it's been hard finding qualified employees, Elad said. That's not hard to believe considering the company is based in Delaware not known for being a magnet for computer techies and software sales wizards. But Quantum's key figures want to stay put, Elad said. And in the near future, the company will move to a larger Newark location.

"To have a really successful technological industry in Delaware we need enough of us to go through the roof," Elad said.

Quantum plans to be one of them.

## Computer Vision syndrome growing concern

*Editor's note: Forgnoni is a Doctor of Optometry*

Computer vision syndrome (CVS) is a growing concern for business owners and their employees. According to the American Optometric Association, CVS is "the complex of eye and vision problems related to near work which are experienced during or related to computer use." Most studies show that 50-90% of computer users have visual symptoms.

CVS symptoms include eyestrain, fatigue, headache, blurred vision, dry or irritated eyes, double vision, neck and backaches. These symptoms can lead to decreases work productivity and time off from work.

Glasses, contacts or surgery can not correct all of the visual symptoms of CVS. Non-surgical relief can be obtained through vision therapy. Vision therapy helps relieve underlying eye muscle disorders, which cause most of the symptoms of computer vision syndrome.

Vision therapy is an individualized treatment program prescribed by an eye care specialist to help individuals gain full function and efficiency with their visual system. Similar to physical therapy, vision therapy utilizes in-office and home exercises. The effectiveness of vision therapy is proven by the American Optometric Association.

Professional athletes use vision therapy to help with speed of recognition, improving eye-hand coordination, and visual thinking.

These skills are important for any visually demanding occupation, especially those using computers. Vision therapy can help give you and your employees a competitive edge in the demanding workforce.

A thorough eye health and vision examination can determine if an individual's vision system is functioning optimally. Look for an eye care provider who has advanced clinical experience and training in the specialty of vision therapy. State-of-the-art instrumentation and techniques help to bring long-lasting relief, quickly and cost-effectively.

You do not have to accept discomfort as part of your work regimen. Eye doctors can focus on treating the underlying physiological problems of CVS. Other specialists are best to consult for ergonomic and environmental work concerns.

Studies show that one in five patients who visits an optometrist will have CVS symptoms. Research shows that there is no correlation between CVS and age. CVS can affect one at any age. One of the leading factors resulting in CVS is visual demand exceeding one's visual ability. One of the most common conditions resulting in CVS is convergence insufficiency (CI) which affects about 4% of the population.

CI results in difficulty or inability to align the eye muscles comfortably for near point tasks such as reading and computer use. The symptoms of untreated CI include: eye fatigue, headaches, blurred vision, double vision, sleepiness, and loss of concentration. CI is a neuromuscular anomaly. The treatment for CI is medically necessary. Vision therapy is the preferred treatment for CI. The success rate of treating CI with VT is reported to be between 85% and 95%. The positive effects can be lifelong relief and satisfaction with one's vision system.

Powerful, state-of-the-art computerized home therapy programs help make VT cost effective. The programs are by prescription only. The patient follows the prescribed treatment plan, and the data about each session is recorded on floppy disk: time and duration of each session, the results and graphs of cumulative work performance. The patient simply brings the disk with them to there progress evaluation, and the data can be analyzed by the doctor in the office. This computer program can be used in conjunction with additional in-office or supplemental home therapy if needed. A strong vision therapy program is goal oriented and individualized for each patient. Positive results can come quickly in just 1 or 2 sessions, however most programs take several weeks to complete. Complicated cases may take several months. It may seem ironic to use a computer program to treat CVS. However, it is all in how we use the computer, which can make or break us.

Due to the design of computer images being made up from pixels (tiny dots) the eye has difficulty focusing on information on a computer screen. Ocular repetitive stress syndrome of the eye muscles occurs as computer user constantly strives to refocus to keep the images clear. Reading printed material on a page is generally not as stressful to an individual.

There are specialized examination procedures and products that go beyond the "routine" to help CVS sufferers. The CVS examination is categorized as an in-depth binocular vision analysis (sensorimotor evaluation). State-of-the-art equipment, including small, near-point computer simulators can be used in the eye doctor's office to provide objective data when prescribing glasses and/or contact lenses to treat CVS.

Various characteristics are critical in comfortably viewing a VDT. They are screen flicker, contrast, monitor size, dot pitch size, resolution, refresh rate, and a clean viewing screen.

If a person is predisposed to CVS, genetic or otherwise, during stressful times, the more intense the work on the computer, the more intense the CVS symptoms are. Some CVS symptoms may be relieved with rest, a weekend break, or a vacation. Sometimes, however, if the symptoms are chronic, they may

occur even during restful times. Because an ounce of prevention is worth a pound of cure, proper intervention should be initiated before symptoms arise, and immediately if they do surface.

Computer workers should follow the "20/20 rule": keep your reading material at least 20 inches away, rest your eyes every 20 minutes for a minimum of 20 seconds while focusing as far away as possible, preferably at least 20 feet away. This rests the eye muscles. There are 6 eye muscles around the outside of each eyeball, which controls movement, and there is a circular body of eye muscles, inside the eyeball, which controls focusing.

These hard-working muscles deserve regular breaks. In addition to headaches and general eye discomfort, if these muscles are not rested, nearsightedness may be induced. The first signs of this pseudo-myopia, which may become permanent, may be distance blur when trying to drive home after work, especially when it's dark outside.

Computer users suffer from dry, irritated eyes more than non-computer users, because their blink-rate decreases, and the eyes are opened wider to look at the VDT thus causing increase tear evaporation. Ironically, watery eyes may actually be dry. This is because as the eye is irritated, reflex tearing occurs, but often the reflex tears are inadequate. Artificial tear supplementation is often required and/or plugging the tear drainage canals so as to inhibit rapid tear evaporation.

Regular vision examinations are imperative for optimal visual wellness. The American Optometric Association's guidelines recommends that all adults be examined regularly in 1 to 2 year intervals, or sooner if needed.

Children are to be examined by an eye doctor first at 6 months of age, then at 3 years, then before 1st grade or sooner if indicated.

A school screening does not suffice for an eye examination. School-age children are recommended to have regular eye exams every 2 years or sooner if indicated.

---

E-mail NCBL at: ledger@dca.net

# EXHIBIT C

delawareonline ¦ The News Journal ¦ Software firm to assist Air Force                                    11/15/2005 08:30 AM

Customer Service | Subscribe Now | To advertise | Place an ad | Contact Us

 The News Journal

Search   ⊙7 days ○Archive

DELAWAREONLINE | WEATHER | CALENDAR | JOBS | CARS | HOMES | CLASSIFIEDS | SHOPPING | DATING

**NEWS JOURNAL ▼**

Local
Nation/World
Business
Sports
Life
Opinion
Obituaries

**ENTERTAINMENT ▼**

**TRAVEL**

HOME > Business > Article

## Software firm to assist Air Force

BY RICHARD SINE
THE NEWS JOURNAL
08/11/2005

✉ Email   🖨 Print   💬 Discuss   📰 Subscribe   📺 Newscast

NEWARK -- The folks at Newark-based software firm Quantum Leap Innovations recently heard of a Department of Homeland Security intelligence analyst who had accumulated 115,000 unopened e-mails after just nine months on the job.

Surely, most of those e-mails were spam. But did she miss a key e-mail? Or was there other useful information she never received? How would she ever know?

"The problem with intelligence is, we're drowning in information but starving for the right knowledge," said Quantum Leap chief executive Joseph Elad.

With a $500,000 contract from the Air Force, Quantum Leap is building software that helps provide "the right



THE NEWS JOURNAL/BOB HERBERT
Donald D. Steiner, chief technology officer at Quantum Leap Innovations, is developing software that could lead to a next-generation search engine.

Advertisement



Get on the Fast Track
**UD Executive MBA**
It's where you're going that counts.
www.emba.udel.edu
302.831.2221

**Click Here**

apartments.com.
apartments.com.
apartments.com.
apartments.com.
Search now

Advertisement

These days it's nice to save time and money under one roof.

**WSFS** bank

information to the right people at the right time," said Elad, a University of Delaware computer science graduate who cofounded Quantum Leap in 1999.

Today's analysts get information from spies, satellites, electronic sensors, cameras, documents, the Internet and other sources, said Donald Steiner, chief technology officer for Quantum Leap.

Steiner is developing an intelligent software "agent" that can continuously search for data and choose which is most important for the analyst to see first.

**Quantum Leap Innovations**

**EMPLOYEES:** 36

**REVENUES:** Undisclosed

**PRODUCTS:** Artificial Intelligence software based on advanced mathematics

**CUSTOMERS:** Intelligence agencies, manufacturers, business planners

**Related news from the Web**
Latest headlines by topic:
• Email Spam
• Cellphones
• Electronics

Powered by Topix.net

For example, routine information might be put into an e-mail. But urgent data would be sent in a text message to the analyst's cell phone.

The agent would change its search parameters based on what the analyst is reading or searching for, Steiner said.

Most people are familiar with search engines that respond to a user's queries. But Steiner's agent would find interesting data that the user never specifically requested.

The program also would keep abreast of the interests and expertise of thousands of intelligence analysts throughout government. It will suggest collaboration between analysts with similar expertise or research interests. U.S. intelligence and law enforcement agencies have frequently been criticized for failing to collaborate or share information.

Intelligence gathering is so overwhelming because "most people are doing legal and ethical things," said James Hendler, former chief scientist for information systems at the federal Defense Advanced Research Projects Agency.

To an outsider, activities involved in planning a wedding look much like those involved in planning a bombing, Hendler noted. Taking flying lessons for recreation looks much like taking flying lessons for terrorist ends. The key is finding suspicious details or patterns.

"Most of the things in all these databases are not going to point to terrorist events," said Hendler. "How are you going to find in this welter of information things that are suspicious?"

Hendler, who is familiar with some of Quantum Leap's work for defense agencies, said the company is "working on some very interesting technology, and the approaches they're taking are very powerful ones."

Stephen Prior, the company's head of biodefense programs, said the constantly evolving terrorist threat requires equally adaptable software.

The Air Force project isn't classified as secret. Quantum Leap avoids classified government contracts because it limits the company's ability to find commercial uses for its software, Elad said. The Air Force project research could someday help the company build a software personal assistant or a next-generation search engine, Elad said.

*Contact Richard Sine at 324-2878 or rsine@delawareonline.com.*

▲ Top of page

Advertisement

**DELAWAREONLINE | WEATHER | CALENDAR | JOBS | CARS | HOMES | CLASSIFIEDS | SHOPPING | DATING**

Partners ¦ Jobs: CareerBuilder.com ¦ Cars· cars.com ¦ Apartments: apartments.com ¦ Shopping: ShopLocal.com   USA TODAY   GANNETT   GF GANNETT

**Copyright © 2005, The News Journal. Use of this site signifies your agreement to the Terms of Service and Privacy Policy (updated 10/3/2005)**

# EXHIBIT D

1 of 1 DOCUMENT

Copyright 2005 HT Media Ltd.
All Rights Reserved
US Fed News

March 18, 2005 Friday 4:40 AM EST

**LENGTH:** 76 words

**HEADLINE:** Quantum Leap Innovations Wins $510,281 Contract

**BYLINE:** US Fed News

**DATELINE:** ROME, N.Y.

**BODY:**

ROME, N.Y., March 18 -- The U.S. **Air Force** has awarded a $510,281 contract to **Quantum Leap Innovations** Inc., Newark, Del., for the research and development work.

The contract was awarded by the Air Force Materiel Command's Air Force Research Laboratory, Rome, N.Y.

For more information about US Fed News contract awards please contact: Myron Struck, Managing Editor/US Bureau, US Fed News, Direct: 703/866-4708, Cell: 703/304-1897, Myron@targetednews.com.

**LOAD-DATE:** March 19, 2005

## CERTIFICATE OF SERVICE

The foregoing **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss together with the Declarations of Christian J. Henrich and Irene Phillips** were filed electronically with the United States District Court for the Western District of New York on **March 31, 2006**. Notice of this filing will be sent to all parties by operation of the Court's filing system.

David S. Widenor, Esq.

-#994469-

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHRISTIAN J. HENRICH,

      Plaintiff,

      v.                                          Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

      Defendants.

_____


**REPLY MEMORANDUM OF LAW
<u>IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349

Edward S. Mazurek
Michael E. Dash, Jr. (pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Dated:  April 5, 2006                Attorneys for Defendant

I.        **INTRODUCTION**

Plaintiff's Opposition is a calculated effort in misdirection.  Unable to meet the

substance of the Defendants' arguments, Plaintiff instead attributes to them an argument of his

own making – namely, Plaintiff asserts that all of the Defendants' arguments somehow rested on

an "abridged" version of his Complaint that did not include those aspects of his claims that rest

on alleged events occurring after his discharge – notwithstanding repeated references to those

post-discharge events throughout Defendants' Motion.  Apparently hoping that the Court will not

notice his sleight of hand, Plaintiff then proceeds to take great pains to demonstrate the lack of

merit in "Defendants' argument."  In fact, the Defendants' Motion did not discount those alleged

post-discharge events; the Defendants merely took them for what they were, minor and

ministerial correspondence (one letter sent to New York and, according to Plaintiff's Affidavit,

one telephone call)[1] that merely informed Plaintiff of the results of events that occurred in

Delaware, namely, the Defendants' decision to repurchase his shares and to evaluate how much

they are worth.  Despite Plaintiff's strained efforts to convert those minor and ministerial

communications into the heart of his claims, they neither confer jurisdiction on this Court nor

render this Court an appropriate venue.  All of the material events at-issue occurred in Delaware,

---

[1]       It should be noted that, notwithstanding language in Plaintiff's Affidavit that suggests
that Innovations sent as many as three letters to Plaintiff in New York regarding the
repurchase of his shares, in fact, Innovations only sent one letter directly to him in New
York, the March 2003 letter which was attached as Exhibit A to Plaintiff's Affidavit.  See
Plaintiff's Aff. at ¶¶ 11-13.  Two prior pieces of correspondence regarding that issue,
dated November 18, 2002 and January 31, 2003, were directed to the residence that
Plaintiff maintained in Delaware.  See Abbott Supplemental Declaration at ¶¶ 8-9 and
Exs. A and B.  Plaintiff's wife accepted certified copies of those letters.  See id.
Curiously, although Plaintiff refers to the November 2002 and January 2003 pieces of
correspondence in his Affidavit, he did not attach copies of them to his Affidavit.  See
Plaintiff's Aff. at ¶¶ 11-13.  Plaintiff did, however, attach to his Affidavit a copy of the
March 2003 correspondence that Innovations sent to his New York address as he
requested.  Id.

which is obviously the more appropriate forum for this action.  Accordingly, the Defendants respectfully renew their request that the Court dismiss this action for lack of personal jurisdiction over the Defendants and improper venue.

## II.    COUNTER-STATEMENT OF RELEVANT FACTS

Notwithstanding Plaintiff's attempts to manufacture substantial connections between the Corporate Defendants (Innovations and Holdings) and the state of New York, in fact, neither entity has any substantial connection with New York or the Western District. Indeed, notably absent from Plaintiff's Motion or its accompanying affidavits is anything that might establish that Holdings, Innovations' parent corporation, has any direct connections with New York.  In fact, it does not.  As explained in Defendants' initial Brief, Holdings is a holding corporation with offices, operations, and officers located solely in Newark, Delaware.

While Innovations does have some business dealings in New York, those dealings are very limited.  Specifically, over the past several years, Innovations has been a party to only four small contracts that have any connections with New York.  These New York-affiliated contracts have always represented a very small percentage of Innovations' total revenue (.9% in 2003, 1.32% in 2004, 7.8% in 2005).  Abbott Supp. Decl. at ¶ 7.  First, beginning in 2003, Innovations sold an annually-renewable software license to IBM, based in Armonk, New York. Id. at ¶ 3.  Innovations has received roughly $24,000 annually under that license, less than 1% of its total annual revenue in 2003.  Id.  Second, in 2004, Innovations performed a small software improvement project for IBM for which Innovations received roughly $21,000.00, less than .7% of Innovations' total revenue that year.  Id. at ¶ 4.  The work on that contract was performed by Innovations employees in Delaware.  Id.  Innovations is also a party to two contracts it entered into with the United States Air Force Research Laboratory in Rome, New York in 2005.  Id. at ¶

5.  Billings on those contracts totaled $281,411 in 2005, less than 7.2% of Innovations' total annual revenue.  Id. at ¶ 6.

## III.    ARGUMENT

### A.    Plaintiff Has Not Met Any of the Requirements of New York Law.

Plaintiff asserts that he has demonstrated that he has met the requirements of all three provisions of New York's long-arm statute, CPLR § 302(a)(1)-(3).  In fact, none of those three alternatives has been met.

Plaintiff cannot rely on § 302(a)(3) for at least two reasons.  First, the Defendants should not "reasonably have foreseen" the consequences of any of their alleged actions in New York.  Innovations hired, employed, and fired Plaintiff in Delaware.  It's board conducted its evaluation of his shares in Delaware and informed him, at his residence in Delaware, that it had done so.  Abbott Supp. Decl. at ¶¶ 8-9.  While Innovations later reiterated that valuation in one piece of subsequent correspondence directed to Plaintiff in New York, it did so only because he had happened to move to New York after his relationship with the Defendants had ended.  The Delaware Employment Agreement – the agreement on which both his employment and shareholder claims are based – clearly contemplated that any litigation regarding it would be conducted in Delaware; it identified Delaware as the appropriate forum.

Second, notwithstanding Plaintiff's attempts to make more out of Innovations' limited New York connections than the actual facts might support, as demonstrated above, none of the Defendants derives substantial revenue from New York.  Only Innovations derives any revenue (albeit, relatively insubstantial) from the state; neither Holdings nor any of the Individual Defendants are alleged to receive *any* revenue – substantial or otherwise – from New York.  Section 302(a)(3) provides no basis for the Court's exercise of personal jurisdiction over any of the Defendants.

Plaintiff also cannot rely § 302(a)(1)'s "transaction" rule. "To invoke § 302(a)(1), a plaintiff must demonstrate that the defendants transacted business within New York <u>and that the cause of action arises out of these activities</u>." <u>Berk v. Nemetz</u>, 646 F. Supp. 1080, 1083 (S.D.N.Y. 1986) (emphasis added). Section 302(a)(1) is obviously not applicable to either Holdings or any of the Individual Defendants; none have transacted any business within New York. The "transaction" at-issue – the Delaware Employment Agreement – was made between Innovations and Plaintiff. Significantly, however, that "transaction" did not occur in New York – it occurred in Delaware when Plaintiff entered into the Employment Agreement with Innovations. The one letter and one phone call that occurred while Plaintiff happened to be in New York were not a "transaction;" they merely conveyed information to Plaintiff regarding his prior Delaware transaction. Section 302(a)(3) provides no basis for the Court's exercise of personal jurisdiction over any of the Defendants.

Finally, § 302(a)(2), which permits the exercise of personal jurisdiction when a defendant commits a tortious act *within* New York, is likewise inapplicable because none of the Defendants committed a tortious act – even allegedly so – *within* New York. Plaintiff's own words demonstrate that is the case. Specifically, Plaintiff asserts that the Defendants "wrongfully converted the Shares of the Plaintiff [<u>i.e.</u>, the alleged post-discharge conduct] <u>at an alleged meeting of the Board of Directors</u> [in Newark, Delaware] .… This wrongful conduct constitutes tortious conduct <u>outside of New York</u> that caused injury to the Plaintiff in New York." [Plaintiff's Opp. at p. 9 (emphasis added)]. Plaintiff's own words indicate that any alleged tortious conduct at-issue occurred outside of New York (although a fair reading of the Complaint demonstrates that this case is clearly a contract action at heart). Section 302(a)(2) is thus obviously inapplicable.

**B.    The Constitutional Requirements for the Exercise of Personal Jurisdiction Are Not Met.**

As explained in the Defendants' initial Brief, even if the Court were to find that New York's requirements for the exercise of personal jurisdiction were met, the Court should still dismiss Mr. Henrich's Complaint because the exercise of such jurisdiction here would violate the due process clause of the United States Constitution. Nothing in Plaintiff's Opposition can alter this conclusion. Plaintiff has not adduced evidence that demonstrates that the minimum contacts test has been met – certainly, not as to all of the Defendants. Moreover, even if that test were met, other than parroting back in conclusory fashion the factors that the Court must consider under the "reasonableness" test, Plaintiff has offered no cogent explanation why it would be reasonable to drag all of the parties witnesses (including those employed by the parties and third-parties) 450 miles from Newark, Delaware to Buffalo merely because Plaintiff happened to move back home after his discharge from Innovations.

Given Plaintiff's abject failure to establish minimum contacts between Holdings and the Individual Defendants and New York, Plaintiff's arguments regarding the minimum contacts tests bear only passing remarks. None of these Defendants have contacts with New York sufficient to satisfy the minimum contacts test. Plaintiff has not even alleged, much less produced evidence that might prove, that any of these Defendants had or has substantial contacts with New York. Likewise, while Innovations does have *some* contacts with New York, as demonstrated above, those contacts are: (1) insubstantial, representing a very small percentage of Innovation's total revenue; and (2) utterly unrelated to the claims in this case, i.e., while those contacts arguably might establish specific jurisdiction over Innovations as to claims related to those specific contacts (which have nothing at all to do with Plaintiff's claims in this case) they certainly are not sufficient to establish general jurisdiction over Innovations. See Helicopteros

Nacionales De Colombia, S.A. v. Hall, 466 US 408, 419 (1984) (holding that a Colombian corporation's contacts with Texas, which consisted of the purchase of $4 million worth of helicopters and equipment from a Texas manufacturer, acceptance of checks drawn on a Texas bank, a trip to Texas by the defendant's chief operating officer for the purposes of negotiating a transportation services contract, and sending personnel to Texas for training were insufficient to find minimum contacts).

   As for the reasonableness test, the Defendants set forth in their Brief numerous reasons why it would be both unreasonable to require the Defendants to defend themselves in this Court but reasonable to require Plaintiff to litigate his claims in a more appropriate forum such as Delaware – a forum that he expressly acknowledged as reasonable in his Delaware Employment Agreement.  For example, the Defendants established that:  (1) all of the parties and witnesses (save Plaintiff), documents, and facilities are located 450 miles away in Delaware where every event at-issue (save Plaintiff's receipt of one phone call and one letter) occurred; (2) Delaware law will govern all of the claims in this case and Delaware courts are obviously more readily able to discern the contours of that law and apply it; (3) even if this Court were to exercise jurisdiction, even Plaintiff would be forced to travel to Delaware to conduct nearly all of the discovery in this case; and (4) there is no reason – much less a compelling one – that would require this case to be litigated before this Court.  In his Opposition, Plaintiff counters none of these arguments directly.  Nor does he point to any compelling reason that might necessitate the adjudication of this litigation here.  Instead, he merely asserts in conclusory fashion, that it would not be unduly burdensome for the Defendants to defend themselves 450 miles from their homes and businesses and that Plaintiff has "strong interest" in litigating his claims here.  That response is no response at all.  None of the factors weigh in favor of a finding that it would reasonable to

conduct this litigation in this District.  Subjecting the Defendants to this suit in the Western

District would be contrary to "traditional notions of fair play and substantial justice" and, thus,

the Complaint should be dismissed for want of personal jurisdiction over the Defendants.

**C.    Venue is Improper**

As explained in the Defendants' Brief, 28 U.S.C. § 1391(a) sets forth three

general circumstances under which venue is appropriate.  In his Opposition, Plaintiff seeks to

rely on only one of those exceptions, that set forth in § 1391(a)(2).  (See Plaintiff's Opp. at p.

17).  Specifically, Plaintiff asserts that "a substantial part of the events … giving rise to his claim

occurred" in New York because he received in New York one phone call and one letter that

addressed:  (1) his rights under the Delaware Employment Agreement he negotiated, entered

into, worked under, and was discharged under in Delaware; (2) the Board's decision regarding

the value of the shares he received under that Delaware Employment Agreement (that the Board

made in Delaware).

The mere articulation of Plaintiff's argument demonstrates its lack of merit.  All

of the material events in this case occurred in Delaware.  The only connection this case has with

New York is the particular happenstance that Plaintiff returned to the state after all of the

material events had already taken place in Delaware and, thus, he received a couple of discrete

communications apprising him of those events.  Those ministerial communications are not "a

substantial part of the events" that make up Plaintiff's claims.

The Bates v. C&S Adjusters, Inc., 980 F.2d 865, 868 (2d Cir. 1992), decision

relied upon by Plaintiff does not hold to the contrary.  In that case, the Second Circuit merely

held that venue was proper in the district in which the plaintiff resided when he received a

communication (related to a debt he had incurred outside the district) that allegedly violated the

Fair Debt Collection Practices Act.  Id. at 867.  Significantly, that substantive provisions of the

statute involved in <u>Bates</u> addressed *the means utilized to collect* the debt, not the debt itself.  <u>Id.</u> at 868.  For example, the court noted that "if the notice were lost in the mail, it is unlikely that a violation of the Act would have occurred."  <u>Id.</u>  Accordingly, the Second Circuit found that venue was appropriate in the District in which the alleged unlawful practice – the *communication* itself – occurred.  <u>Id.</u>

The <u>Bates</u> decision has nothing to do with Plaintiff's circumstances here.  Plaintiff has not leveled any allegations of impropriety regarding the communications he received from the Defendants.  He does not, for example, argue that those communications contained any misrepresentations or, somehow by themselves, deprived him of the full value of his shares.  Instead, he challenges the Board's *decision* to value his shares in the manner that it did, a decision that unquestionably occurred in Delaware.  Plaintiff's Opp. at p. 9 ("This wrongful conduct [the meeting at which the Board established the fair market value for his shares] <u>constitutes tortious conduct outside of New York</u> that caused injury to the Plaintiff in New York") (emphasis added).  Again, Plaintiff's own words demonstrate that the *events* at-issue occurred in Delaware – he merely received *notice* of them in New York.  The mere receipt of such notice does not render venue in this District appropriate.  <u>See, e.g.</u>, <u>Daniel v. Am. Bd. of Emergency Med.</u>, 428 F.3d 408, 434 (2d Cir. 2005) (holding under identical language set forth in 28 U.S.C. § 1391(b)(2), in case challenging substance of medical board's certification programs, that board's communication of "its decision [rejecting plaintiffs' applications] to plaintiffs by mail sent their home states [some of which included New York] …. constitutes only an <u>insignificant and certainly not 'substantial part</u> of the events or omissions giving rise to'" the plaintiffs' claims and thus venue in the Western District of New York was not appropriate) (emphasis added).

8

In short, none of options set forth in § 1391(a) are applicable. The Western District is not an appropriate venue. Accordingly, the Court should dismiss the Complaint under Rule 12(b)(3).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons and those set forth in their initial Brief, the Defendants respectfully request that this Court find that it does not have personal jurisdiction over any of the Defendants and dismiss the Complaint pursuant to Rule 12(b)(2). The Defendants also request that the Court find that venue is improper and dismiss the Complaint pursuant to Rule 12(b)(3) as well.

Respectfully submitted,

/s/  Michael E. Dash, Jr. (pro hac vice)
Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349

Edward S. Mazurek
Michael E. Dash, Jr. (pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Dated:  April 5, 2006                    Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I, Brenden R. Chainey, hereby certify that I caused a true and correct copy of the

foregoing Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss the

Plaintiff's Complaint Pursuant to 12(b)(2) and 12(b)(3) to be served on April 5, 2006, via

overnight mail on the following:

> David S. Widenor
> Damon & Morey LLP
> 1000 Cathedral Place
> 298 Main Street
> Buffalo, New York 14202
>
> Counsel for Plaintiff

> /s/ Brenden R. Chainey
> Brenden R. Chainey

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHRISTIAN J. HENRICH, | Case No. 05 CV 0798 |
| Plaintiff, |  |
| v. |  |
| JOHN W. FIELD, individually, JOSEPH B. ELAD, individually, FAITH B. ELAD, individually, QUANTUM LEAP HOLDING, INC., and QUANTUM LEAP INNOVATIONS, INC., |  |
| Defendants. |  |

## SUPPLEMENTAL DECLARATION OF FRANK ABBOTT

I, FRANKLIN T. ABBOTT declare:

1.     I understand that, in response to the Defendants' Motion to Dismiss, Mr. Henrich has made certain allegations regarding the Defendants' New York business activities. I submit this supplemental declaration in further support of the Defendants' Motion to Dismiss.

2.     In recent years, Quantum Leap Innovations ("Innovations") has been a party to only four small contracts with parties located in New York: two with IBM and two with the United States Air Force Research Laboratory in Rome, New York.

3.     Specifically, in 2003, Innovations sold an annually-renewable software license to IBM, based in Armonk, New York. Innovations has received roughly $24,000 on average annually under that license, less than 1.0 % of Innovations' total annual revenue in 2003.

4.     In 2004, Innovations performed a small software improvement project for IBM for which Innovations received roughly $21,000.00, less than .7 % of Innovations' total

revenue that year. The work on that contract was performed by Innovations employees in Delaware.

5.    Innovations is also a party to two small contracts it entered into with the United States Air Force Research Laboratory in 2005.

6.    In 2005, billings on those contracts totaled $281,411, less than 7.2 % of Innovations' total annual revenue.

7.    In total, these four contracts have represented a very small percentage of Innovations' total annual revenue (.9% in 2003, 1.32% in 2004, 7.80% in 2005).

8.    On November 18, 2002, Innovations informed Plaintiff, in a letter addressed to his residence in Wilmington, Delaware, that it had exercised certain rights to repurchase shares issued under Plaintiff's employment agreement. A copy of that letter, along with an accompanying certified mail receipt that indicates that Plaintiff's wife accepted receipt of it on November 21, 2002, at the Wilmington address is attached hereto as Exhibit A.

9.    On January 31, 2003, Innovations informed Plaintiff, in a letter addressed to his residence in Wilmington, Delaware, that it had exercised certain additional rights to repurchase shares issues under Plaintiff's employment agreement. A copy of that letter, along with an accompanying certified mail receipt that indicates that Plaintiff's wife accepted receipt of it at the Wilmington address on February 3, 2003, is attached hereto as Exhibit B.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual averments are true and correct.

Date:  April 5, 2006

Franklin T. Abbott

-2-

# EXHIBIT A

Apr 05 06 03:30p    Quantum Leap Innovations    302-894-8001    p.2



November 18, 2002

Mr. Christian J. Henrich
35 Rockford Road
Wilmington, DE 19806

Dear Chris:

In accordance with the provisions of Item 3(a)(ii) of your Employment Agreement dated August 27, 2001 we are exercising the Corporation's right to repurchase your Unvested Shares. Check # 1662 in the amount of $13.54 is enclosed to cover the repurchase of the Unvested Shares based upon the formula contained in the above referenced Employment Agreement. Details of the calculation are provided below:

Formula:
X = Total number of shares of the Granted Stock
Y = Number of Calendar Months that have been completed subsequent to October 31, 2001

$$[X*(.625)] - [Y*(.017361111)*X] = \text{The Unvested Shares}$$

For the Calculation:
X = 3,250 Shares
Y = 12 Months

| Therefore: | 3250*.625 = | 2,031.25 |
|---|---|---|
| Minus | 12*.017361111*3250 = | 677.08 |
| | The Unvested Shares= | 1,354.17 |
| | Repurchase Price per share | .01 |
| | Total Repurchase Amount | $ 13.54 |

Sincerely yours,

F.T. Abbott
Controller & Contract Administration Manager

3 Innovation Way
Suite 100
Newark, DE 19711

phone 302.894.8000
fax 302.894.8001

www.QuantumLeap.us

Apr 05 06 03:30p    Quantum Leap Innovations    302-894-8001    p.4

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE
WILMINGTON DE 19804

| | | |
|---|---|---|
| Postage | $ | $0.37 |
| Certified Fee | | $2.30 |
| Return Receipt Fee (Endorsement Required) | | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $4.42 |

Sent To  *Mr. Christian J. Henrich*
Street, Apt. No.; or PO Box No.  *35 Rockford Run*
City, State, ZIP+4  *Wilmington, DE 19806*

PS Form 3800, June 2002    See Reverse for Instructions

7002 2030 0007 6326 0637

---

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

A. Signature
X *Lizabeth H...*    ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )  *Lizabeth Henn*    C. Date of Delivery  11 21 02

1. Article Addressed to:

*Mr. Christian J. Henrich*
*35 Rockford Road*
*Wilmington, DE 19806*

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7002 2030 0007 6326 0637

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

# EXHIBIT B



January 31, 2003

VIA CERTIFIED MAIL
Mr. Christian J. Henrich
35 Rockford Road
Wilmington, DE 19806

Dear Chris:

In accordance with the provisions of Item 8(d) of your Employment Agreement dated
August 27, 2001 we are exercising the Corporation's right to repurchase your Vested
Shares. Check # 1858 in the amount of $530.88 is enclosed to cover the repurchase of
your 1896 Vested Shares at the current fair market price of $0.28/share established by
the Board of Directors.

Sincerely yours,

F.T. Abbott
Controller & Chief Administrative Officer

3 Innovation Way
Suite 100
Newark, DE 19711

phone 302.894.8000
fax 302.894.8001

www.QuantumLeap.us



| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _Lisabeth Kr_  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name)   C. Date of Delivery  2/3/03 |
| 1. Article Addressed to:<br><br>MR. CHRISTIAN J. HENRICH<br>35 ROCKFORD ROAD<br>Wilmington, DE 19806 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
| | 3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7002 2030 0007 6326 0644 |

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee<br>(Endorsement Required) | |
| Restricted Delivery Fee<br>(Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To  MR. Christian J. Henrich
Street, Apt. No.; or PO Box No.  35 Rockford Road
City, State, ZIP+4  Wilmington DE 19806

7002 2030 0007 6326 0644

PS Form 3800, June 2002.          See Reverse for Instructions

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────

CHRISTIAN J. HENRICH,

      Plaintiff,

      v.                            Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

      Defendants.               The Honorable John T. Elfvin
───────────────────────────────

## SUPPLEMENTAL MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

      As directed by the Court, the Defendants submit this Supplemental Memorandum to address the <u>Namer v. America Networks Int'l Inc.</u>, 99 Civ. 12120 (MBM), 2000 U.S. Dist. LEXIS 18114 (Dec. 15, 2000), decision raised by Plaintiff for the first time during the April 7, 2006 oral argument.  Rather than supporting Plaintiff's Opposition to the Defendants' Motion to Dismiss, the <u>Namer</u> decision, in fact, significantly undercuts the primary argument he has advanced in support of his contention that this Court has personal jurisdiction over the Defendants and that venue is proper in this District, namely, that the Defendants' allegedly unlawful "taking" of his shares occurred in New York.  The <u>Namer</u> decision instead provides further support for the conclusion that, to the extent any unlawful "taking" occurred, it occurred in Delaware, not New York; Plaintiff merely happened to have received notice of that "taking" in New York.

      The <u>Namer</u> opinion involved a dispute over a defendant corporation's decision – effectuated by its two directors – to cancel certain shares of stock previously awarded to the

plaintiff.  Id. at *2.  The plaintiff brought suit in the Southern District of New York, *where the corporation maintained its principal place of business*, against the corporation and its two directors.  Id. at *2.  One of the directors, an Israeli resident and citizen (and the corporation's largest shareholder), moved to dismiss the claims against him, asserting that he was not subject to the court's personal jurisdiction.  Id. at *3.

The court denied the director's motion finding that he, through the corporation, had "engaged in purposeful activities in New York in relation to canceling [the plaintiff's] shares."  Id. at *4.  The court noted that, although the Board did not physically meet or vote in New York to cancel the plaintiff's shares, the corporation's "usual practice when adopting Board resolutions was for its counsel to draft the resolution in New York and fax it to [the Israeli director], who would then fax the resolution back to the company's New York offices" and that the "*company [never] conducted its business outside New York* …"  Id. (emphasis added).  Thus, the court "concluded, therefore, that [the company had] canceled [the plaintiff's] shares *from its New York office*."  Id. (emphasis added).

Because the Israeli director had "purposefully participated" in events occurring in New York that were directly relevant to the plaintiff's claims at issue in the law suit – i.e., the cancellation of the shares which was *the* "allegedly unlawful event that produced this lawsuit" – the Namer court found § 302(a)(1) of New York's long-arm statute – which allows a New York court to exercise jurisdiction over claims brought against a foreign individual who engaged in purposeful activity in New York related to the claims asserted – had been met.  Id. at *4-5.  The court also found that its exercise of *specific jurisdiction* – i.e., jurisdiction over claims directly related to purposeful contacts by a defendant with the forum state – over that director comported with the "minimum contacts" test under the due process clause of the Fourteenth Amendment.

Id. at *5-6.  With regard to the second step of the constitutional test – whether the assertion of jurisdiction was consistent with "traditional notions of fair play and substantial justice" – the court held that the defendant bore the burden of presenting a "compelling case that asserting jurisdiction [would have been] unreasonable."  Id. at *6.  Because the director had failed to articulate any such argument, not surprisingly, the court found the requirements of due process had been met.  Id.

The analogous facts of Namer drive home the point that, in this case, all of the relevant events occurred in Delaware, not New York.  With regard to Plaintiff's employment claims, Plaintiff has effectively conceded, as he must, that all of the relevant events occurred in Delaware:  Plaintiff was hired in Delaware; he worked for Innovations in Delaware; and he was discharged in Delaware.  His shareholder claims rest *exclusively* on the Defendants' decision to repurchase his vested shares in January 2003 at a share price that Plaintiff deemed below their fair market value.  [See Complaint at ¶¶ 82, 105-109].  As the Namer decision makes clear, that decision occurred *in Delaware*, where the Corporate Defendants maintain their principal places of business and where the Individual Defendants serve as officers and directors.  Namer, supra at *4.  Plaintiff's shareholder claims thus arise exclusively out of conduct that occurred in Delaware, not New York.

To the extent Plaintiff's reliance on Namer is focused on that court's recognition of the unremarkable principle that once a plaintiff is able to establish minimum contacts the burden shifts to the defendant to establish that a court's exercise of jurisdiction would not comport with the "traditional notions of fair play and substantial justice," that proposition does nothing to change the legal landscape.  Indeed, in their initial brief, the Defendants quoted from the *exact same language* set forth in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985),

quoted by the <u>Namer</u> court for that proposition.[1/]  As explained in both the Defendants' initial

and reply briefs, this case presents just the circumstances contemplated by the Supreme Court in

<u>Burger King Corp.</u> under which it would be unreasonable for the Court to exercise jurisdiction

over the Defendants even if the Court were to find that Plaintiff had first established sufficient

minimum contacts.

      The Second Circuit's application of the <u>Burger King Corp.</u> reasonableness test, in

<u>Metropolitan Life Ins. Co.</u>, 84 F.3d at 565 (cited previously by the Defendants in their initial

brief) is instructive in this regard.  As in this case, the <u>Metropolitan Life Ins. Co.</u> decision

involved the application of the due process test in the context of "general jurisdiction," <u>i.e.</u>, the

question of whether a corporation's general business activities within a state justify subjecting it

broadly to claims that are not directly related to those business activities.  84 F.3d at 565.

Specifically, the plaintiff, the purchaser of a building in Florida outfitted with "wall systems"

manufactured by the defendant, sued the defendant in Vermont asserting that even though the

property was located in Florida and all of the relevant events occurred there, the defendant's

general business connections with the state of Vermont rendered it subject to suit there.  <u>Id.</u> at

564-65.  Evaluating the defendant's connections with Vermont – connections more substantial,

systematic, and continuous than Innovations' limited connections with New York here – the

Second Circuit found that the defendant's contacts "were more than sporadic and occasional"

and narrowly satisfied the minimum contacts test.  <u>Id.</u> at 572-73.

---

<u>1/</u>    <u>See</u> Defendants' Initial Brief at p. 11 ("'While the exercise of jurisdiction is favored
where the plaintiff has made a threshold showing of minimum contacts at the first stage
of the inquiry, *it may be defeated where the defendant presents 'a compelling case that
the presence of some other considerations would render jurisdiction unreasonable*.' <u>Id.</u>
[<u>Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996)]
(quoting <u>Burger King</u>, 471 U.S. at 477)") (emphasis added).

In explaining the relationship between the minimum contacts and reasonableness stages of the due process inquiry, the <u>Metropolitan Life Ins. Co.</u> court noted that "a court must weigh the relative strengths and weaknesses of each requirement – that is, depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." <u>Id.</u> (citing <u>Burger King</u>, 471 U.S. at 477). That is, the "'reasonableness prong of the due process inquiry evokes a sliding scale: *the weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of reasonableness to defeat jurisdiction*.'" <u>Id.</u> (quoting <u>Ticketmaster-New York, Inc. v. Alioto</u>, 26 F.3d 201, 210 (1st Cir. 1994) (emphasis added)). Evaluating the reasonableness prong under this sliding scale, the <u>Metropolitan Life Ins. Co.</u> court found that subjecting the defendant to suit in Vermont was unreasonable, particularly given the plaintiff's barely adequate showing of minimum contacts. <u>Id.</u> at 574. Specifically, the court found that the increased burden of litigating in a state so removed from the witnesses and property at-issue were located, the lack of any significant convenience to the plaintiff in litigating in Vermont, the lack of any judicial efficiencies in conducting the litigation in such a remote locale, and the lack of any compelling state interest or public policy that would be served by conducting the litigation in Vermont, all pointed towards the unreasonableness of subjecting a defendant with such negligible contacts to the state to such a litigation. <u>Id.</u>

All of these factors are present in this case. The Defendants have demonstrated that litigating this case in New York is the *least* effective means of resolving it and there is no compelling, countervailing need to elect to do so. All of the documents, witnesses, and physical property involved in this case are located 450 miles away in Delaware. Indeed, even Plaintiff would be forced to travel to Delaware to conduct the vast majority of discovery in this case and

would be severely hampered in his ability to compel the attendance of witnesses at any trial

conducted in Buffalo, New York (as would the Defendants).  Delaware law governs the parties'

disputes and the Delaware courts are obviously more proficient in identifying and applying that

body of law.  There is no reason to believe that Plaintiff will not receive any redress to which he

might be entitled in Delaware courts; to the contrary, he expressly agreed that Delaware was an

adequate and appropriate venue in the Delaware Employment Agreement that he negotiated

during a three-and-a-half month period before accepting it.  (See Complaint at ¶ 38).  Given the

negligible contacts between the Defendants and New York – Innovations is the only one of the

four Defendants even alleged to have any contacts that even arguably meet the minimum

contacts test – the Defendants have demonstrated that it would be unreasonable to conduct this

litigation in this venue.

   Plaintiff's reliance on the Namer decision for the proposition that the Defendants

are required to carry such a burden, however, puts the cart before the horse – a couple of carts, in

fact.  The burden shifts to the Defendants to demonstrate the unreasonableness of conducting the

litigation in this Court only if Plaintiff first is able to:  (1) demonstrate that the assertion of

jurisdiction would be appropriate under New York state law, e.g., CPLR §§ 301 and 302; and (2)

demonstrate that each of the Defendants maintained contacts with New York – systematic,

continuous, and substantial contacts – that rise to the level of minimum contacts sufficient to

allow the Court to exercise general jurisdiction over each Defendant (the alleged contacts

between the Defendants and New York are not related to Plaintiff's claims).  As explained in the

Defendants' initial and reply briefs, Plaintiff has failed to overcome either of these hurdles.  (See,

e.g., Defendants' Initial Brief at pp. 6-12, Reply at pp. 3-5).[2]  Accordingly, the exercise of

---

[2]  See also Savin v. Ranier, 898 F.2d 304, 306-07 (2d Cir. 1990) (holding that plaintiff

personal jurisdiction would be improper *even absent* a showing by the Defendants of

unreasonableness.

---

failed to establish sufficient contacts with jurisdiction based on defendant's:  (1) receipt
of financing from party located within jurisdiction; (2) dealings with business entity that
was initially organized within jurisdiction; and (3) agreement to make payments under
promissory note within jurisdiction); In re Ski Train Fire in Kaprun, Austria on
November 11, 2000, 343 F. Supp. 2d 208, 215-16 (S.D.N.Y. 2004) (holding that
subsidiary corporation did not have sufficient minimum contacts to justify exercise of
general jurisdiction based on:  (1) the filing of franchise tax report with state revenue
authorities; (2) the parent corporation's presence in jurisdiction in the form of license to
do business – without an actual showing of "substantial, continuous, and systematic
contacts" in the jurisdiction pursuant to that license; (3) the academic funding activities
of a related corporate entity; and (4) the active and substantial business presence in the
jurisdiction of other subsidiary entities of parent corporation).

In short, rather than helping Plaintiff, the <u>Namer</u> decision further demonstrates that his arguments in opposition to the Defendants' Motion are without merit.  The Defendants, therefore, respectfully renew their request that the Court find that:  (1) it does not have personal jurisdiction over any of the Defendants and dismiss the Complaint pursuant to Rule 12(b)(2); and (2) venue is improper and dismiss the Complaint pursuant to Rule 12(b)(3) as well.

Respectfully submitted,

/s/  Michael E. Dash, Jr. (pro hac vice)
Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349

Edward S. Mazurek
Michael E. Dash, Jr. (pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Dated:  April 13, 2006                    Attorneys for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

I, Brenden R. Chainey, hereby certify that I caused a true and correct copy of the

foregoing Defendants' Supplemental Memorandum of Law in Further Support of Motion to

Dismiss the Plaintiff's Complaint Pursuant to 12(b)(2) and 12(b)(3) to be served on April 13,

2006, via overnight mail on the following:

David S. Widenor
Damon & Morey LLP
1000 Cathedral Place
298 Main Street
Buffalo, New York 14202
Counsel for Plaintiff


/s/ Brenden R. Chainey
Brenden R. Chainey

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHRISTIAN J. HENRICH,                    )
                                         )
                                         )        Case No. 05 CV 0798
                    Plaintiff,           )
                                         )
        vs.                              )
                                         )
JOHN W. FIELD, individually,             )
JOSEPH B. ELAD, individually,            )
FAITH B. ELAD, individually,             )
QUANTUM LEAP HOLDINGS, INC.,             )
QUANTUM LEAP INNOVATIONS, INC.,          )
                                         )
                    Defendants.          )
                                         )

## SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION OF
## DEFENDANTS' MOTION TO DISMISS

DAMON & MOREY LLP
*Attorneys for Plaintiff*
1000 Cathedral Place
298 Main Street
Buffalo, New York  14202-4096
(716) 856-5500

David S. Widenor, Esq.
    of Counsel

## INTRODUCTION

The Plaintiff submits this sur-reply memorandum of law in opposition to Defendants' supplemental memorandum of law, which was filed with this Court on April 13, 2006 and which was intended only to address the issue that the Defendants have failed to "present a compelling case" that asserting jurisdiction over the Defendants would be unreasonable.[1]    The Defendants have presented no case why asserting jurisdiction over the Defendants would be unreasonable other than to claim that "all relevant facts occurred in Delaware, not New York."

At oral argument on April 7, 2006, the Plaintiff offered in opposition to the Defendant's Motion the case of Jeffrey Namer v. America Networks Intn'l. Inc., 2000 U.S. Dist. LEXIS 18114 (S.D.N.Y. 2000) (copy attached).    Instead of using their Supplementary Memorandum of Law to distinguish Namer, the Defendants' largely reiterates their fallacious argument that New York has little or no connection with the present controversy.  As the Plaintiff alleged, the Defendants have extensive contacts with New York dating to 1990 (a fact they now admit).  Almost ten percent (10%) of Defendants' business takes place in New York, and the most relevant events to Plaintiff's causes of action—the taking of his Shares and the purported tender of fair value for those shares—took place in New York (a fact Defendants now admit).  Therefore, this Court should find that the Plaintiff has met, at a minimum and by the Defendants' own admissions, his burden and assert personal jurisdiction over the Defendants for the wrongful taking of the Plaintiff's Shares.

---

[1] For convenience sake, the Plaintiff employs the same definitions herein as set forth in Plaintiff's Response papers filed with the Court on March 30, 2006.

## ARGUMENT

Although the Plaintiff agrees that certain events happened in Delaware, ***the most legally significant events to the Plaintiff's causes of action as a shareholder happened in New York, a state with which Defendants have extensive contacts***. As the Defendants now admit—the Defendants purposefully projected themselves into New York by sending a letter with a check allegedly effecting the purchase of Plaintiff's Shares while the Plaintiff was in New York (hereinafter, the letter and the check will be referred to as the "Letter with Value"). The Defendants now unconditional state that "The Plaintiff merely happened to have received notice of that "taking" in New York." (Dnft Supp MOL at 1).

Whether the "Letter with Value" that the Defendants admit to sending to the Plaintiff when the Plaintiff was in New York constitutes mere "notice" (as the Defendants would have this Court believe) or a breach of a contract or tort (as the Plaintiff has properly alleged) is immaterial at this stage of the litigation. The mere fact that the Defendants sent the "Letter with Value" to the Plaintiff in New York is more than sufficient for this Court to assert personal jurisdiction over the Defendants and each of the Namer and Bates[2] decisions supports that conclusion.

This Court will find that the Defendants initially claimed to have no contacts whatsoever with New York. (Dnft MOL at 1). However, when the Plaintiff reminded the Defendants that the Defendants have been doing business in New York since at least 1990, the Defendants, in reply, conceded that the Defendants' contacts in New York may not, in fact, be "nothing", but could be as much as 10% of their business. Moreover, when the Plaintiff alleged that the Defendants are engaged in interstate commerce or

---

[2] Bates v. C&S Adjusters, Inc., 980 F.2d 865, 867-68 (2d Cir. 1992).

reasonably should have expected to be hauled into a New York court, the Defendants conceded the point by remaining silent.

Again, when the Plaintiff reminds the Defendants that under Namer, the burden shifts to the Defendants to "present a compelling case" for why it would be unreasonable for the Court to assert jurisdiction over the Defendants after the Plaintiff has established "minimum contacts" with the forum state, the best argument the Defendants can muster is that "all of the relevant events occurred in Delaware, not New York." The Defendants are wrong.

Regarding the shareholder-related causes of action, the key and legally significant facts occurred in New York, not Delaware—because when the Defendants decided to unlawfully "take" the Plaintiff's Shares from him, the Defendants knew he was in New York, as evidenced by the Letter with Value, which Defendants admit they sent to New York, where Plaintiff resided. If this was a "taking", it took place in New York when the Letter with Value purportedly took the Shares. If there was a breach of contract, that breach occurred when Defendants offered $.28 per share for the Shares they knew were each worth in excess of $41.50. Likewise, but for the Letter with Value, knowingly directed at the Plaintiff in New York, there is no breach of the Individual Defendants' fiduciary duties as directors and majority shareholder to the Plaintiff.

This Court should deny the Defendants' Motion because the Plaintiff has met at this stage of the litigation his *prima facie* burden of alleging facts sufficient for this Court to assert personal jurisdiction over the Defendants. The key events did not take place in Delaware. Under CPLR 302(a)(1), the Defendants "transacted business" in New York when the Defendants sent the "Letter with Value" to the Plaintiff when the Plaintiff

resided in New York. Under CPLR 302(a)(2), another argument unrefuted by the Defendants, the "Letter with Value" constitutes a tort committed in New York. Under CPLR 302(a)(3)(i) or (ii), the "Letter with Value" constitutes injury in New York when the Defendants reached from Delaware by the "Letter with Value" into New York and "took" the Plaintiff's Shares for minimal value.

This lawsuit is about the fact that the Defendants acted wrongfully when the Defendants expected the Plaintiff to accept $.28 per share for certain of his Shares, despite the fact that the Defendants assessed that the fair market value of similar shares were $41.50 cents per share just three (3) months before. Moreover, the Defendants' business was not in decline when the Defendants offered $.28 per share. During that three (3) month period after the Defendants valued the similar shares at $41.50 per share, the Defendants were awarded a six million dollar ($6,000,000.00) government contract and won the prestigious Tibbets award, which has only brought greater recognition and business opportunities to the Defendants.

The <u>Namer</u> decision supports either directly or by analogy each of the above bases for this Court asserting personal jurisdiction over all of the Defendants.

A.        **The <u>Namer</u> Decision**

In <u>Namer</u>, the plaintiff received shares of stock in the defendant corporation. The individual defendant in <u>Namer</u> subsequently voted to unlawfully "cancel" the plaintiff's shares, which, the court found, constituted transacting business in New York not because the individual defendant actually did any business in New York *per se*, but mainly because the individual defendant faxed one letter to New York, which letter effectively canceled the plaintiff's shares. There is no allegation in <u>Namer</u>, as there is here, that the

4

defendants "repurchased" any of the plaintiff's shares nor directly communicated with the plaintiff.

In our case, however, the Plaintiff received the Shares from the Defendant Corporations by agreement and corporate resolution. Almost 3 months after the Defendants terminated the Plaintiff's employment, the Defendants purportedly voted to "repurchase" certain of the Plaintiff's Shares pursuant to a provision of the Employment Agreement, which provision did not survive termination (and could not, as the Plaintiff has alleged, be a basis for the Defendants purported "repurchase" of the Shares)[3], and, as such, the Defendants had no contractual right to repurchase the Shares. Although the Individual Defendants allegedly "voted" to repurchase the Plaintiff's Shares in Delaware, all of the Defendants transacted business in the New York (whether directly or by agent) when the Defendants made the offer to purchase the Plaintiff's Shares (whether pursuant to the Employment Agreement or not) by sending the Letter with Value to the Plaintiff when the Plaintiff resided in New York. The Defendants could have "repurchased" the Plaintiff's Shares when the Plaintiff still resided in Delaware, but they failed to.

Like the plaintiff in <u>Namer</u>, the Plaintiff filed suit against the Defendants for unlawfully taking the Plaintiff's Shares. Like the defendants in <u>Namer</u>, the Defendants have move to dismiss the Plaintiff's complaint for lack of personal jurisdiction.

Like the <u>Namer</u> court, this Court should deny the Defendants' motion to dismiss in its entirety.

---

[3] It bears repeating that the Defendants also ignore the fact that the "jurisdiction and venue" provision of the Employment Agreement is not "exclusive." In other words, the provision does not prevent the Plaintiff from bring an action in this District. Moreover, if the Employment Agreement is terminated and does not provide for a "repurchase" right, it is questionable whether Delaware law applies to the post-termination taking of the Plaintiff's Shares, which is an issue to be addressed as we proceed with this case.

[5] <u>See</u> <u>Distefano v. Corozzi</u>, 286 F.3d 81 , 84 (2d Cir. 2001), and <u>Hargrave v. Oki Nursery</u>, 636 F.2d 897 (2d Cir. 1980) (dealing with "situs of injury" test, which is satisfied in our case)..

**B.**          **This Court has personal jurisdiction over the Defendants because the Defendants, among other things, "transacted business" in New York.**

The Namer plaintiff argued that the court had personal jurisdiction over one individual defendant (a citizen and resident of Israel) because he was "transacting business" in New York through his agent, the defendant corporation. The individual defendant's main argument for why the court lacked personal jurisdiction over him was that the plaintiff's "complaint fail[ed] to allege that he [had transacted business in New York]." Id. At no time (whether in moving papers or at oral argument), however, have the Defendants in our case alleged (in any way) that the Plaintiff has not properly alleged facts sufficient for this Court to find personal jurisdiction over the Defendants. The Defendants merely disagree with the facts as alleged.

In Namer, the corporation drafted resolutions in New York and faxed the resolutions to the individual defendant, who, in turn, faxed it back to New York. The only significant event (i.e., the point of cancellation) occurred only when the defendant faxed the letter back to New York. Therefore, the court in Namer found that the defendants transacted business in New York—on the basis that the individual defendant faxed to New York one letter effectively canceling the plaintiff's stock.

Like Namer, this Court may exercise personal jurisdiction over the Individual Defendants (and Corporate Defendants) because the Defendants "engaged in purposeful activities in New York in relation to the stock" taking. Id. The Plaintiff has also properly alleged that the Defendants "took" (either by breach of a contract or tort) Plaintiff's Shares "for the benefit of and with the knowledge and consent of" the Individual Defendants, all of whom are major shareholders of the Corporate Defendants. Id.

6

Moreover, as officers and directors of the Corporate Defendants, the Individual Defendants "exercised some control over" the Corporate Defendants in this matter. Id.

The fact that, in Namer, the corporation's principal place of business was New York played no significant role whatsoever in the court's analysis (and even if it did, the fact that the Defendants in our case admit to sending the Letter with Value to the Plaintiff in New York demonstrates that the Defendants purposefully projected themselves into New York in a way similar to the corporate defendant in Namer). The court found in Namer "that the Board did not actually meet, nor vote, in New York to cancel the shares." Id. In our case, the Plaintiff does not allege that the Defendants actually met, or voted, in New York to take the Plaintiff's Shares. However, like Namer, the Defendants have engaged in purposeful activities in New York when the Defendants sent the Letter with Value to the Plaintiff when they knew the Plaintiff resided in New York—a fact the Defendants have never disputed.

As in Namer, the relevant events in our case did not take place in Delaware, but in New York. Although the Defendants admit that they acted in Delaware to "take" the Plaintiff's Shares, the Defendants also admit that the Plaintiff was in New York when they "took" the Plaintiff's Shares. (Dnft Supp MOL at 1). This purposeful activity (as the Plaintiff has duly alleged) constitutes either transacting business in New York or a tort committed outside New York causing injury in New York.[5] Either case is sufficient for this Court to assert personal jurisdiction over the Defendants.

**C.**        **Because the Corporate Defendants "Transacted business" in New York, the Individual Defendants have as well.**

The Defendants attempt to "take" the Plaintiff's Shares benefited the Individual Defendants by increasing their ownership (just like the individual defendant in Namer).

The "taking" of the Plaintiff's Shares could not have been accomplished (just like Namer) without the Individual Defendants' approval, a fact, again, admitted by the Defendants.

Consequently, like Namer, the Plaintiff has shown that this Court's exercise of jurisdiction over the Defendants under New York's long-arm statute does not violate the Fourteenth Amendment's Due Process Clause. Where, as here, this Court seeks to exercise "specific jurisdiction" over the Defendants for a claim arising out of the Defendants' contacts with the forum state, this Court must find that the Defendants "purposefully directed [their] activities at a resident of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." Namer, 2000 LEXIS at 18114 at *4. Like the individual defendant in Namer, the Individual Defendants purposefully participated in the conduct of the Corporate Defendants' business as a member of their board, including the unlawful taking of the Plaintiff's Shares—*the allegedly unlawful events that produced this lawsuit*.

**D.        Defendants have made no compelling case why it would be unreasonable for this Court to exercise jurisdiction.**

The final step in any long arm personal jurisdiction analysis is determining whether the assertion of personal jurisdiction is consistent with "fair play and substantial justice." In Namer, the court found that because the lawsuit arose out of the contacts that were the basis for the lawsuit, "the plaintiff established sufficient contacts with the forum state." Id. Once a plaintiff has established sufficient contacts, "the burden shifts to the defendant to 'present a compelling case' that asserting jurisdiction will be unreasonable." Namer, 2000 LEXIS 18114, at *4. The Defendants cannot meet this burden.

Rather than looking to why it would be "unreasonable" for the Defendants to litigate this matter in New York, the Defendants argue that it is "unreasonable" for the Plaintiff. According to the Defendants, it is unreasonable for the Defendants to litigate in New York because the Plaintiff will have to travel to Delaware to conduct discovery. The Plaintiff fails to see, however, how this fact, if true, renders jurisdiction over the Defendants in this Court unreasonable. Moreover, in this age of electronic discovery, there is nothing preventing the Plaintiff from conducting any deposition via video conferencing—effectively eliminating the need to travel to Delaware. Tellingly, without identifying any witnesses, the Defendants also claim that the Plaintiff may lack subpoena power over certain witnesses. The Plaintiff disagrees. Any person that may need to testify in this action on behalf of the Plaintiff will be subject to this Court's power without the need for any subpoena being issued. The Defendants consideration is fallacious not only because they fail to identify any such person but because there is no one with relevant information beyond this Court's power.

As the Plaintiff has repeatedly stated, this case is about the valuation of the Plaintiff's Shares that the Defendants wrongfully "took" from the Plaintiff for little or no value. There is no dispute that the Plaintiff owned the Shares, the number of Shares owned, or that the Defendant attempted to repurchase certain of the Shares. This case requires either a legal analysis regarding the contractual rights of the parties or an expert determination of the Shares' Value. No doubt the Defendants will seek to show that the value of each the Share is $.28, while the Plaintiff will seek to show that the value of each Share was not less than $41.50 per share, which was the fair market value that the Board assigned just months previously.

9

The Defendants blatantly exaggerate discovery by embellishing ancillary events that may have occurred in Delaware, but have nothing material to do with the Plaintiff's shareholder action. The Defendants' merely seek to deprive the Plaintiff of his choice of forum, despite being legally and fairly chosen. Establishing the value of Plaintiff's Shares will require the production of financial records, which will need be evaluated by an expert, who need not be from Delaware. These events, however, present no unreasonable barriers to the Defendants in litigating these issues in this District, a District that the Defendants purposefully availed themselves of when the Defendants sent the Letter with Value to the Plaintiff while the Plaintiff was a resident in New York, in this District.

Therefore, the Defendants have completely failed to present a compelling case as to why it is unreasonable for them to litigate these issues in the Western District of New York.

## CONCLUSION

Consequently, as in <u>Namer</u>, this Court should find that exercising personal jurisdiction over the Defendants satisfies New York's long-arm statute as well as the requirements of due process. This Court should also find that venue is proper in this District pursuant to 28 USC §1391(a)(1) and (c), as well as 28 USC §1391(b)(2).

DATED:      Buffalo, New York
            April 20, 2006

                                    **DAMON & MOREY LLP**

                                    By:    _JWidenor_
                                           David S. Widenor, Esq.
                                    Attorneys for Plaintiff
                                    1000 Cathedral Place
                                    298 Main Street
                                    Buffalo, New York 14202
                                    (716) 856-5500

#999773

11

## CERTIFICATE OF SERVICE

The foregoing **Plaintiff's Sur-Reply Memorandum of Law in Opposition to Defendant's Motion to Dismiss** was filed electronically with the United States District Court for the Western District of New York on **April 20, 2006**. Notice of this filing will be sent to all parties by operation of the Court's filing system.

_____
One of the attorneys for Plaintiff

-#999773-

12

*2000 U.S. Dist. LEXIS 18114, \**

JEFFREY NAMER, Plaintiff, -against- AMERICA NETWORKS INTERNATIONAL INC., AEL
APELBOIM, STEPHEN DOYLE, and DOMINICK ZAPPIA, Defendants.

99 Civ. 12120 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 18114

December 14, 2000, Decided
December 15, 2000, Filed

**SUBSEQUENT HISTORY:** As Amended January 11, 2001.

**DISPOSITION: [\*1]** Motion to dismiss denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant foreign national moved for dismissal of a diversity
action for conversion pursuant to Fed. R. Civ. P. 12(b)(2).

**OVERVIEW:** Defendant foreign national was the largest shareholder of defendant
corporation whose principal place of business was New York City. Plaintiff held 310,000
shares in the defendant corporation. Defendant foreign national and defendant director
canceled plaintiff's shares. Plaintiff brought a diversity action for conversion. Defendant
foreign national moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(2), contending lack
of personal jurisdiction. Plaintiff showed that defendant corporation engaged in purposeful
activities in New York in relation to the stock cancellation, for the benefit of and with the
knowledge and consent of defendant foreign national, and that defendant foreign national
exercised some control over defendant company in the matter. Plaintiff also showed that
defendant's contacts with the forum state were sufficient to justify the exercise of personal
jurisdiction. The defendant foreign national failed to present a compelling case that
personal jurisdiction was unreasonable. Therefore, the court dismissed the defendant
foreign national's motion.

**OUTCOME:** Motion to dismiss was denied as the court had personal jurisdiction over
defendant foreign national.

**CORE TERMS:** discovery, personal jurisdiction, forum state, cancellation, transacted, long-
arm, cancel, lack of personal jurisdiction, reasons stated, purposefully, purposeful, principal
place of business, canceling, resident, stock, voted, fax

**LexisNexis(R) Headnotes**

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN1* The plaintiff bears the burden of showing that the court has jurisdiction in a diversity
   action. When a defendant moves to dismiss for lack of personal jurisdiction prior to
   discovery, the plaintiff can satisfy that burden on the basis of legally sufficient
   allegations of jurisdiction. When the parties have conducted extensive discovery
   regarding jurisdiction, the plaintiff must aver facts that, if credited by the ultimate
   trier of fact, would suffice to establish jurisdiction.

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

*HN2*See N.Y. C.P.L.R. 302(a)(1)(McKinney 1990).

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN3*However, even if a defendant has not personally transacted business in New York, he or she can still be subject to personal jurisdiction under N.Y. C.P.L.R. 302(a)(1) (McKinney 1990), if it can be shown that a corporation transacted business in New York as his or her agent.

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN4*Plaintiff need not show that a formal agency relationship existed between defendant and defendant company to establish personal jurisdiction under N.Y. C.P.L.R. 302(a)(1)(McKinney 1990). He must show only that defendant company engaged in purposeful activities in New York, for the benefit of and with the knowledge and consent of defendant, and that defendant exercised some control over defendant company in the matter.

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN5*A plaintiff must show that the court's exercise of jurisdiction over a defendant under New York's long-arm statute does not violate U.S. Const. amend. XIV. In particular, the court must consider whether a defendant's contacts with the forum state is sufficient to justify the exercise of personal jurisdiction. Where the court seeks to exercise specific jurisdiction over a defendant for a claim arising out of defendant's contacts with the forum state, the court must find that defendant purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN6*The court must also consider whether the assertion of personal jurisdiction is consistent with fair play and substantial justice. However, once a plaintiff has established sufficient contacts with the forum state, the burden shifts to the defendant to present a compelling case that asserting jurisdiction is unreasonable.

**COUNSEL:** DAVID R. BUCHANAN, ESQ., SETH A. KATZ, ESQ. (Attorneys for Plaintiff), Seeger Weiss, New York, NY.

JOSEPH J. SALTARELLI, ESQ. (Attorney for Defendant Apelboim), Hunton & Williams, New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINIONBY:** MICHAEL B. MUKASEY

**OPINION:** OPINION and ORDER

MICHAEL B. MUKASEY, U.S.D.J.

In this diversity action, Jeffrey Namer sues Americom Networks International, Inc., Ael Apelboim, Stephen Doyle, and Dominick Zappia for conversion. Pursuant to Fed. R. Civ. P. 12 (b) (2), defendant Apelboim moves to dismiss for lack of personal jurisdiction. For the reasons stated below, Apelboim's motion is denied.

I.

On June 2, 1998, Namer received 310,000 shares of Americom stock. (Katz Decl., Exh. A)

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 18114

Case 1:06-cv-00591-SLR    Document 18-27    Filed 09/22/2006    Page 3 of 5    Page 3 of 5

Americom is a Florida corporation (id.), and its principal place of business is New York City (Comp. P2).

Apelboim is a citizen and resident of Israel. (Sherby Decl., Exh. 2) He owns approximately 44% of Americom's outstanding shares, and is its largest shareholder. (Id.) When Namer received his shares, Americom's sole director was Mary Ellen Tefarkis. (Katz Decl., Exh. A) That same day, Apelboim was elected as an additional director. **[*2]** (Id.) Subsequently, Dominick Zappia became a director and Tefarkis was removed. (Katz Decl., Exh. C, Tefarkis Decl. P3) Several days later, on May 14, 1999, Abelboim and Zappia voted to cancel Namer's and Tefarkis's shares. (Katz Decl., Exh. E) On December 16, 1999, Namer filed this suit.

II.

*HN1*The plaintiff bears the burden of showing that the court has jurisdiction. See Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). When a defendant moves to dismiss for lack of personal jurisdiction prior to discovery, the plaintiff can satisfy that burden on the basis of "legally sufficient allegations of jurisdiction." Id. When the parties have conducted extensive discovery regarding jurisdiction, the plaintiff must aver facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction. See id. Here, Namer appears to have requested some discovery of defendants, although it is unclear whether that discovery was "extensive." Nonetheless, because the facts averred by Namer can carry the heavier burden, I will apply it in this case.

III.

Namer argues that the court has personal jurisdiction over Abelboim under **[*3]** § 302(a) (1) of New York's long-arm statute which provides that "*HN2*a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state . . . ." N.Y. C.P.L.R. 302(a) (1) (McKinney 1990). Apelboim responds that he has not transacted any business in New York and that Namer's complaint fails to allege that he has done so. (Def. Mem. at 4) *HN3*However, even if Apelboim has not personally transacted business in New York, he "can still be subject to personal jurisdiction under § 302(a) (1) . . ., if it can be shown that the corporation transacted business in New York as [his] agent." In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 2000 U.S. Dist. LEXIS 15717, 2000 W.L. 161962 (S.D.N.Y. 2000).

*HN4*Namer need not show that a formal agency relationship existed between Apelboim and Americom. He must show only that 1) Americom engaged in purposeful activities in New York in relation to the stock cancellation; 2) for the benefit of and with the knowledge and consent of Apelboim; and 3) Apelboim exercised some control over Americom in the matter. See Retail Software Services Inc. v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988) **[*4]** (citing Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

Here, Americom engaged in purposeful activities in New York in relation to canceling Namer's shares. Americom's principal place of business is New York (Comp. P2), and on May 14, 1999, the corporation's board of directors voted to cancel the shares (Katz Decl., Exh. E). The board's only two members were Apelboim and Zappia (see id.), and Apelboim was in Israel (Sherby Decl, Exh. 2). Thus, the Board did not actually meet, nor vote, in New York to cancel the shares. However, the company's usual practice when adopting Board resolutions was for its counsel to draft the resolution in New York and fax it to Apelboim, who would then fax the resolution back to the company's New York offices. (Tefarkis Decl. P8) Apelboim has not produced any evidence suggesting that the company ever conducted its business outside New York, including on this occasion. I conclude, therefore, that Americom canceled Namer's shares from its New York office.

Americom's cancellation of Namer's shares benefited Apelboim by increasing his ownership. Further, Namer controlled Americom's decision in that the board could not have passed the resolution without Apelboim's approval. He was **[*5]** one of only two directors when Americom's board passed the resolution canceling Namer's shares.

*HN5*Namer also must show that the court's exercise of jurisdiction over Apelboim under New York's long-arm statute does not violate the Fourteenth Amendment's Due Process Clause. See Metropolitan Life Ins. Co., 84 F.3d at 566. In particular, the court must consider whether a defendant's contacts with the forum state are sufficient to justify the exercise of personal jurisdiction. See id. Where, as in this case, the court seeks to exercise "specific jurisdiction" over Apelboim for a claim arising out of Apelboim's contacts with the forum state, the court must find that Apelboim "purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). Here, Apelboim purposefully participated in the conduct of Americom's business as a member of its board, including the cancellation of Namer's shares--the allegedly **[*6]** unlawful event that produced this lawsuit. *HN6*

The court must also consider whether the assertion of personal jurisdiction is consistent with "fair play and substantial justice." Id. at 476. However, once a plaintiff has established sufficient contacts with the forum state, the burden shifts to the defendant to "present a compelling case" that asserting jurisdiction will be unreasonable. Id. at 477. Apelboim has not so argued. Accordingly, I find that exercising jurisdiction over Namer satisfies New York's long-arm statute as well as the requirements of due process.

* * *

For the reasons stated above, the motion to dismiss is denied.

SO ORDERED:

Dated: New York, New York

December 14, 2000

Michael B. Mukasey,

U.S. District Judge

Service: **Get by LEXSEE®**
Citation: **2000 US DIST LEXIS 18114**
View: Full
Date/Time: Thursday, April 20, 2006 - 3:35 PM EDT

\* Signal Legend:
⬤ - Warning: Negative treatment is indicated
🆀 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 18114    Page 5 of 5

Case 1:06-cv-00591-SLR    Document 18-27    Filed 09/22/2006    Page 5 of 5

 **LexisNexis®**

About LexisNexis  | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**FILED**

JUN 0 7 2006

**CLERK, US DISTRICT COURT, WDNY**

CHRISTIAN J. HENRICH,

      Plaintiff,

      v.

Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

      Defendants.

The Honorable John T. Elfvin

## ORDER

AND NOW, this _6 th_ day of _June_ , 2006, Michael E. Dash,

Jr. is granted leave to withdraw as counsel for Defendants, John W. Field, Joseph B. Elad, Faith

B. Elad, Quantum Leap Holdings, Inc. and Quantum Leap Innovations, Inc.  Michael E.

Maxwell, Hugh M. Russ, III and Edward S. Mazurek will continue to represent the Defendants.

_John T. Elf___, S.U.S.D.J.,

_Buffalo, N.Y., June 6, 2006_

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTIAN J. HENRICH,

      Plaintiff,

      v.                                 Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

      Defendants.

---

## SUR REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349

Edward S. Mazurek
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Dated:  August 29, 2006          Attorneys for Defendants

## I.        INTRODUCTION

By letter dated August 4, 2006, Plaintiff purported to proffer "new evidence" in opposition

to Defendants' Motion to Dismiss.  Unfortunately, Plaintiff did not file his letter as of record

with the Clerk of Court so it is unclear whether Plaintiff was attempting to avoid the constraints

of Rule 11 or what Plaintiff's intentions were in submitting it.  The arguments advanced in the

letter, however, do not enable Plaintiff to withstand Defendants' Motion to Dismiss.  Plaintiff

claims that a contract between Defendant Quantum Leap Innovations ("Innovations") and the

United States Air Force establishes that Innovations, although not the other Defendants, is

subject to personal jurisdiction by the Court.  Next, Plaintiff claims that the Court has personal

jurisdiction over Defendant John W. Field, although not the other Defendants, because Mr. Field

owns an interest in an apartment co-op in Rye, New York.  Plaintiff is wrong on both counts and,

not surprisingly, does not cite a single case in purported support of his claims.

## II.       ARGUMENT

### A.        THE AIR FORCE CONTRACT DOES NOT ESTABLISH PERSONAL JURISDICTION OVER INNOVATIONS, MUCH LESS ANY OTHER DEFENDANT.

The Air Force contract that Plaintiff claims to have belatedly "discovered" is merely an

extension of the 2005 contract ("SBIR contract") that Defendants referred to in their initial and

reply briefs.  (Supplemental Declaration of Frank Abbott, attached as Exhibit "A").  That

contract was between Innovations and the United States Air Force Research Laboratory.  While

the Air Force Lab happens to be in Rome, New York, neither Innovations nor any other

Defendant solicited the Air Force for this contract, and, more importantly, no Innovations

officer, director, agent or employee, or any other Defendant has ever set foot in New York

regarding this contract.  Exh. at ¶ 3.  Innovations never left Delaware in negotiating the contract,

and Innovations' performance of the contract is exclusively in Delaware.  Exh. A at ¶ 4.

Plaintiff attempts to mischaracterize the importance of this contract by adding its alleged impact (almost 10 %) with the revenues generated from the phase 1 aspect of the contract (7.8 %) to equal 20% of Innovations' revenues.  Plaintiff's unsupported argument is as flawed as his arithmetic.  The contract is not, as the Plaintiff asserts, an additional source of significant revenue for Innovations.  Instead, Innovations' revenues stemming from the Air Force contract extension will remain an insignificant part of its revenues, ie. less than 7.8%.  Exh. A at ¶ 5.  In fact, as of July 2006, revenue from the contract was only 4.2% of Innovations' total revenue.  Exh. A at ¶ 6.  And even though the total contract was for $748, 811, the revenues will be spread over almost 3 years.  Exh. A at ¶ 6.  Thus, those revenues will constitute less than 7.8 % of Innovations' annual revenues for 2006, 2007, and 2008 respectively.

In truth, Innovations does not receive any revenues from New York under the contract.  The Air Force installation in New York does not pay Innovations for any of the work performed under the contract.  Exh. A at ¶ 7.  Instead, Innovations receives its money from the Department of Defense out of the Defense Finance and Accounting Service, which is located in Columbus, Ohio.  Exh, A, at ¶ 7.  Because Innovations' contracts originated with the Department of Defense/federal government and are not paid out of New York, the revenue derived from them cannot be considered to originate from New York.  As a result, as set forth in greater detail in Defendants' previously submitted briefs, Section 302(a)(3) of the New York long-arm statute provides no basis for the Court's exercise of personal jurisdiction over any of the Defendants.

**B.    AN APARTMENT OWNED BY MR. FIELD DOES NOT ESTABLISH PERSONAL JURISDICTION.**

In 2003, Defendant John W. Field purchased an interest in a corporation that owns an apartment building in Rye, NY, in an arrangement known as a "co-op."  (Declaration of John W. Field, attached as Exhibit B).  In suggesting to the Court that Field's ownership interest in the co-op subjects him to the personal jurisdiction of this Court, Plaintiff overlooks decades-old Supreme Court precedent that holds that "the presence of the defendant's property [in a State] alone would not support the State's jurisdiction."  Shaffer v. Heitner, 433 U.S. 186, 209 (1977).

This case has nothing to do with Field's apartment co-op and Plaintiff has again failed to demonstrate that Field has minimum contacts with New York.  See Orient Overseas Container Line v. Kids International Corp., No.96 Civ. 4699, 1998 WL 531840, (S.D.N.Y. August 24, 1998)(rejecting a plaintiff's argument that the court had quasi in rem jurisdiction over the Defendant which owned New York property because the court found that quasi in rem jurisdiction "'does not exist when the property serving as the jurisdictional basis has no relationship to the cause of action and there are no other ties among the defendant, the forum and the litigation").

III.    <u>**CONCLUSION**</u>

For the foregoing reasons and those set forth in their initial and reply Briefs, the

Defendants respectfully request that this Court find that dismiss the Complaint pursuant to Rule

12(b)(2) and/or 12(b)(3).

Respectfully submitted,

/s/  Edward S. Mazurek
Edward S. Mazurek
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5000
215.963.5001 (facsimile)

Michael E. Maxwell
Hugh M. Russ III
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, NY  14203
716.856.4000
716.849.0349

Dated:  August 29, 2006                     Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I, Brenden R. Chainey, hereby certify that I caused a true and correct copy of the

foregoing Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss the

Plaintiff's Complaint Pursuant to 12(b)(2) and 12(b)(3) to be served on April 29, 2006, via

overnight mail on the following:

> David S. Widenor
> Damon & Morey LLP
> 1000 Cathedral Place
> 298 Main Street
> Buffalo, New York 14202
>
> Counsel for Plaintiff

> /s/ Brenden R. Chainey
> Brenden R. Chainey

# Exhibit A

**Morgan Lewis**
COUNSELORS AT LAW

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

CHRISTIAN J. HENRICH,

                Plaintiff,

    v.

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

                Defendants.

Case No. 05 CV 0798

---

## SECOND SUPPLEMENTAL DECLARATION OF FRANK ABBOTT

I, FRANKLIN T. ABBOTT declare:

1.    I understand that, in response to the Defendants' Motion to Dismiss, Mr. Henrich has made certain allegations regarding the Defendants' New York business activities. I submit this supplemental declaration in further support of the Defendants' Motion to Dismiss.

2.    The Air Force contract that Plaintiff claims to have belatedly "discovered" is merely an extension of the 2005 contract ("SBIR contract") that Defendants referred to in their initial and reply briefs. (Supplemental Declaration of Frank Abbott, attached as Exhibit "A"). That contract was between Innovations and the United States Air Force Research Laboratory.

3.    While the Air Force Lab happens to be in Rome, New York, neither Innovations nor any other Defendant solicited the Air Force for this contract, and, more importantly, no Innovations officer, director, agent or employee, or any other Defendant has ever set foot in New York regarding this contract.

AUG-23-2006  14:49      tim lund                           13028948047    P.03

4.    Innovations never left Delaware in negotiating the contract, and Innovations' performance of the contract is exclusively in Delaware.

5.    Innovations' revenues stemming from the Air Force contract extension will remain an insignificant part of its revenues, i.e. less than 7.8%.

6.    As of July 2006, revenue from the contract was only 4.2% of Innovations' total revenue.  And even though the total contract was for $748, 811, the revenues will be spread over almost 3 years.

7.    The Air Force installation in New York does not pay Innovations for any of the work performed under the contract.  Instead, Innovations receives its money from the Department of Defense out of the Defense Finance and Accounting Service, which is located in Columbus, Ohio.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual averments are true and correct.

Date:  August 23, 2006

_Franklin T. Abbott_
Franklin T. Abbott

1-PH/2476459.1

Total P.03

# Exhibit B

# Morgan Lewis
COUNSELORS AT LAW

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

CHRISTIAN J. HENRICH,

Plaintiff,

v.

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDING, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

Defendants.

Case No. 05 CV 0798

## DECLARATION OF JOHN W. FIELD

I, JOHN W. FIELD declare:

1.    I understand that, in response to the Defendants' Motion to Dismiss, Mr. Henrich has made certain allegations regarding the Defendants' New York contacts. I submit this declaration in further support of the Defendants' Motion to Dismiss.

2.    In 2003, I, Defendant John W. Field, purchased an interest in a corporation that owns an apartment building in Rye, NY, in an arrangement known as a "co-op."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual averments are true and correct.

Date: August 23, 2006

John W. Field

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHRISTIAN J. HENRICH,

      Plaintiff,

      v.                                                                    Civil No. 05 CV 0798 E/SC

JOHN W. FIELD, individually,
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,
QUANTUM LEAP HOLDINGS, INC., and
QUANTUM LEAP INNOVATIONS, INC.,

      Defendants.

_____

## NOTICE OF ENTRY OF APPEARANCE

      Kindly enter the appearance of Edward S. Mazurek, of the firm of Morgan, Lewis & Bockius LLP, on behalf of Defendants John W. Field, individually, Joseph B. Elad, individually, Faith B. Elad, individually, Quantum Leap Holdings, Inc. and Quantum Leap Innovations, Inc.

                                Respectfully submitted,


                                s/s Edward S. Mazurek_____
                                Edward S. Mazurek
                                Morgan, Lewis & Bockius, LLP
                                1701 Market Street
                                Philadelphia, PA  19103
                                215.963.5000
Dated:  September 1, 2006, 2006      FAX 877.432.9652

                                Attorney for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I, Edward S. Mazurek, hereby certify that on September 1, 2006 a true and correct copy of the foregoing entry of appearance was served by way of automatic notification using the Court's electronic filing system, on the following person:

David S. Widenor, Esquire
Damon & Morey LLP
100 Cathedral Pl.
298 Main Street
Buffalo, NY  14202-9949

Counsel for Plaintiffs

/s/ Edward S. Mazurek
Edward S. Mazurek

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHRISTIAN J. HENRICH,                                                    05-CV-0798E(Sc)

                    Plaintiff,

        -vs-                                                              MEMORANDUM

JOHN W. FIELD, individually,                                                     and
JOSEPH B. ELAD, individually,
FAITH B. ELAD, individually,                                               ORDER[1]
QUANTUM LEAP HOLDINGS, INC. and
QUANTUM LEAP INNOVATIONS, INC.,

                    Defendant.

_____

## **BACKGROUND**

        Plaintiff Christian Henrich ("Henrich") commenced this action on November

4, 2005 against his former employer Quantum Leap Innovations, Inc., ("Innovations"),

Quantum Leap Holdings, Inc., ("Holdings"), and corporate officers John W. Field,

Joseph B. Elad and Faith B. Elad (collectively "Defendants"). Henrich alleges that

Defendants breached his employment agreement with Innovations and committed

various torts at the time of and after his termination in November 2002. Henrich

asserts claims for unlawful termination, misrepresentation, breach of contract,

conversion, and breach of fiduciary duty. He also seeks a declaratory judgment and

the imposition of a constructive trust. Pending before the Court is Defendants'

Motion to Dismiss the Complaint for lack of personal jurisdiction pursuant to Rule

_____

        [1]This decision may be cited in whole or in any part.

12(b)(2) of the Federal Rules of Civil Procedure ("FRCvP") and for improper venue pursuant to FRCvP 12(b)(3).

## FACTS

The following facts are alleged in Henrich's Complaint and are, for purposes of this Motion, assumed to be true. Innovations and Holdings are Delaware corporations. Field and the Elads are Delaware residents. From November 2000 to August 2001 Henrich provided consulting services to Quantum. On August 27, 2001, Henrich entered into an Employment Agreement ("Agreement") with Innovations by which Innovations employed Henrich as its Chief Network Building Officer. The Agreement was negotiated and entered into in Delaware. Under the terms of the Agreement, Innovations issued to Henrich 3,250 shares of Innovations stock subject to a specific vesting schedule. On November 5, 2001 Holdings also issued to Henrich 3,250 shares of Holdings stock. In the Agreement, Innovations reserved the right to buy back its shares upon the termination of the Agreement.

On or about November 8, 2002, Henrich was terminated. Shortly after his termination, Henrich relocated to New York.[2] On November 18, 2002 Innovations sent Henrich a letter informing him that it was exercising the right to buy back its shares. The letter enclosed a check for the value of the shares. In February 2003, Innovations sent Henrich another letter informing him that Holdings was exercising its right to buy back its shares. Enclosed with the letter was a check for the value of the shares

---

[2] Henrich affirms that at the time of his termination he informed Field of his intention to relocate to Buffalo by the end of December 2002.

- 2 -

as determined by Holdings. While not alleged in the Complaint, the letters indicate and Henrich does not dispute that the letters were addressed and sent to his Delaware residence and were accepted by his wife. Henrich responded to the February letter, rejecting Innovations "offer" to repurchase the shares. This lawsuit followed.

## DISCUSSION

A. Venue

When faced with a motion to dismiss for improper venue pursuant to FRCvP 12(b)(3), the burden rests with the plaintiff to show that venue in the selected forum is proper. *See United States Envtl. Prot. Agency* v. *Port Auth. of New York & New Jersey*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001); *Indymac Mortgage Holdings, Inc.* v. *Reyad*, 167 F. Supp. 2d 222, 237 (D. Conn. 2001). The Court must assume all allegations in the complaint to be true, unless contradicted by the defendant's affidavits, and "[w]hen an allegation is so challenged a court may examine facts outside the complaint to determine whether venue is proper. The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Indymac*, at 237 (internal citations and quotation marks omitted). If venue in the chosen forum is improper, the Court has discretion to dismiss the case or to transfer the case, pursuant to 28 U.S.C. §1406(a), to a District in which venue is proper.

Section 1391(a) of Title 28 of the United States Code governs the venue of civil actions. It states:

"A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."

28 U.S.C. §1391(a). Henrich argues that venue is proper in this District pursuant to §1391(a)(2) because Defendants attempted to repurchase his shares by tendering an "offer" to him in Buffalo, New York and that such constitutes a "substantial part of the events ₓₓₓ giving rise to the claim." Henrich's argument is unavailing. The United States Court of Appeals for the Second Circuit has warned that district courts are to take seriously the adjective "substantial" within the venue statute. *See Gulf Ins. Co.* v. *Glassbrenner*, 417 F.3d 353, 357 (2d Cir. 2005). The Second Circuit stated that "substantial" events means "*significant* events *material* to the plaintiff's claim must have occurred in the district in question ₓₓₓ." *Ibid.* (emphasis in original).

As noted, this lawsuit consists of several claims: unlawful termination, misrepresentation, breach of contract, breach of fiduciary duty and conversion. All of the relevant acts with respect to the unlawful termination, misrepresentation and breach of contract claims occurred in Delaware. Henrich was hired in Delaware, performed his work in Delaware, negotiated and executed the Agreement in Delaware, relied in Delaware on representations allegedly made in Delaware, and was terminated in Delaware.

- 4 -

With respect to the conversion and breach of fiduciary duty claims, Henrich alleges that he experienced some or all of the injury related to those claims in New York. However, most of the *events* related to those claims occurred in Delaware. Defendants made the decisions to repurchase his shares in Delaware.[3] The letters notifying Henrich of Defendants' decisions to repurchase his shares and the checks representing the value of the shares were initially provided to Henrich in Delaware in November 2002 and February 2003.[4] Moreover, if Defendants breached their fiduciary duties to Henrich by failing to keep him apprised of information of which he should have been made aware, those omissions occurred in Delaware. Thus, even if the Court accepts Henrich's argument that he experienced part or all of the injury related to his conversion and/or breach of fiduciary duty claim in New York due to the transmission of letters to him in New York, the Court concludes that such events do not constitute a *substantial* portion of the events or omissions giving rise to the totality of his claims and §1391(a)(2) is inapplicable. Furthermore, §1391(a)(3) is inapplicable because all Defendants reside in Delaware and this action could have been commenced in the District of Delaware pursuant to §1391(a)(1). Thus, venue is improper in this District.

---

[3] The Court notes that Henrich alleges that, contrary to the Agreement, the Board of Directors never actually met to decide to repurchase his shares. Even if the Board did not meet, as all Defendants reside in Delaware, then the decision to repurchase — whether or not properly authorized — was made in Delaware.

[4] Defendants provided copies of the letters addressed to Henrich in Delaware as well as return receipts with Henrich's wife's signature.

As noted *supra*, the Court has discretion to transfer the matter to a District in which venue is proper when doing so would further the interests of justice. *See* 28 U.S.C. §1406(a); *Daniel* v. *Am. Bd. of Emergency Medicine*, 428 F.3d 408, 435-36 (2d Cir. 2005). A "compelling" argument for transfer is presented when a plaintiff's case, if dismissed, would be time-barred in the proper forum. *Ibid.* Here, there is an issue with respect to whether plaintiff's case — or a portion thereof — would be time-barred. It appears that Henrich's claims for breach of contract, breach of fiduciary duty and conversion would be subject to Delaware's three-year statute of limitations if no basis for tolling exists. 10 Del. C. §8106.

Accordingly, it is **ORDERED** that venue is improper in this District and as this action could have been commenced in the District of Delaware, the action is transferred to the District of Delaware pursuant to 28 U.S.C. §1406(a), and the Clerk of the Court is directed to take all steps necessary to effectuate the transfer[5] and to close this case in this District.

DATED:     Buffalo, N.Y.

           September 13, 2006

ECF
DOCUMENT
I hereby attest and certify that this is a printed copy of a
document which was electronically filed with the United States
District Court for the Western District of New York

Date Filed: 9/13/06
Rodney C. Early, Clerk

By: _____ Deputy Clerk

/s/ **John T. Elfvin**
JOHN T. ELFVIN
S.U.S.D.J.

[5]In light of the Court's conclusion that venue is improper in this District, the Court does not reach the merits of Defendants' claim of lack of personal jurisdiction.

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
304 U.S. COURTHOUSE
68 COURT STREET
BUFFALO, NEW YORK 14202-3498
(716) 551-4211

September 19, 2006

Clerk, U.S. District Court
District of Delaware
J. Caleb Boggs Federal Bldg.
844 North King Street
Wilmington, DE 19801-3519

Re: HENRICH V. FIELD, et al.,     0 6     5 9 1 —
05-CV-798E

Dear Sir/Madam:

Pursuant to an Order of this Court, dated and signed by the Hon. John T. Elfvin, United States District Judge, the above referenced action is transferred to your district.

Enclosed please find the following:

1.     Certified Docket Sheet
2.     Certified Transfer Order
3.     Electronic documents on disk.  Item # 1 through # 18.
4.     Copy of Cover Letter

Please return the copy of the cover letter acknowledging receipt of same.

Very truly yours,

RODNEY C. EARLY, Clerk

S/

By: Suzanne Grunzweig
Deputy Clerk

Enclosures
Receipt acknowledged of documents described herein.

Assigned Case Number:
Date:

By: _____ , Deputy Clerk



FILED

SEP 22 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE