UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTIAN J. HENRICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | |
| | ) | **JURY IS DEMANDED** |
| JOHN W. FIELD, individually, | ) | |
| JOSEPH B. ELAD, individually, | ) | |
| FAITH B. ELAD, individually, | ) | Case No.:_____ |
| QUANTUM LEAP HOLDINGS, INC., | ) | |
| QUANTUM LEAP INNOVATIONS, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Christian J. Henrich ("Plaintiff"), by his attorneys, Damon & Morey LLP, as and for his Complaint against defendants above named, alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      The nature of this action is for the recovery of monetary damages for wrongful termination of an employment agreement, breach of fiduciary duties to a shareholder, breach of contract, imposition of a constructive trust and accounting, conversion, and misrepresentation (innocent, negligent, and/or intentional), all arising from the wrongful conduct of the above named defendants.

2.      The relief sought is direct and indirect damages of over one million dollars ($1,000,000.00), with interest thereon, plus exemplary damages where applicable.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

4.      This Court has a basis for exercise of *in personam* jurisdiction over each defendant under New York Civil Procedure Law and Rules §§301 and 302.

5.      Venue is proper in this District under 28 U.S.C. §1391(a) as the events giving rise to the above-mentioned claims occurred in this District and the defendants are persons, corporations and/or legal entities subject to personal jurisdiction in this District due to their conducting business and/or directing business activities in this District.  Thus, the defendants are considered residents of this District, and venue proper, in accordance with 28 U.S.C. §1391(c).

## THE PARTIES

6.      Plaintiff, an attorney, admitted to practice in the States of Delaware and New York, is the former employee of Quantum Leap Innovations, Inc. ("Innovations"), and currently resides in the Town of Orchard Park, County of Erie, State of New York.

7.      Defendant Innovations was and is, at all times herein mentioned, a corporation organized under the laws of the state of Delaware with its principal place of business at 3 Innovation Way, Suite 100, Newark, Delaware.

8.      Defendant Innovations was and is, at all times herein mentioned, engaged in the business of software programming and development.

9.      Defendant Quantum Leap Holdings, Inc. ("Holdings"), was and is, at all times herein mentioned, a corporation organized under the laws of the State of Delaware with its principal place of business at 3 Innovation Way, Suite 100, Newark, Delaware.

10.     Defendant Holdings was and is, at all times herein mentioned, engaged in the business of holding stock in Innovations, Quantum Leap Life Sciences, Inc., Quantum Leap

Research Inc. ("Research"), Quantum Leap Interactive, Inc., Quantum Leap Solutions, Inc., Quantum Leap Technologies, Inc., and   (collectively referred to as "Quantum Entities").

11.     Defendant John W. Field ("Field") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

12.     Defendant Field was and is, at all material times herein mentioned, the Chairman of the Board of Directors of Holdings.

13.     Defendant Field was and is, at all material times herein mentioned, a substantial shareholder of Holdings.

14.     Defendant Joseph B. Elad ("JB Elad") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

15.     Defendant JB Elad was and is, at all times herein mentioned, the Chief Executive Officer and/or President of Innovations.

16.     Defendant JB Elad was and is, at all times herein mentioned, a member of the Board of Directors of the Quantum Entities.

17.      Defendant Faith B. Elad ("FB Elad") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

18.     Defendant FB Elad was and is, at all material times herein mentioned, the majority shareholder of Holdings.

19.     Defendant FB Elad was and is a member of the Board of Directors of the Quantum Entities.

20.     Defendant FB Elad was and is, at all material times stated herein, President of Holdings and Secretary of Innovations.

21.     For the sake of convenience, Defendants Innovations, Holdings, Fields, JB Elad, Fb Elad will be collectively referred to herein as the "Defendants".

## BACKGROUND FACTS
## COMMON TO ALL CAUSES OF ACTION

22.     The Quantum Entities, collectively, was and are, at all times herein mentioned, engaged in the business of developing unique, intelligent software solutions for government, military, and manufacturing customers.

23.     In October 2000, Defendants JB Elad and Field approached the Plaintiff to inquire whether the Plaintiff would be interested in joining the Quantum Entities as the head of business development.

24.     In 1999, the Plaintiff obtained a Masters in Business Administration from the University of Pennsylvania's Wharton School of Business.

25.     In 1999, the Plaintiff obtained a law degree from the University of Pennsylvania.

26.     From November 1, 2000 to about August 27, 2001, Defendant JB Elad and the Plaintiff agreed that the Plaintiff would provide Quantum Entities with consultant services (referred to as the "Initial Services" period).

27.     On behalf of the Quantum Entities, Defendant JB Elad and the Plaintiff agreed that the Plaintiff would receive deferred compensation during the Initial Services period.

28.     During the Initial Services period, the Plaintiff, as a consultant, provided not less than five hundred twenty-five (525) hours of service to the Quantum Entities.

29.     Defendant JB Elad repeatedly assured the Plaintiff that the Defendant JB Elad would "take care of [the Plaintiff], and treat [the Plaintiff] fairly for the services [the Plaintiff] was providing at the time" to the Quantum Entities despite the fact that the Quantum Entities were not financially viable.

30.     During March and April 2001, the Quantum Entities had nearly no cash receipts.

31.     In summer of 2000, Defendant Innovations bid for and was awarded a Phase II contract by the Air Force to develop a software program that (i) created the optimal schedule for downloading and uploading information from approximately 700 intelligence gathering satellites and (ii) scheduled launch and maintenance activities during the two week period prior to space shuttle launches (the "Air Force Project").

32.     Each of the satellite and launch scheduling projects had been deemed "unsolvable" by the United States Air Force Space Command ("Space Command") and submitted to industry competition for solutions.

33.     The Air Force Project started in May 2001.

34.     The Air Force Project generated sufficient cash flow to cover approximately 80% of the Quantum Entities' expenses during the approximately 15 month performance period.

35.     In late January of 2002, the Plaintiff undertook direct management of the Air Force Project.

36.     After commencement of the Air Force Project and in order to cover the Quantum Entities' negative cash flow, Defendant Field agreed to provide a $250,000.00 certificate of deposit (the "Field Certificate of Deposit") as collateral to enable the Quantum Entities to secure a line of credit in the same amount from Christiana Bank (the "Christiana Line of Credit").

37.     The Quantum Entities obtained the Christiana Line of Credit in August of 2001.

## THE EMPLOYMENT AGREEMENT

38.     From about May 1, 2001 to about August 15, 2001, Defendant JB Elad and the Plaintiff negotiated the terms of the Plaintiff's employment with Defendant Innovations.

39.     On August 27, 2001, Plaintiff and Defendant Innovations executed an Employment Agreement for an unspecified term as an at-will employee (the "Innovations Employment Agreement").

40.     A true and correct copy of the Innovations Employment Agreement, **Marked Exhibit "A"**, is attached hereto and incorporated by reference.

41.     Pursuant to the express terms of the Innovations Employment Agreement, Defendant Innovations employed the Plaintiff as the Chief Network Building Officer of Innovations.

42.     In addition to a base salary, in paragraph 3(a)(ii) of the Innovations Employment Agreement, Defendant Innovations agreed to issue to the Plaintiff three thousand, two hundred and fifty (3,250) shares of "Granted Stock" of Innovations with the following restrictions:

> (a)     the Corporation shall have right to repurchase, for one cent ($.01) per share, 100% of the Granted Stock up to November 1, 2001 (the "Initial Vesting Date").

> (b)     After the Initial Vesting Date, the Corporation shall have the right to repurchase from the Employee, for one cent ($.01) per share, the number of shares equal to the number that results from the following formula (the "Unvested Shares"):

> X = Total number of shares of the Granted Stock
> Y = Number of calendar months that have been completed subsequent to October 31, 2001

> $[X * (.625)] - [Y * (.017361111) * X]$ = The Unvested Shares.

43.     At the time Plaintiff was wrongfully terminated by the Defendants, the Plaintiff owned 1,896 shares of Innovations stock (the "Vested Shares").

44.     The Plaintiff conditioned his execution of the Innovations Employment Agreement upon JB Elad's oral representation that (1) the Quantum Entities had no liabilities other than those set forth in their Balance Sheets and (2) Field's guarantee of a line of credit with Christiana Bank for not less than $250,000.00.

45.     At the time Plaintiff executed the Innovations Employment Agreement, the Quantum Entities had a "pipeline" of approximately $550,000 of future work and expenditures exceeded revenues by approximately $25,000 per month.

46.     On November 5, 2001 the Board of Directors of Holdings held a "special meeting" wherein the Board of Directors of Holdings ratified the issuance of three thousand, two hundred fifty (3,250) shares of restricted Common Stock of Holdings to the Plaintiff (the "Holdings Shares").

47.     The Vested Shares and Holdings Shares will collectively be referred to as the "Plaintiff's Shares."

## THE PROMOTION

48.     In February 2002, the Plaintiff was promoted to Chief Operating Officer of Innovations.

49.     In February 2002, at or about the same time as the Plaintiff was named the Chief Operating Officer of Innovations, Defendant JB Elad appointed the Plaintiff project manager of the Air Force Project, which, at the time, was the Quantum Entities' largest software project and principal source of revenue.

50.     As project manager of the Air Force Project, the Plaintiff was responsible for day-to-day management of the software development activities of approximately 10 software developers as well as coordinating testing and interaction with Space Command.

51.     At the time the Plaintiff was appointed project manager of the Air Force Project, Defendant JB Elad instructed the Plaintiff to "milk" the Air Force Project for "cash."

52.    At the time Plaintiff was appointed project manager of the Air Force Project, Defendant JB Elad also stated to the Plaintiff that Defendant JB Elad "expected nothing successful" from the Air Force Project.

53.    After the Plaintiff undertook project manager responsibilities for the Air Force Project, it became successful and was awarded the prestigious Tibbets award, which the Quantum Entities marketed to obtain additional business from the United States government.

54.    For three (3) successive months (April, May, and June of 2002), the Plaintiff agreed to accept one-half his normal monthly salary to help preserve the Quantum Entities' cash flow.

55.    On August 19, 2002, the Plaintiff received a superlative employment review that stated, among other things, that the Quantum Entities were "lucky to have you" and praised the Plaintiff for "fix[ing]" the Air Force Project.

56.    A true and correct copy of the employment review, Marked as **Exhibit "B"**, is attached hereto and incorporated by reference.

57.    At or about the time of the superlative employment review, the Quantum Entities rewarded the Plaintiff with a $250,000 life insurance policy.

### THE BUDNER PROMISSORY NOTE

58.    On or about Fall of 1998, Innovations entered into a promissory note whereby Mr. Stanley Budner, father-in-law to Defendant JB Elad, agreed to loan Innovations approximately $350,000.00 (the "Budner Liability") (collectively referred to as the "Budner-Innovations Loan Documents").

59.    At the time, Defendant JB Elad and FB Elad were the sole shareholders of Defendant Innovations.

60.     The Defendants never disclosed to the Plaintiff the Budner Liability before execution of the Innovations Employment Agreement.

61.     On July 26, 2002, the Board of Directors of Holdings resolved that in the event the Quantum Entities experienced a liquidity event of not less than $50,000,000.00, the Quantum Entities would pay Defendant JB Elad $500,000.00 for the purpose of satisfying the Budner Liability relating to the Budner-Innovations Loan Documents (the "Budner Resolution").

62.     On or about August 15, 2002, Defendant Field agreed to allow Christiana Bank ("Christiana") to receive the proceeds from the Field Certificate of Deposit that had been guaranteeing the Christiana Line of Credit in exchange for six thousand thirty (6,030) shares of Holdings.

63.     The Field Certificate of Deposit significantly reduced the Quantum Entities' financial obligations.

64.     In August 2002, as compensation for the Field Certificate of Deposit, the Board of Directors of Holdings issued six thousand thirty (6,030) shares of Holdings at a per share price of approximately forty-one dollars and fifty cents ($41.50) per share as payment for the Field Certificate of Deposit.

65.     During late August 2002, the Plaintiff discovered another set of loan documents establishing that a Quantum corporation wholly owned by Defendant JB Elad was solely liable for repaying the Budner Liability (the "Fake Budner Loan Documents.")

66.     When the Plaintiff confronted Defendant JB Elad about two sets of loan documents, in late August 2002, Defendant JB Elad told the Plaintiff that the Budner Liability was his personal obligation only and not Defendant Innovations' liability.

67.    In late August 2002, Defendant JB Elad instructed the Plaintiff to destroy the Budner Loan Documents obligating Holdings and/or Innovations to pay the Budner Liability.

68.    The Plaintiff refused to destroy either the Budner Loan Documents or the Fake Budner Loan Documents.

69.    Upon such refusal, Defendant JB Elad became extremely angry and stopped all verbal communication with the Plaintiff for several weeks.

## THE ANALYSIS

70.    At approximately the same time as Defendant JB Elad demanded that the Plaintiff destroy the Budner Loan Documents, Defendant Field instructed the Plaintiff to provide an analysis of how to reduce the Quantum Entities' expenditures and to identify all financial practices that would need to be altered to comply with demands of potential investors and/or auditors (the "Analysis").

71.    The Analysis set forth a number of recommended changes, including, among other matters, the following recommendations:

(a)    that the Quantum Entities cease paying Defendants JB Elad and FB Elad's handyman's salary as the handyman performed few or no services for the Quantum Entities;

(b)    reducing the monthly royalty payments to Research as excessive and unlikely to survive auditor scrutiny;

(c)    increase JB Elad's salary;

(d)    reduction of Defendant FB Elad's salary; and

(e)    introduction of a cost accounting system.

72.     In early September 2002, the Quantum Entities received official notice that it had been awarded a six million dollar project from the Office of Naval Research (the "Homeland Security Project").

73.     In August 2002, the Quantum Entities began an extensive hiring process, ultimately making permanent hires of approximately five (5) persons to commence work on the Homeland Security Project.

74.     During October 2002, the Quantum Entities received the Tibbetts Award from the Small Business Administration for the company's performance on the Air Force Project.

75.     The Tibbetts Award is given annually to approximately sixty (60) companies from a pool of two thousand, five hundred (2,500) companies for superlative performance on Phase II of the Small Business Innovation Research program.

76.     On or about November 5, 2002, the Plaintiff gave a well-received and successful brief to a collection of senior members of Space Command, including Lieutenant General Brian A. Arnold, regarding the Air Force Project.

## WRONGFUL TERMINATION

77.     On or about November 8, 2002, Defendant Field informed the Plaintiff that he was terminated, effective immediately.

78.     Defendant Field also assured the Plaintiff that "he would be treated fairly" and his shares, if repurchased, would be repurchased "for a fair price."

79.     Shortly after being terminated, the Plaintiff permanently moved his residence to New York.

80.    Upon information and belief, the Board of Directors of Innovations never met, as required by Section 8 of the Innovations Employment Agreement, to discuss termination of the Plaintiff.

81.    On November 18, 2002, after the Plaintiff moved to New York, Innovations sent the Plaintiff a corporate check in the amount of $13.54 to cover the repurchase of the Unvested Shares based upon the formula contained in paragraph 3(a)(ii) of the Innovations Employment Agreement.

82.    In early February 2003, the Plaintiff received a letter dated January 31, 2003 in the amount of $530.88 purporting to repurchase the Vested Shares for twenty-eight cents ($.28) per share.

83.    On or about February 18, 2003, the Plaintiff advised Defendants that the Plaintiff was rejecting the Defendants' offer to repurchase the vested shares as patently unfair and that the price was not establish pursuant to the express terms of the Innovations Employment Agreement.

84.    On March 13, 2003, Defendant JB Elad purportedly reaffirmed that the "fair market value as established by the Board of Directors was $.28/share."

85.    Upon information and belief, the Board never met to discuss the fair market value of Plaintiff's Vested Shares.

86.    On June 2, 2003, the Plaintiff sent a correspondence via facsimile to Defendant Field, Mike Bowman, and Defendant JB Elad stating that the "offer to purchase [the Plaintiff's] shares of stock is completely unacceptable."

87.    Neither, Defendant Field, Defendant JB Elad, nor any other representative of the Quantum Entities responded to the June 2, 2003 facsimile correspondence.

## FIRST CAUSE OF ACTION
### Unlawful Termination

88.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 87, inclusive, and incorporates them herein by reference.

89.    The State of Delaware has a substantial interest in officers and agents of a corporation preserving corporate records.

90.    Plaintiff was the Chief Operating Officer of Innovations and therefore responsible for all operations of the corporation, creation of corporate records, and legal matters.

91.    Defendant JB Elad instructed the Plaintiff to destroy corporate records to eliminate evidence of a substantial corporate liability.

92.    Destruction of such documents would have been a breach of the Plaintiff's fiduciary duty to Defendant Innovations and/or the Quantum Entities and unlawful.

93.    Upon information and belief, the Plaintiff was terminated for his refusal to destroy such documents.

94.    As a result of the Defendants' wrongful actions, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

## SECOND CAUSE OF ACTION
### Unlawful Termination:  Misrepresentation

95.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 94, inclusive, and incorporates them herein by reference

96.    Plaintiff executed the Innovations Employment Agreement on the express condition that the Quantum Entities disclosed all corporate liabilities.

97.     Defendant JB Elad intentionally misrepresented the extent of the debt obligations of the Quantum Entities in that he knowingly and purposefully concealed from the Plaintiff the existence of the Budner Liability in that prior to the Plaintiff becoming an employee of Innovations Defendant JB Elad stated to the Plaintiff that (a) the Quantum Entities had no further liabilities beyond those disclosed on the Quantum Entities' balance sheet and concealed the fact that the Quantum Entities, not Defendant JB Elad, was obligated to repay the Budner Liability.

98.     Plaintiff left Morris, Nichols, Arsht & Tunnel to join the Quantum Entities based, in part, upon Defendant JB Elad's misrepresentation.

99.     As a result of the Defendants' wrongful actions, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

## THIRD CAUSE OF ACTION
### Breach of Contract

100.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 99, inclusive, and incorporates them herein by reference

101.    In executing the Innovations Employment Agreement, Innovations agreed to pay a fair market value for the Vested Shares.

102.    The Defendants have refused to honor the terms of the Innovations Employment Agreement in that they have failed to pay the Plaintiff a fair market value for the Vested Shares.

103.    Based upon the default in performance and resulting breach of the Innovations Employment Agreement by the Defendants, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

## FOURTH CAUSE OF ACTION
### Conversion

104.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 103, inclusive, and incorporates them herein by reference.

105.    The Plaintiff is the rightful owner of the Vested Shares.

106.    The Defendants have converted for their own personal use and benefit the Vested Shares.

107.    The Defendants' conversion of the Vested Shares has resulted in the deprivation of the use, enjoyment and benefit of the Vested Shares to the Plaintiff.

108.    The Plaintiff has demanded that the Defendants repurchase the Vested Shares at a fair market value.

109.    The Defendants have intentionally and maliciously refused to repurchase the Vested Shares at a fair market value.

110.    As a direct and proximate result of the Defendants' wrongful conversion of the Vested Shares, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

111.    Additionally, by reason of the willful and malicious nature of the conversion, the Plaintiff is entitled to recover punitive damages in the amount of $300,000.00.

## FIFTH CAUSE OF ACTION
### Declaratory Action

112.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 111, inclusive, and incorporates them herein by reference.

113.    The Plaintiff seeks judgment as to Plaintiff's rights and ownership to the Vested Shares.

114.    Plaintiff seeks judgment that Defendants have not lawfully exercised its right to repurchase the Vested Shares.

115.    The Plaintiff seeks judgment as to Plaintiff's rights and ownership to the Holdings Shares.

116.    The Plaintiff has received no communication (such as a notice to stockholders) from any of the Defendants or the Quantum Entities in over two years even though, upon information and belief, Holdings has reorganized its capital structure during that period of time.

117.    A case and controversy exists between the parties as the Defendants have refused to repurchase the Vested Shares at a fair market value as required by the express terms of the Innovations Employment Agreement.

118.    Plaintiff has no adequate remedy at law.

119.    Plaintiff seeks a speedy hearing in respect to Plaintiff's prayer for relief regarding Plaintiff's rights and ownership in the Plaintiff's Shares.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duties

120.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119, inclusive, and incorporates them herein by reference.

121.    The wrongful conduct of Defendants JB Elad, FB Faith and Field ("Individual Defendants") constitutes a breach or breaches of fiduciary duties owed by them to the Plaintiff, as a stockholder of Innovations and/or constitutes gross mismanagement on the part of the Individual Defendants.

122.    The wrongful conduct of Individual Defendants constitutes a breach or breaches of fiduciary duties owed by them to the Plaintiff, as a minority stockholder of Holdings and/or constitutes gross mismanagement on the part of the Individual Defendants.

123.    As a direct and proximate result of the wrongful conduct of the Individual Defendants has been deprived of money and property, the full extent of which is not known.

124.    By reason of the foregoing, the Plaintiff has been damaged in the amount to be proven at trial, but in no event less than $1,000,000.00.

125.    The wrongful conduct of the Individual Defendants was gross, wanton, willful, malicious and deliberately designed to injure the Plaintiff, thereby entitling the Plaintiff to punitive damages of not less than $2,000,000.00.

**SEVENTH CAUSE OF ACTION**
**Constructive Trust to Prevent Unjust Enrichment**

126.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 125 inclusive, and incorporates them herein by reference

127.    By virtue of the Defendants' scheme and artifice to wrong the Plaintiff, the Defendant now unfairly and unjustly holds the Vested Shares.

128.    In purporting to acquire the Vested Shares under the circumstances set forth herein, the Defendants' wrongful activities are such that the Defendants may not in good conscience be allowed to retain the Vested Shares.

129.    Any further benefit to the Defendants based upon the use and enjoyment of the wrongful conversion of the Vested Shares will only result in further unjust enrichment to the Defendants.

130.    Based upon these facts and the nature of the Defendants' actions, the Court should impose a constructive trust upon the Vested Shares in favor of the Plaintiff, and declare the Defendants trustees over the Vested Shares until such time as this Court appoints an independent trustee.

131.    As trustee of the constructive trust, the Defendants should be made to account for the fair market value of the Vested Shares in Defendants' possession and control up to and through the time that this Court appoints an independent trustee and the Vested Shares are delivered to the trustee.

**WHEREFORE**, Plaintiffs demand judgment against the defendants as follows:

a.    On the **FIRST** and **SECOND CAUSES OF ACTION**, that Defendants wrongfully terminated the Plaintiff causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00;

b.    On the **THIRD CAUSE OF ACTION**, that Defendants breach the Innovations Employment Agreement causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00;

c.    On the **FOURTH CAUSE OF ACTION**, that Defendants have wrongfully converted the Plaintiff's Shares causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00; together with punitive damages in the amount of $300,000.00;

d.    On the **FIFTH CAUSE OF ACTION**, that judgment be entered declaring that the Plaintiff retains rights and ownership in the Vested Shares and Holdings Shares;

e.    On the **SIXTH CAUSE OF ACTION**, that the Individual Defendants, jointly and severally, have breached certain fiduciary duties to the Plaintiff causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $1,000,000.00; together with punitive damages in the amount of $2,000,000.00.

f.      On the **SEVENTH CAUSE OF ACTION**, that a constructive trust be imposed on the Defendants over the Vested Shares; and

g.      Against all Defendants, on all causes of action, for costs, disbursements, pre-judgment interest and post-judgment interest and such other and further relief as may be just, proper and equitable.

DATED:      Buffalo, New York
            November 4, 2005

                                   **DAMON & MOREY LLP**


                                   By: ___/s/ David S. Widenor_____
                                         David S. Widenor, Esq.
                                   1000 Cathedral Place
                                   298 Main Street
                                   Buffalo, New York 14202
                                   (716) 856-5500


954888 v2

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of August 27, 2001, by and between Quantum Leap Innovations, Inc., a Delaware corporation having a place of business at Three Innovation Way, Suite 100, Newark, Delaware 19711 (the "Corporation"), and Christian J. Henrich (the "Employee"), an individual residing in Wilmington, DE.

## W I T N E S S E T H:

WHEREAS, the Corporation and the Employee desire to set forth the terms and conditions on which, from and after August 27, 2001 (the "effective Date"), (i) the Corporation shall employ the Employee, (ii) the Employee shall render services to the Corporation and (iii) the Corporation shall compensate the Employee for such services;

WHEREAS, the Employee has provided substantial consulting services commencing upon November 1, 2000 (the "Initial Services") to the Corporation for which the Employee has, as of the Effective Date, not yet received compensation;

WHEREAS, the Initial Services were equal to approximately five hundred and twenty five (525) total hours;

WHEREAS, the Employee has agreed that the consideration received in this Agreement adequately compensates him for the Initial Services as well as future services to be provided by the Employee to the Corporation;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants herein contained, the parties agree as follows:

1.    <u>EMPLOYMENT; DUTIES</u>

    (a)    The Corporation engages and employs the Employee, and the Employee hereby accepts engagement and employment, as the Chief Network Building Officer of the Corporation. The Employee shall perform such services and duties as are normally incident to such positions and are commensurate with the Employee's background, education and professional standing, all as the Board of Directors of the Corporation (the "Board") shall reasonably determine. Such services and duties will include, but are not limited to: i) business development, ii) supporting the effort to obtain financing for the Corporation, iii) serving as a liaison between the Corporation's officers and the Board of Directors of the Corporation, and iv) serving as the primary point-of-contact between the Corporation's legal counsel and the Corporation.

    (b)    The Employee shall perform his duties hereunder from the Corporation's executive offices in the Delaware Technology park in Newark, Delaware; provided, however, that the Employee acknowledges and agrees that the performance of his duties hereunder may require domestic and international travel by the Employee.

(c)    The Employee shall devote such time and efforts to the Corporation as required for the proper discharge of his duties and responsibilities under this Agreement.

2.    TERM

The Employee's employment hereunder shall be for an unspecified term and shall be "at-will." Either the Employee or the Corporation may terminate the employment relationship at any time.

3.    COMPENSATION

(a)    As compensation for the performance of his duties on behalf of the Corporation, the Employee shall be compensated as follows:

(i)    The Corporation shall pay the Employee a base salary ("Base Salary") at the rate of ninety thousand dollars ($90,000) per annum which amount may be increased (but not decreased) by the Corporation; provided, however, that such Base Salary may be reduced below ninety thousand dollars ($90,000) in the event that there has been a general reduction in the base salaries of a majority of the senior officers of the Corporation; and provided, further, that any reduction to the Base Salary shall be proportional to such other salary reductions.

(ii)    Within sixty (100) days of the completion of the Effective Date, the Corporation shall issue the Employee three thousand two hundred fifty (3,250) shares of common stock of the Corporation, par value one cent ($.01) per share (the "Granted Stock"). The Granted Stock shall be subject to the following restrictions: the Corporation shall have right to repurchase, for one cent ($.01) per share, 100% of the Granted Stock up to November 1, 2001 (the "Initial Vesting Date"). After the Initial Vesting Date, the Corporation shall have the right to repurchase from the Employee, for one cent ($.01) per share, the number of shares equal to the number that results from the following formula (the "Unvested Shares"):

$X$ = Total number of shares of the Granted Stock
$Y$ = Number of calendar months that have been completed subsequent to October 31, 2001.

$[X * (.625)] - [Y * (.017361111) * X] =$ The Unvested Shares

By way of example, on November 30, 2001, the Employee shall have one thousand, two hundred seventy-five shares of vested Common Stock and the Unvested Shares shall equal one thousand, nine hundred seventy-five (1,975) shares. All of the shares of the Granted Stock that are no longer subject to the Corporation's right to repurchase for one cent ($.01) per share (i.e., no longer an Unvested Share) shall be referred to hereunder as the "Vested Shares".

(iii)    No share of the Granted Stock may be transferred without the written consent of the Corporation. In addition, the certificate representing the shares of the Granted Stock shall contain a legend substantially similar to the legend set forth below:

- 2 -

THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE SECURITIES LAW OF ANY JURISDICTION AND MAY NOT BE TRANSFERRED UNTIL (i) A REGISTRATION STATEMENT UNDER SUCH SECURITIES ACT OR SUCH APPLICABLE SECURITIES LAWS SHALL HAVE BECOME EFFECTIVE WITH REGARD THERETO, OR (ii) IN THE OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY, REGISTRATION UNDER SUCH SECURITIES ACT OR SUCH APPLICABLE SECURITIES LAWS IS NOT REQUIRED IN CONNECTION WITH SUCH PROPOSED TRANSFER.

THESE SHARES ARE SUBJECT TO TRANSFER RESTRICTIONS SET FORTH IN THE STOCK TRANSFER AGREEMENT BETWEEN QUANTUM LEAP HOLDINGS, INC. AND CHRISTIAN J. HENRICH DATED AUGUST 27, 2001.

(iv)    The Base Salary and the Employee's additional participation in the Corporation's stock option plan, shall be reviewed by the Corporation at the end of each year of the Employee's employment but with no obligation to effect an increase in the Base Salary or to grant additional options to purchase common stock of the Corporation.

The Corporation shall withhold all applicable federal, state and local taxes, social security and workers' compensation contributions and such other amounts as may be required by law or agreed upon by the parties with respect to the compensation payable to the Employee pursuant to this Section 3(a).

(b)    The Corporation shall reimburse the Employee for all reasonable expenses incurred by the Employee in furtherance of the business and affairs of the Corporation, including reasonable travel and entertainment, against receipt by the Corporation of appropriate vouchers or other proof of the Employee's expenditures and otherwise in accordance with such Expense Reimbursement Policy as may from time to time be adopted by the Board of Directors of the Corporation.

(c)    The Employee shall accrue paid vacation and shall be entitled to participate in all health, dental, disability, life insurance and other employee benefits plans, including any 401(k) or other retirement plans, as set forth in the Corporation's Employee Handbook, subject to eligibility, enrollment or other requirements of such plans. The Employee shall also be entitled to all other benefits generally made available to senior executive officers of the Corporation from time to time.

- 3 -

4.   REPRESENTATIONS AND WARRANTIES BY
     THE EMPLOYEE AND CORPORATION

The Employee hereby represents and warrants to the Corporation as follows:

(a)   Neither the execution and delivery of this Agreement nor the performance by the Employee of his duties and other obligations hereunder (i) violate or will violate any statute, law, determination or award or (ii) conflict with or constitute a default under (whether immediately, upon the giving of notice or lapse of time or both) any prior employment agreement, contract or other instrument to which the Employee is a party or by which he is bound;

(b)   The Employee has the full right, power and legal capacity to enter into and deliver the Agreement and to perform his duties and other obligations hereunder.  This Agreement constitutes the legal, valid and binding obligation of the Employee enforceable against him in accordance with its terms.  No approvals or consents of any persons or entities are required for the Employee to execute and deliver the Agreement or perform his duties and other obligations hereunder;

(c)   The Employee shall devote his full time, attention and energies to the business of the Corporation and shall not so long as he remains an employee of the Corporation engage in any other business activity, whether or not such business activity is pursued for gain, profit or other pecuniary advantage;

(d)   The Employee is authorized to work in the United States and will provide proof of such authorization upon request by the Corporation; and

(e)   The Employee has read the Corporation's Employee Handbook and has an opportunity to ask questions regarding the policies contained therein.

The Corporation hereby represents and warrants to the Employee as follows:

(a)   The Corporation is duly organized, validly existing and in good standing under the laws of the State of Delaware, with all requisite corporate power and authority to own its properties and conduct its business in the manner presently contemplated.

(b)   The Corporation has full power and authority to enter into the Agreement and to incur and perform its obligations hereunder.

(c)   The execution, delivery and performance by the Corporation of the Agreement does not conflict with or result in a breach or violation of or constitute a default under (whether immediately, upon the giving of notice or lapse of time or both) the certificate of incorporation or by-laws of the Corporation, or any agreement or instrument to which the Corporation is a party or by which the Corporation of any of its properties may be bound or affected.

- 4 -

5.    NON-COMPETITION

The Employee understands and recognizes that his services to the Corporation are special and unique and agrees that during the term of the Agreement and for one (1) year thereafter the Employee shall not in any manner, directly, on behalf of himself or any person, firm, partnership, joint venture, corporation, limited liability company or other business entity, enter into or engage in any business competitive with and employing the same or substantially similar technology of a type developed by the Corporation, either as an individual for his own account, or as a partner, joint venturer, executive, agent, consultant, salesperson, officer, director or shareholder of a firm, partnership, joint venture, corporation, limited liability company or other business entity operating or intending to operate within the market that the Corporation is, at the date of termination, conducting its business.    Notwithstanding the foregoing, if the Employee is terminated without Cause, as defined in Section 8 of the Agreement, this Section 5 shall not be binding on the Employee and shall have no force and effect.

6.    INVENTIONS; CONFIDENTIAL INFORMATION

(a)    All inventions, improvements, ideas, names, patents, trademarks, copyrights, and innovations (including all data and records pertaining thereto), whether or not reduced to writing, which the Employee may originate, make or conceive during the term of his employment or during the three (3) month period following the date of termination, either alone or with others, and which (i) are developed using equipment, supplies, facilities or trade secrets of the Corporation, (ii) result from work performed by the Employee for the Corporation or (iii) relate to the Corporation's business or current or anticipated research and development, shall be the exclusive property of the Corporation.

(b)    The Employee agrees that during the course of his employment and for a period of one (1) year after termination, he will not (i) disclose or make accessible to any other person, firm, partnership, joint venture, corporation, limited liability company or other business entity any technical, business and other information of the Corporation or its clients, whether or not in writing, which derives value, economic or otherwise, from not being generally known to the public or to any other person, firm, partnership, joint venture, corporation, limited liability company or other business entity who can obtain value from its disclosure or use, including, without limitation, technical or non-technical data, compositions, devices, methods, techniques, drawings, inventions, processes, financial data, financial plans, product plans, lists or information concerning actual or potential customers or suppliers, information regarding business plans and operations, methods and plans of operation, marketing strategies, sales and distribution plans or strategies, cost information, pricing strategies, and acquisition and investment plans ("Confidential Information"), (ii) use Confidential Information for himself or others, (iii) take any Confidential Information or reproductions thereof from the Corporation's facilities at any time during his employment by the Corporation, except in connection with the performance of the Employee's duties to the Corporation, or (iv) without the prior written authorization of the Corporation, publish any articles, journals or other scientific or marketing materials that contain any Confidential Information. The Employee agrees immediately to return all Confidential Information and reproductions thereof in his possession to the Corporation upon request and in any event upon termination of employment. The foregoing notwithstanding, the

- 5 -

parties acknowledge and agree that the Confidential Information of the Corporation and/or its clients shall not include the following: (a) information already in the public domain or hereafter disclosed to the public through no fault of the Employee (including but not limited to knowledge of (i) the business of other companies in the field, (ii) general business methods, and (iii) the status of patents and other technology in the field (other than those of the Corporation)); (b) general knowledge about the medical field obtained through the Employee's academic or previous general business experience; (c) information that becomes available to the Employee from a source other than the Corporation, provided that such source is not bound by a confidentiality agreement with the Corporation and otherwise has the lawful right to disclose the same; or (d) information that any governmental or judicial authority requires that the Employee disclose, provided that in such case the Employee shall use his reasonable efforts to notify the Corporation promptly of any such requirement so that the Corporation shall have an opportunity to contest it.

(c)     Any and all information conceived, developed and/or made by the Employee while in the employ of Corporation and which is or may be of use to Corporation in its business or as a business shall be disclosed promptly to the Corporation and shall be the sole and exclusive property of the Corporation or its nominee and shall become part of Corporation's "proprietary information" as defined below; and whenever requested so to do by the Corporation (whether or not Employee is in the employ of Corporation at such time) the Employee shall execute any and all applications, assignments, and other instruments or writings which the Employer shall deem necessary or desirable, in order (1) to apply for and obtain copyrights, patents or other proprietary protection in the United States and foreign countries covering said proprietary information or (2) otherwise to protect its confidential and/or proprietary status and in order to assign, transfer and convey to the Corporation or its nominee the sole and exclusive right, title and interest therein. These obligations of Employee contained in this Agreement shall continue beyond the termination, for whatever reason, of the period of employment with respect to any proprietary information conceived, developed and/or made by the Corporation or to which the Corporation obtains access during his or her employment and shall bind such Employee and his or her assigns, executors, administrators or other legal representative.

For purposes of the Agreement, "Proprietary Information" shall mean any files, methods, processes, products, equipment, systems, know-how, customer lists and information and other information (including, without limitation, research and development information), which are patented, copyrighted, trademarked or held as trade secrets or as confidential information (whether because it relates to the business of clients or to the business of the Corporation or because it is useful to the Corporation in maintaining its competitive status) by the Corporation and are related to the Corporation's (i) development and sale of software systems and products and (ii) research activities.

## 7.     INJUNCTIVE RELIEF

The Employee hereby acknowledges that the Corporation has entered into this Agreement in reliance, among other things, upon the fulfillment by the Employee of the

covenants made by the Employee in Sections 5 and 6. The parties hereto acknowledge and agree that remedies at law for any breach of the provisions of Section 5 or 6 will be inadequate and if there is a breach or threatened breach by the Employee of any provisions of Section 5 or 6, the Corporation shall, in addition to all other remedies, be entitled to injunctive relief and specific performance.

8.    TERMINATION

(a)    The Employee's employment hereunder shall begin on the Effective Date and shall continue thereafter until terminated upon the first to occur of the following events:

(i)    the death or Disability (as defined below) of the Employee;

(ii)    termination by the Board of Directors of the Corporation, either with or without Cause; or

(iii)    voluntary resignation by the Employee after providing the Corporation with at least thirty (30) days prior written notice.

(b)    Upon termination pursuant to clause (a)(i) above, the Employee (or the Employee's estate in the event of termination as a result of the death of the Employee) shall be entitled (i) to receive two (2) months salary and any other compensation or benefits required under applicable law or offered generally by the Corporation to its employees. "Disability" of the Employee shall be deemed to have occurred if the Employee, by virtue of any injury, sickness, or physical condition, is unable to perform substantially and continuously the duties assigned to the Employee hereunder for more than sixty (60) consecutive or ninety (90) non-consecutive days out of any consecutive twelve (12) month period, exclusive of any accrued vacation.

(c)    Upon termination pursuant to clause (a)(ii) for any reason other than for Cause: (i) the Employee shall be entitled to all health and other benefits described in Section 3(c) above for two (2) months unless the Employee becomes entitled to comparable health and other benefits provided by a new employer or contractor at such new employer or contractor's expense; and (ii) thereafter, the Employee shall have only those health and other benefits required by law. The Employee shall have no duty to mitigate the Corporation's obligations hereunder by seeking any employment or consulting arrangements after the Termination Date (and the receipt by the Employee of any compensation from employment or consulting arrangements following termination hereunder shall not reduce the severance compensation payable hereunder). If following the Termination Date the Employee becomes entitled to health and other benefits provided by a new employer or contractor at such new employer or contractor's expense, the Employee agrees to inform the Corporation promptly of such entitlement and to cooperate with the Corporation in terminating the Employee's coverage under the Corporation's benefit plans.

(d)    Upon termination for any reason, the Corporation shall have the right to repurchase each of the Vested Shares held by the Employee (or the Employee's estate in the

event of termination as a result of the death of the Employee) for the fair market value of such shares as shall be reasonably determined by the Board.

(e)     For purposes of this Agreement, "Cause" shall mean (i) any unlawful conduct of the Employee constituting a felony under the law, (ii) any dishonest conduct of the Employee involving moral turpitude and causing material harm to the Corporation, (iii) material substandard performance of the Employee's duties hereunder continuing beyond a period of thirty (30) days after written notice thereof by the Board of Directors or (iv) a material breach of any of the Employee's obligations (not occasioned by the Employee's death or Disability) hereunder after written notice by the Board of Directors and failure to cure within 30 days of such notice.

(f)     Upon the occurrence of a Constructive Termination Event (as defined below), the Employee shall have the right to terminate his employment with the Corporation upon at least thirty (30) days prior written notice.  In the event such notice is given by the Employee within sixty (60) days following the occurrence of any Constructive Termination Event, such termination of employment shall be deemed, for all purposes of this Agreement (including, without limitation, Section 8(c) above), as a termination of the Employee's employment by the Corporation without Cause.  As used herein, the term "Constructive Termination Event" means a material breach of or default under this Agreement by the Corporation which is not cured by the Corporation within thirty (30) days after its receipt of written notice thereof from the Employee.

9.     NOTICES

Any notice or other communication under this Agreement shall be in writing and shall be deemed to have been given upon receipt by the other party.

10.     SEVERABILITY OF PROVISIONS

If any provision of this Agreement shall be declared by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced in whole or in part, the remaining conditions and provisions or portions thereof shall nevertheless remain in full force and effect and enforceable to the extent they are valid, legal and enforceable, and no provision shall be deemed dependent upon any other covenant or provision unless so expressed herein.

11.     ENTIRE AGREEMENT; MODIFICATION

This Agreement contains the entire agreement of the parties relating to the subject matter hereof, and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein.  No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.

12.     BINDING EFFECT

The rights, benefits, duties and obligations under this Agreement shall inure to, and be binding upon, the Corporation, its successors and assigns, and upon the Employee and his legal

representatives. This Agreement constitutes a personal service agreement, and the performance of the Employee's obligations hereunder may not be transferred or assigned by the Employee.

13.    NON-WAIVER

The failure of either party to insist upon the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver or relinquishment of future compliance therewith, and said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or condition of this Agreement on the part of either party shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

14.    GOVERNING LAW; CONSENT TO JURISDICTION. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE. EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND OF ANY FEDERAL COURTS LOCATED IN THE STATE OF DELAWARE FOR ALL PURPOSES IN CONNECTION WITH ANY ACTION OR PROCEEDING THAT ARISES FROM OR RELATES TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND HEREBY WAIVES ANY RIGHT IT MAY HAVE TO PERSONAL SERVICE OF SUMMONS, COMPLAINT OR OTHER PROCESS IN CONNECTION THEREWITH, AND AGREES THAT SERVICES MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH PARTY AT SUCH PARTY'S ADDRESS PROVIDED IN, OR DETERMINED IN ACCORDANCE WITH, SECTION 9 HEREOF.

15.    INDEMNIFICATION

As additional consideration for the Employee's agreement to perform the duties outlined herein, the Employee shall be held harmless for any activity in any suit brought against the Employee for actions undertaken on behalf of the Corporation and shall be indemnified by the Corporation (and shall receive advancements of expenses) to the maximum extent provided by law.

16.    MATERIAL CHANGE

In the event of a Material Change, the Employee may elect to have the Unvested Shares and all previously granted options vest immediately. A Material Change shall be defined as (i) any purchase of not less than seventy-five percent (60%) of the shares of all classes of stock of the Corporation if all such shares are treated as a single class of stock; (ii) any merger in which the Corporation is not the surviving entity; (iii) any sale of not less than seventy-five percent (60%) of the assets of the Corporation; or (iv) any public offering pursuant to a registration statement under the Securities Act of 1933.

17.    RULES OF CONSTRUCTION; HEADINGS

Words used herein, regardless of the number and gender used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires and, as used herein, unless the context otherwise requires, the words "hereof," "herein" and "hereunder," and words of similar import, shall refer to the Agreement as a whole and not to any particular provision hereof. The term "including" shall be deemed to mean "including, without limitation." The headings contained in the Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement.

18.    SURVIVAL

The obligations of the parties in Section 6, shall survive termination of this Agreement indefinitely. The obligations of the parties in Section 5 shall survive for one (1) years upon termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

QUANTUM LEAP INNOVATIONS, INC

By:     Joseph B. Elad
Title:  Chief Executive Officer

By:     Christian J. Henrich

- 10 -

# EXHIBIT B

**Name:** Arejh

**Supervisor:** jbe

**Position / Job Description:** COO

**Goals & Objectives of Review Period\*:**
[*Section C & D (or equivalent) of previous review]

---

**Instructions:** Please complete the following form as a means to evaluating those Quantumites under your supervision. All questions refer to the last 6 months. Provide examples as necessary. This is a .dot file, please save your completed .doc files into your own directories. Thank you.

## (A) Does X uphold Quantum Leap's Core Values?

### 1. Be a pioneer

a. Does X communicate important information concerning the tasks they face and the business? Do they do more than "just follow orders?" Are they intelligent advisors - concerned that the orders make sense?
Yes to all.

b. Is X innovative? Does X generate creative, original solutions to challenges?
Yes. Quite innovative.

c. Does X enjoy challenges?
Yes. He loves them.

d. Is X too afraid of failure?
Never.

e. Is X willing to try new ideas?
Mostly. There is still a little bit of risk-averse and logic left probably from legal background. Not bad to have a bit of that.

f. Is X remaining current in his/her area of expertise?

I can't answer the legal side, but he is learning quickly on the software and AI side -- though there is much more to learn for all of us.

### 2. Reach beyond

a. Does X constantly push his/herself to succeed personally? Do they find useful work even when it is not assigned to them?
Yes.

b. Is X willing to take on tasks for the good of the team that are not within their comfort zone? Provide examples?
Always. Aug Cog Program Mgmt. is an excellent example.

### 3. Try another way

a. Does X work effectively to accomplish his/her tasks? Does X use his/her time, experience and expertise effectively? Has X actively and effectively tried to identify and avoid roadblocks?
Yes to all.

b. Does X make an adequate attempt to solve problems personally before bringing them to you?
Always.

c. Does X give up easily when forced with a challenge? Does X exhibit too much persistence?
No, no. Never.

### 4. Be Fair

a. Does X respect the organizations' efforts and co-worker's time by making meetings on time?
Yes. Perhaps the best here, though Frank is a tough competitor on that.

b. Does X give good estimates about the difficulty of accomplishing various tasks?
Yes.

c. Does X communicate closely with the others inside and beyond QL?
Yes.

d. Does X shoulder his/her share of tasks?
More than his share.

e. Is X a good team player?
Yes.

f. Does X help out co-workers?
Always.  Though some may view strong personality and attention to detail as too much – I disagree.

g. When X makes a statement, can it be relied upon?

Yes.

### 5. Respect the individual

a. When X is part of your team, do you feel comfortable that X will deliver quality work on time and being fully prepared for teamwork?
Yes.

b. Is X receptive to your input?
Mostly, when he is not I believe it is a personality trait that I have too of trying to answer before hearing the entire argument.  Input-Process-Output would solve that.

c. Does X respect his/her coworkers?  Supervisor?
Always, but sometimes it is misunderstood because of strong personality and what might be perceived by some as being too pushy, too detail oriented,  other small staff – I think that patience and a bit more maturity would solve all of that.

d. Is X a good listener?
Mostly.  Again, as for myself a bit more I-P-O would help here.

e. Does X ever act in a disruptive or team damaging way?
~~Rarely.~~ Disruptive happened in the past; ~~rarely~~ *does not* happens anymore.  That was at least 75% my fault in most cases.

**(B) State X's principle accomplishments since his/her last review:**

1. Process for managing projects
2. Financial controls and reviews
3. Personnel controls and reviews
4. Business development, yes – believe it or not – business development (e.g. SPF in USAF; DuPont/Dow Kalrez)

5. Aug Bg Program Mgmt.
6. SPF fix-up @
7. Legal work / Capital structure

8. Juris hrwrking
3 (

**(C) State 3 things you would like X to improve over the next review period:**

1. Be more patient — *realist*
2. Use more I-P-O ~~when communicating~~
3. Be ~~~~ but also optimist; it is rough in high-tech startup: we must be realists and optimists at the same time and all the time

**(D) State/describe the key tasks/projects you'd like X to focus on over the next review period:**

1. Software project mgmt. and methodologies with Barry and Irene
2. Financial controls and mgmt. with Frank
3. Business development – any contribution to this is a BIG plus in the next 12-18 months  { SPF mt btavx ; xy }
4. Patent filing process and effort – we must find a solution which allows us to continue to do this; perhaps hiring a paralegal part-time; other solutions, but this is a big concern re. process and mgmt. that I don't know how to s

**(E) Other comments/feedback:**

Lucky to have you. We are building an good team, but we will need an awesome team to win in a BIG way.



Employee _____  Date   8-19-07

Supervisor   Joseph B Ell   Date   8|19|02